# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER ARMSTRONG, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MEDICAL PROPERTIES TRUST, INC., EDWARD K. ALDAG, JR., R. STEVEN HAMNER, and J. KEVIN HANNA, <br><br> Defendants. | **Case No. 1:23-cv-008597-VSB** <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ....................................................................................... 4

JURISDICTION AND VENUE .................................................................................. 28

PARTIES ...................................................................................................................... 29

SUBSTANTIVE ALLEGATIONS ............................................................................. 30

    1.     Applicable Accounting Standards ................................................................. 30

    2.     Additional Applicable SEC Regulations ...................................................... 36

    3.     The History of MPW's Relationship With Prospect ..................................... 37

    4.     MPW Reports Results for Q1 2023, Including Developments
          With Respect to Prospect ............................................................................... 41

    5.     MPW and Prospect Enter Into the Restructuring Agreement ....................... 43

    6.     MPW Announces the Restructuring Transactions .......................................... 46

    7.     Prospect Plan Files the June 2023 NMM With the DMHC
          To Secure Approval of the Minority Interest Transaction ............................. 49

    8.     The DMHC Postpones the Effectiveness and Prohibits the Implementation of the
          Minority Interest Transaction Pending the DMHC's Further Regulatory Review ....... 52

    9.     MPW Reports Results for Q2 2023, Including $68 Million in Revenue From a
          Purported Increase in the Value of Equity in PHP Holdings Received by MPW ....... 53

    10.    The *WSJ* Reveals the Existence of the June 2023 NMM
           and the July 2023 DMHC Order .................................................................. 60

    11.    The DMHC and Prospect Plan Engage in Months of Extensive Correspondence
           Culminating in DMHC Approval of the Minority Interest Transaction on April 18,
           2024, On Condition That MPT Picasso Address the Blocking Rights and Not
           Increase Its Equity Stake in PHP Holdings Without Prior DMHC Approval .............. 66

    12.    MPW Reports Results for Q3 2023, Including $13 Million in
           Additional Revenue From the Purported $82 Million Increase in
           the Value of MPW's "Equity Interest" in PHP Holdings ............................. 70

    13.    MPW Beats Guidance for NFFO in 2023, But Only Because of the Improper
           Recognition of $82 Million in Prospect Gain in 2023 in Violation of GAAP ............. 73

14.    Defendants Aldag and Hamner Were Economically Incentivized to Conceal the June 2023 NMM and the July 2023 DMHC Order, and to Improperly Recognize the $68 Million Q2 2023 Prospect Gain and $13 Million Q3 2023 Prospect Gain ...... 74

15.    MPW Sharply Decreases the Value of MPW's Investment in PHP Holdings After Entry of the April 2024 DMHC Order ................................................ 79

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD** ................................................................. **82**

1.    Materially False and Misleading Statements and Omissions in the May 2023 Release .................................................................... 82

2.    Materially False and Misleading Statements and Omissions in the May 2023 Form 8-K .................................................................... 83

3.    Omissions That Rendered Misleading Statements in the Q2 2023 Release, During the Q2 2023 Call, and in the Q2 2023 Form 10-Q ......................... 84

4.    Materially False and Misleading Statements in the Q2 2023 Release ......................... 87

5.    Materially False and Misleading Statements During the Q2 2023 Call ..................... 89

6.    Materially False and Misleading Statements in the Q2 2023 Form 10-Q ................... 91

**LOSS CAUSATION** ......................................................................... **97**

**ADDITIONAL SCIENTER ALLEGATIONS** ................................................ **98**

**CLASS ACTION ALLEGATIONS** .......................................................... **100**

**PRESUMPTION OF RELIANCE** ............................................................ **102**

**INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE** ................................................................. **103**

**COUNT I** ...................................................................................... **103**

**COUNT II** ..................................................................................... **106**

**PRAYER FOR RELIEF** ...................................................................... **108**

**DEMAND FOR TRIAL BY JURY** .......................................................... **108**

Lead Plaintiff John Cuomo ("Lead Plaintiff") and additional Plaintiff Christopher Armstrong (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, and for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, reviewing documents produced to Plaintiffs pursuant to requests for records submitted to California's Department of Managed Health Care under the California Public Records Act; filings by Defendant Medical Properties Trust, Inc. ("MPW" or the "Company") with the United States Securities and Exchange Commission ("SEC"), and transcripts of MPW's quarterly conference calls; media stories regarding MPW; and other public information concerning MPW readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION[1]

1.    This federal securities class action is brought on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired MPW securities between May 23, 2023 and August 17, 2023, both dates inclusive (the "Class Period"), and were damaged thereby. This action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. As detailed below, Defendants—*i.e.*, MPW and three of its senior executives—made materially false and misleading statements and omissions during the Class Period concerning MPW's investment in assets related to its third largest tenant, Prospect Medical

---

[1] Any emphasis in quotations is added unless otherwise noted.

Holdings, Inc. ("Prospect"). As a result of such materially false and misleading statements and omissions, MPW investors acquired MPW securities at artificially inflated prices, and thereafter suffered substantial losses when the truth was revealed, and the risks concealed by Defendants materialized.

***MPW's Challenges With Respect to Prospect***

2.      MPW is a real estate investment trust, or REIT, that acquires and leases hospitals and other healthcare facilities. In August 2019, MPW invested approximately $1.5 billion in a portfolio of acute care hospitals in three states (California, Pennsylvania, and Connecticut) operated by Prospect.

3.      Beginning in 2020, Prospect struggled through the COVID-19 pandemic due to falling admissions, surgeries, and ER visits. As a result of, among other things, the COVID-related decline in hospital activity, and higher labor and other costs due to inflation, Prospect experienced a decline in cash flows in 2022.

4.      On February 23, 2023, in connection with reporting its fourth quarter ("Q4") 2022 and full year ("FY") 2022 results, MPW announced that it was recording a $283 million impairment charge in Q4 2022 with respect to Prospect consisting of (i) a real estate impairment of approximately $171 million related to four properties in Pennsylvania leased to Prospect, and (ii) a write-off of approximately $112 million in unbilled Prospect rent. In its Form 10-K for 2022 filed on March 1, 2023, MPW confirmed that it had reserved $112 million in non-cash rent from Prospect, and further disclosed that it expected to "record rent on our Prospect leases on a ***cash only*** basis for the foreseeable future." MPW later clarified that it had also started reporting receipt of interest from Prospect on a cash only basis.

5.      MPW's challenges with respect to Prospect were a material concern since, as of December 31, 2022, Prospect was MPW's third largest tenant on a "total asset basis" with assets related to Prospect valued at $1.48 billion, or 7.5% of MPW's total assets. Additionally, MPW disclosed in its 2022 Form 10-K as a "Concentration of Credit Risk" that revenue from Prospect represented more than 10% of MPW's total revenue in 2022. For this reason, as one J.P. Morgan analyst observed, MPW's stock price was "extremely sensitive" to "headlines and decisions" related to Prospect.

6.      To address its challenges concerning Prospect, MPW announced that it intended to reallocate capital away from real estate tied to Prospect by, among other steps, restructuring Prospect's debt, and acquiring an equity interest in Prospect's California-based managed care business that could be monetized via a subsequent sale or recapitalization. MPW estimated that it would take 12 to 18 months for Prospect to restructure, and for MPW to then monetize its equity interest in Prospect's managed care business. On a quarterly earnings call held on February 23, 2023 ("Q4 2022 Call"), MPW's Chief Executive Officer ("CEO"), Defendant Edward K. Aldag, Jr. ("Aldag"), advised analysts that "based on third-party offers and negotiations and independent valuations" Prospect's managed care business was "worth about *$1 billion*."

***Execution of Agreement to Restructure and Monetize MPW's Investment in Prospect***

7.      On May 23, 2023, as part of MPW's plan to restructure and monetize its investment in Prospect, certain wholly-owned affiliates of MPW, including MPT Picasso Investors TRS, LLC ("MPT Picasso"), entered into a restructuring agreement ("Restructuring Agreement") with Prospect, and certain wholly-owned affiliates of Prospect, including PHP Holdings LLC ("PHP Holdings"). PHP Holdings is the parent of Prospect Health Plan, Inc. ("Prospect Plan"), the affiliate that operates Prospect's managed care business in California. A copy of relevant portions

of the Restructuring Agreement cited below are annexed hereto as Exhibit A, and relevant organizational charts are annexed hereto as Exhibit B.

8.      Defendant R. Steven Hamner ("Hamner"), MPW's Chief Financial Officer ("CFO"), signed the Restructuring Agreement on behalf of MPT Picasso and other MPW affiliates in his capacity as CFO and Executive Vice President of those MPW affiliates.

9.      The Restructuring Agreement provided for a series of transactions designed to restructure Prospect-related assets held by MPW ("Restructuring Transactions"). Under Sections 3.2(a) and (b) of the Restructuring Agreement, among the Restructuring Transactions was the issuance by PHP Holdings to MPT Picasso of (i) a minority equity interest in PHP Holdings consisting of preferred equity units ("Initial PHP Preferred Units") valued at approximately $75 million, or 49% of PHP Holdings' net equity value (hereinafter, the "Minority Interest Transaction"), and (ii) a note convertible into additional PHP Preferred Units ("PHP Convertible Note") with an original principal amount of approximately $646 million. Issuance of the minority interest in PHP Holdings to MPT Picasso pursuant to the Minority Interest Transaction was accompanied by certain governance rights pursuant to a Third Amended and Restated Limited Liability Company Agreement between PHP Holdings and MPT Picasso, dated May 23, 2023 ("LLC Agreement"), and signed by Defendant Hamner on behalf of MPT Picasso.

10.     Section 3.2(c) of the Restructuring Agreement provided that issuance of the Initial PHP Preferred Units and PHP Convertible Note to MPT Picasso was intended to fully satisfy certain obligations owed by Prospect to MPW with a face value of approximately $721 million (i.e., $646 million plus $75 million). As per Exhibit A to the Restructuring Agreement, those obligations consisted of the following:

| Obligations Released for Equity Interests | Amount |
|---|---|
| Proceeds from sale of Connecticut and Pennsylvania facilities | $203M |
| Principal of two outstanding loans | $264M |
| Principal of outstanding convertible note | $50M |
| Past due rent, and past due interest on outstanding loans and note | $204M |
| **Total** | **$721M** |

11.     Section 3.2(c) of the Restructuring Agreement also provided that PHP Holdings was issuing the PHP Convertible Note in lieu of issuing additional PHP Preferred Units to MPT Picasso because the issuance of additional PHP Preferred Units (over and above the Initial PHP Preferred Units issued) was subject to the regulatory approval of, *inter alia*, the Director of California's Department of Managed Health Care ("DMHC"). In turn, (i) Section 4.1(b) of the Restructuring Agreement obligated Prospect and its affiliates to promptly submit "***a notice of material modification by or on behalf of Prospect Health Plan, Inc. to the DMHC***, which notifies and requests the approval [of] the DMHC of the [conversion of the PHP Convertible Note into equity in PHP Holdings]," and (ii) Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates that signed the Restructuring Agreement with at least three (3) business days to review and provide comments on the draft notice of material modification before it was submitted to the DMHC under Section 4.1(b).

12.     In contrast, the Restructuring Agreement did not require Prospect to seek DMHC approval before issuing the Initial PHP Preferred Units to MPT Picasso pursuant to the Minority Interest Transaction. Plainly, MPW and Prospect did not expect that the Minority Interest Transaction would require DMHC approval.

13.     Section 4.4 of the Restructuring Agreement provided that, upon receipt of all regulatory approvals—including from the DMHC—MPT Picasso would be entitled in "Phase II" of the Restructuring Transactions to convert the PHP Convertible Note into additional equity in PHP Holdings. The Restructuring Agreement contemplated receiving all such approvals by no later than November 30, 2023. However, as a fallback, in the event that DMHC approval for conversion of the PHP Convertible Note into equity was not timely received before consummation of a sale of PHP Holdings, Section 4.1(e) of the Restructuring Agreement provided for MPT Picasso to receive a share of the proceeds from any such sale equal to the share of the proceeds that it would have otherwise received from such sale had it converted the PHP Convertible Note into equity ("Fallback Provision"). The Fallback Provision did not address what would happen were the DMHC to require approval of the Minority Interest Transaction, and then decline to approve that transaction.

***MPW Announces the Restructuring Transactions***

14.     On May 23, 2023, MPW issued a press release ("May 2023 Release") announcing the Restructuring Transactions. According to the May 2023 Release, the Restructuring Transactions would, among other steps, result in the issuance of "equity interests" in PHP Holdings to MPW valued $573 million in exchange for the release of obligations as follows:

| Source of Equity Interest | Amount |
|---|---|
| Proceeds from Connecticut Hospital Sale | $103M |
| Proceeds from transfer of Pennsylvania real estate | $100M |
| Principal of two outstanding loans | $264M |
| Principal of outstanding convertible note | $50M |
| Accrued rent and interest (2022) | $56M |
| **Total** | **$573M**[2] |

15.     Even though the Restructuring Transactions were governed by the Restructuring Agreement, the May 2023 Release failed to disclose the existence of the Restructuring Agreement and its material terms, including the need for DMHC approval to convert the PHP Convertible Note into equity.

---

[2] As per MPW's SEC filings, the $148 million difference between the (i) $573 million value assigned to the equity interests and released obligations in the May 2023 Release, and (ii) the $721 million value assigned to the equity interests and released obligations under Exhibit A of the Restructuring Agreement, resulted from an unexplained marketability discount applied by MPW when calculating the fair value of the PHP Convertible Note and PHP Preferred Units. On the obligations side of the equation, the discount inexplicably adjusted only the unpaid rent and interest, which was valued at $204 million in the Restructuring Agreement, but at only $56 million in the May 2023 Release.

Notably, in a slide deck dated October 31, 2023, an analyst at Hedgeye Risk Management, a leading independent provider of real-time investment research and an online financial media company, analyzed the amounts of past due rent reported in Exhibit A of the Restructuring Agreement, in the May 2023 Release, and in MPW's SEC filings, and found glaring inconsistencies that it was unable to reconcile. Hedgeye concluded its analysis by stating that "Hedgeye continues to believe that, unless MPW management clearly and transparently addresses [Hedgeye's] questions, the company remains 'un-investible,' especially for fiduciaries. In our view, these issues raise additional questions around management's transparency and the way it conducts business."
*See* https://app.hedgeye.com/mu/prospect-rent_10-31-23?encoded_data=fL75!iWZDoMFHHAMwa6WMYBQZzUdlD5c= (last visited on October 30, 2024).

16.     On May 25, 2023, MPW filed a Form 8-K disclosing the Restructuring Transactions, which attached the May 2023 Release as an exhibit. The Form 8-K was filed under Item 8.01, which requires a reporting company to disclose "any events, ***with respect to which information is not otherwise called for by this Form***, that the registrant deems ***of importance to security holders***," thus conceding the materiality of the Restructuring Transactions. Item 1.01 of Form 8-K, however, "calls for" a company that has entered into a material agreement not made in the ordinary course of business to briefly describe the material terms of that agreement. Since the Restructuring Transactions were concededly material and not in the ordinary course, the Restructuring Agreement governing the Restructuring Transactions was also material and not in the ordinary course, and thus MPW was obligated to briefly describe the material terms of the Restructuring Agreement under Item 1.01, including the need for DMHC approval to convert the PHP Convertible Note into equity, and the assumption that DMHC approval was not required to consummate the Minority Interest Transaction. Instead, MPW provided an incomplete description of the Restructuring Transactions under Item 8.01.

17.     The failure to disclose the Restructuring Agreement in the May 2023 Release rendered the May 2023 Release materially false and misleading because reasonable MPW investors would have understood from its contents that the Restructuring Transactions were a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW. For example, on May 25, 2023, the Motley Fool investment website published an article entitled "***With a Major Tenant Issue Addressed***, *Is Medical Properties Trust's Ultra-High-Yielding Dividend Finally Safe?*" The article observed that under the Restructuring Transactions, MPW was "making a big shift in its relationship with Prospect," essentially exchanging "rental income from hospital real estate for

upside potential in the managed-care business," the value of which will ideally grow, and enable MPW "to eventually sell its equity interests at a profit."[3] In another article entitled "*Medical Properties Trust Got A Base Hit*," an investor opined that by virtue of the Restructuring Transactions, "it does appear that MPW management can now **put the Prospect issues in the 'resolved' column** so that management can now tackle more issues."[4]

18.    Plainly, reasonable MPW investors would have deemed it important to learn about the emergence of any regulatory risk to the Restructuring Transactions, including the Minority Interest Transaction. As discussed below, MPW failed to advise MPW investors about developing regulatory risk to the Minority Interest Transaction from the DMHC.

***The Minority Interest Transaction Unexpectedly Becomes Subject to DMHC Approval***

19.    As discussed in further detail below, under Section 1399.65 of Article 10.2 of Chapter 2.2 of Division 2 of the California Health and Safety Code, a health care service plan like Prospect Plan that intends to enter into an agreement resulting in a change of "control" must give "notice to, and secure prior approval from" the DMHC, and may not consummate the agreement until such approval is obtained. In order to obtain such approval, the health plan must file "all the information necessary for the [DMHC] director to make the determination to approve, ***conditionally approve***, ***or disapprove***" the agreement. Under Section 1352 of Article 3 of Chapter 2.2 of Division 2 of the California Health and Safety Code, requests for DMHC approval of a change in control are made by filing what is known as a notice of material modification.

---

[3] *See* https://www.fool.com/investing/2023/05/25/with-a-major-tenant-issue-addressed-is-medical-pro/ (last visited on October 27, 2024).

[4] *See* https://seekingalpha.com/article/4607079-medical-properties-trust-got-a-base-hit) (last visited on October 27, 2024).

20.    As noted, the Restructuring Agreement did not contemplate that issuance of a minority equity interest in PHP Holdings to MPW pursuant to the Minority Interest Transaction would require DMHC approval. But as per a filing by Prospect Plan with the DMHC on June 23, 2023, at some point after execution of the Restructuring Agreement, the DMHC had "expressed a preference that the submission" of the Minority Interest Transaction "be processed as a notice of material modification." Although Prospect Plan disputed that the Minority Interest Transaction required DMHC approval under Section 1399.65, it agreed to "provide the information and documentation that would ordinarily be submitted in connection with a notice of material modification." Accordingly, on June 23, 2023, before the close of MPW's Q2 2023, Prospect Plan filed a Notice of Material Modification ("June 2023 NMM") with the DMHC seeking approval under Section 1399.65 of MPT Picasso's acquisition of a minority equity interest in PHP Holdings pursuant to the Minority Interest Transaction.

21.    The June 2023 NMM contended that the Minority Interest Transaction was not a change of "control" requiring DMHC approval under Section 1399.65 since it transferred only a minority interest in PHP Holdings to MPT Picasso. The June 2023 NMM acknowledged, however, that (i) "MPT was not previously included in PHP's chain of ownership and the Minority Interest Transaction was not [merely] an internal restructuring," and (ii) pursuant to the Minority Interest Transaction, MPT Picasso had been granted "blocking rights with respect to certain major decisions of [PHP Holdings]." While the June 2023 NMM argued that these blocking rights "do not entitle [MPT Picasso] to exercise direction or control over the day-to-day business or governance of [PHP Holdings] or [Prospect Plan], the care of any subscribers or enrollees or any decisions regarding health plan contracting or provider networks, and that [MPT Picasso] is simply

a passive investor in [PHP Holdings]," MPT Picasso's blocking rights subsequently became a subject of substantial concern for the DMHC.

22.    In sum, contrary to expectations, the DMHC required Prospect Plan to seek regulatory approval of the Minority Interest Transaction under Section 1399.65. This development—occurring before the end of Q2 2023—created a risk that the DMHC might only approve the Minority Interest Transaction subject to onerous conditions, or disapprove the Minority Interest Transaction altogether. The latter outcome would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions). And while the Fallback Provision purported to address MPW's economic rights in the event of a failure to timely secure regulatory approval for conversion of the PHP Convertible Note into equity, it did not address a failure to secure regulatory approval of the Minority Interest Transaction.

23.    Moreover, the process for approving the Minority Interest Transaction might drag out, thus putting consummation of the Restructuring Transactions in limbo for a considerable amount of time until Prospect and MPW resolved any concerns about the Minority Interest Transaction that the DMHC might raise during its review (which is what ultimately occurred, as described below). Indeed, as one Wells Fargo analyst prophetically remarked after first learning in August 2023 about the need for DMHC approval of the Minority Interest Transaction, "regulatory snags have a tendency to drag on."

24.    As noted, Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates that signed the Restructuring Agreement with at least three (3) business days to review and provide comments to any notice of material modification before it was submitted to the DMHC. Since Defendant Hamner was the MPW

representative who signed the Restructuring Agreement, and was closely monitoring the Restructuring Transactions, it is reasonable to infer that no later than June 20, 2023 (*i.e.*, three (3) business days before the June 2023 NMM was submitted), Defendant Hamner would have become aware that the Minority Interest Transaction had unexpectedly become subject to significant regulatory risk. Additionally, given the importance of the Restructuring Transactions to MPW, and how closely Aldag monitored the Restructuring Transactions together with Hamner, it is also reasonable to infer that Aldag was also promptly made aware that the Minority Interest Transaction had unexpectedly become subject to significant regulatory risk.

***The DMHC Suspends the Effectiveness and Prohibits the Implementation of the Minority Interest Transaction***

25.    On July 20, 2023, in response to the June 2023 NMM, the DMHC sent a letter to Prospect Plan with extensive comments attached ("July 2023 DMHC Letter") (i) disputing that the Minority Interest Transaction was not a change of "control" under Section 1399.65 that could be implemented without prior DMHC approval, and (ii) inquiring into the "blocking rights" that had been granted to MPT Picasso. The July 2023 DMHC Letter further advised Prospect Plan that an order ("July 2023 DMHC Order") had been entered "***postpon[ing] the effectiveness of the material modification of the Plan or its operations*** as proposed in the [June 2023 NMM], and thereby ***prohibit[ing] the Plan from implementing the terms of the [June 2023 NMM]*** until the Director issues a subsequent Order approving the [June 2023 NMM]."

26.    The July 2023 DMHC Order stated in relevant part that "the terms of the Notice of Material Modification filed on June 23, 2023, ***proposing a change of control resulting from a Minority Interest Transaction***, ***are postponed as of the date set forth below*** for the reasons stated in the letter attached hereto and incorporated herein by reference. This Order shall remain in effect until revoked or superseded by further Order of the Director."

27.     The July 2023 DMHC Order heightened the regulatory risk to the Minority Interest Transaction that had already become apparent to Defendants no later than June 20, 2023. In particular, the July 2023 DMHC Letter and attached comments ("Comments Table") incorporated by reference into the July 2023 DMHC Order indicated that the DMHC intended to thoroughly review the circumstances of the Minority Interest Transaction, including the blocking rights granted to MPT Picasso. Consequently, the DMHC might raise additional concerns about the Minority Interest Transaction during the course of its review (which is what ultimately occurred), and might ultimately disapprove the Minority Interest Transaction. A refusal by the DMHC to approve the Minority Interest Transaction would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

28.      The DMHC gave Prospect Plan until September 13, 2023 to respond to the July 2023 DMHC Letter. Copies of the July 2023 DMHC Letter and attached Comment Table, and July 2023 DMHC Order are annexed hereto as Exhibit C.

***Defendants Ignore the June 2023 NMM and the July 2023 DMHC Order When Reporting Q2 2023 Results***

29.     Meanwhile, on August 8, 2023, MPW issued a press release ("August 2023 Release") announcing its results for the Q2 2023 ending on June 30, 2023, including an update concerning the Restructuring Transactions. That same day, MPW also held a conference call ("Q2 2023 Call") during which Defendants Aldag and Hamner discussed the Restructuring Transactions with analysts. Subsequently, on August 9, 2023, MPW filed its Form 10-Q for Q2 2023 ("Q2 2023 Form 10-Q), which detailed the accounting for the Restructuring Transactions.

30.     Despite becoming aware no later than June 20, 2023, of substantial regulatory risk to the Minority Interest Transaction, Defendants failed to disclose the June 2023 NMM and the

July 2023 DMHC Order in the August 2023 Release and the Q2 2023 Form 10-Q, and/or during the Q2 2023 Call, when discussing the issuance of equity under the Restructuring Transactions. Instead, when reporting Q2 2023 results, MPW acted as if there were *no regulatory risk at all* to the Minority Interest Transaction from the DMHC, and recorded a purported *increase* in the fair value of MPW's equity interest in PHP Holdings to $655 million—up $82 million from the $573 million originally reported on May 23, 2023. In turn, from this $82 million increase in value, MPW recognized $68 million in revenue in Q2 2023 from the "receipt of equity" in PHP Holdings under the Restructuring Agreement in lieu of payment of previously unrecorded rent and interest contractually owed by Prospect during Q1 and Q2 2023 ("Q2 2023 Prospect Gain").[5]

31.    Recognizing the non-cash $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 was inconsistent with the accounting treatment of non-cash gain from Prospect-related assets previously described in MPW's SEC filings, which had stated that, as of January 1, 2023, MPW was recognizing rent and interest from Prospect on a cash only basis. Indeed, on April 27, 2023, Hamner had stated on a conference call discussing Q1 2023 results that "[as] we reported last quarter, we are currently recognizing prospect rental income *only as cash is received, and prospect paid no rent or interest during the quarter*."

***Defendants' Public Statements Concerning MPW's Results During Q2 2023 Were Materially False and Misleading***

32.    The multiple statements by Defendants in the August 2023 Release and the Q2 2023 Form 10-Q, and during the Q2 2023 Call, concerning the issuance of equity in PHP Holdings

---

[5] The actual amount of the Q2 2023 Prospect Gain reported in MPW's Q2 2023 Form 10-Q consisted of $55.3 million in rent owed during Q2 2023, and $13.5 million in interest owed during Q1 and Q2 2023, for a total of $68.8 million. As discussed below, the remaining approximately $13 million of the $82 million purported increase in the fair value of MPW's interests in PHP Holdings was recognized as rent and interest revenue in Q3 2023.

to MPW pursuant to the Restructuring Transactions (as if such issuance was a done deal), were rendered misleading by Defendants' failure to disclose the filing of the June 2023 NMM, and the postponement of the effectiveness and bar on the implementation of the Minority Interest Transaction under the July 2023 DMHC Order pending the DMHC's review. The June 2023 NMM and the July 2023 DMHC Order were critical qualifying facts, the disclosure of which would have significantly altered the total mix of information for MPW investors by making them aware of a substantial regulatory risk to the issuance of equity in PHP Holdings to MPW, *i.e.*, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether. The latter outcome would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

33.    Additionally, recognition of the $68 million Q2 2023 Prospect Gain as revenue on account of the purported increase in the value of MPW's equity interest in Prospect violated Generally Accepted Accounting Principles, or GAAP. Specifically, the $68 million "gain" from the receipt of equity under the Restructuring Agreement was subject to contingencies (*i.e.*, the DMHC's approval of the Minority Interest Transaction and the conversion of the PHP Convertible Note into equity), and GAAP bars recognizing contingent gains as revenue due to uncertainty as to whether the relevant contingency will resolve favorably. Indeed, as discussed below, a key contingency here—DMHC approval of the Minority Interest Transaction—was not resolved until ***April 18, 2024***, when the DMHC finally entered an order ("April 2024 DMHC Order") approving the Minority Interest Transaction, but only after Defendant Hamner first signed certain "undertakings" addressing numerous concerns that the DMHC had flagged during its detailed review of the Minority Interest Transaction ("April 2024 Undertakings"). A copy of the April 2024

DMHC Order and accompanying letter of the DMHC, and the April 2024 Undertakings, is annexed hereto as Exhibit D.

34.    Even though MPW's premature recognition and reporting of the Q2 2023 Prospect Gain violated GAAP, the Form 10-Q for Q2 2023 reporting those items was (i) signed by Defendant J. Kevin Hanna ("Hanna"), MPW's Chief Accounting Officer ("CAO"), and (ii) certified as compliant with GAAP, and not containing any materially false and misleading statements or omissions, by Defendants Hamner and Aldag.[6]

***Defendants Aldag and Hamner Had Strong Economic Incentives to Conceal the June 2023 NMM and the July 2023 DMHC Order, and Improperly Recognize Purported "Gains" From MPW's Receipt of Equity in PHP Holdings as Revenue in 2023***

35.    Aldag and Hamner had strong economic incentives to conceal the contingency created by the June 2023 NMM and the July 2023 DMHC Order, and prematurely recognize as much revenue as possible in 2023 from MPW's receipt of equity in PHP Holdings—to boost their annual cash bonuses and Performance-Based Share awards. Under MPW's 2023 executive compensation program ("2023 Comp Program"), Aldag and Hamner were eligible to receive annual cash bonuses and Performance-Based Share awards, based on whether certain performance metrics were met or exceeded. One of those metrics was Normalized Funds From Operations, or NFFO. Because NFFO is a key performance metric for MPW, the 2023 Comp Program assigned a weighting of 50% to NFFO when calculating annual cash bonuses—the highest weighting among all of the relevant performance metrics.

36.    According to MPW, investors and analysts following REITs like MPW utilize funds from operations, or FFO, as a key supplemental performance measure. Using its net income

---

[6] SEC regulations (17 C.F.R § 210.4-01(a)(1)) state that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles ***will be presumed to be misleading or inaccurate*** . . ."

or loss under GAAP as a starting point, MPW calculates FFO by excluding items like depreciation and amortization, impairment charges, and gains or losses on sales of real estate. Normalized FFO, of NFFO, then "adjusts FFO for items that relate to unanticipated or ***non-core events or activities*** or accounting changes that MPW believes, if not noted, would make comparison to prior period results and market expectations ***less meaningful to investors and analysts***."

37.    By prematurely recognizing the Q2 2023 Prospect Gain derived from the Restructuring Transactions as "revenue" in Q2 2023 before the undisclosed contingency arising from DMHC's review of the Minority Interest Transaction was resolved—and by not excluding the Q2 2023 Prospect Gain from NFFO even though it derived from a non-core event (*i.e.*, the Restructuring Transactions)—MPW was able to boost NFFO in Q2 2023 by nearly 30% from $0.37 per share to $0.48 per share.

38.    Moreover, in Q3 2023 (ending on September 30, 2023), MPW "doubled down" on its improper accounting with respect to Prospect, and improperly recognized another $13 million in "gain" ("Q3 2023 Prospect Gain") as revenue from the receipt of equity under the Restructuring Agreement in lieu of payment of rent and interest accrued in Q3 2023, even though (i) it remained unclear as of September 30, 2023, whether the DMHC would approve the Minority Interest Transaction from which the $13 million Q3 2023 Prospect Gain derived, and (ii) as noted, under MPW's accounting policies, NFFO is supposed to exclude gains like the Q3 2023 Prospect Gain that derive from "non-core events or activities" like the Restructuring Transactions in order to avoid making comparison to "prior period results and market expectations less meaningful to investors and analysts."

39.    Taken together, the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain resulted in premature recognition of $82 million in revenue in 2023 from a purported "gain" from the receipt

of equity under the Restructuring Agreement ("2023 Prospect Gain") before the contingency of DMHC approval of the Minority Interest Transaction was resolved. In turn, by prematurely recognizing the $82 million 2023 Prospect Gain—and failing to exclude such gain from NFFO because it derived from a non-core event—MPW boosted NFFO in 2023 by $0.14 per share. Without the additional NFFO of $0.14 per share in 2023, NFFO in 2023 would have dropped to $1.45 per share, and missed not only the "Maximum" benchmark of $1.50 per share, but also the "Target" benchmark of $1.46 per share under the annual cash bonus calculation for Aldag and Hamner. In turn, missing the "Maximum" and "Target" benchmarks for NFFO in 2023 would have reduced Aldag's annual cash bonus in 2023 by $1 million, and reduced Hamner's annual cash bonus in 2023 by $422,000. (*See* calculations in tables in paragraph 190 below).

40.     Additionally, besides NFFO, another performance metric used to calculate annual cash bonuses (with a 20% weighting)—as well as the issuance of Performance-Based Share awards (with a 50% weighting)—was Earnings Before Interest Taxes Depreciation and Amortization, or EBITDA, which is a non-GAAP measure of profitability. To the extent prematurely recognizing the 2023 Prospect Gain boosted revenue, it also boosted the "earnings" used to calculate EBITDA. Exceeding the "Maximum" benchmark for the EBITDA/Interest Expense ratio in 2023, added another $600,000 to Aldag's annual cash bonus, and another $304,000 to Hamner's annual cash bonus. Additionally, in 2023, MPW issued Performance-Based Share awards to Aldag and Hamner with calculated values of $8.25 million, and $4.125 million, respectively, based on meeting certain targets for EBITDA (which, as noted, was weighted 50% for purposes of granting such awards).[7]

---

[7] Notably, on April 15, 2024, in connection with MPW's maneuverings with respect to its largest tenant, Steward Health Care, United States Senators Elizabeth Warren (D-Mass.) and Edward J. Markey (D-Mass.) sent a letter to Aldag accusing MPW of running a "Ponzi scheme" with respect to Steward by continuing "to provide capital to Steward, which allowed the hospital system to

***The Wall Street Journal Reveals the Existence of the June 2023 NMM and the July 2023 DMHC Order***

41.     The existence of the June 2023 NMM and the July 2023 DMHC Order was finally revealed by the *Wall Street Journal* ("*WSJ*") on August 18, 2023, when it published an article concerning the DMHC's review of the Minority Interest Transaction (based on materials that the *WSJ* had secured from the DMHC via a requests for records submitted under the California Public Records Act). The article observed that it was not "clear how Prospect would pay MPT if the [DMHC] rejected the deal permanently." It also questioned recognition of the $68 million Q2 2023 Prospect Gain as revenue in light of the uncertainty created by the June 2023 NMM and the July 2023 DMHC Order. A copy of the *WSJ* article is annexed hereto as Exhibit E.

***MPW's Stock Price Drops Upon Publication of the WSJ Article Even as MPW Seeks to Reverse the Decline With a False and Misleading Rebuttal***

42.     Upon publication of the *WSJ* article, MPW's stock price fell approximately 15% in intraday trading. Then, at approximately 1:50 P.M., the NYSE halted trading in MPW's stock pending an announcement from MPW. Thereafter, at 2:26 P.M, in an effort to reverse the decline, MPW issued a materially false and misleading press release purporting to rebut the *WSJ* article. Among other things, MPW's press release claimed that (i) the DMHC's "hold" on the Minority Interest Transaction was an "expected" and "non-controversial" part of the DMHC approval process; (ii) MPW expected DMHC to approve the Minority Interest

---

continue paying rent to MPT . . . [which] allowed MPT to avoid devaluing its real estate purchases and the leases that it held, ***bolster its stock price***, ***and report lucrative cash flows***."

*See* https://www.warren.senate.gov/newsroom/press-releases/warren-markey-call-out-medical-properties-trust-and-macquarie-infrastructure-partners-for-exploiting-steward-hospitals-urge-them-to-help-keep-the-hospitals-open and https://www.warren.senate.gov/imo/media/doc/2024.04.15%20MPT%20and%20Macquarie%20Letter.pdf (last visited on October 30, 2024).

Transaction in due course once the additional information requested by the DMHC was provided; (iii) even in the event of non-approval, the PHP Convertible Note had "identical economics to equity;" and (iv) the recording of the "$68 million equity investment as revenue in the second quarter was fully consistent with accounting requirements, and was entirely unrelated to the DMHC approval process."

43.    The statements in MPW's purported rebuttal were materially false and misleading because (i) MPW had *not* expected a "hold" on the Minority Interest Transaction, as evidenced by the fact that the Restructuring Agreement did not condition the Minority Interest Transaction on DMHC approval (a fact of which MPW investors would have been unaware since MPW never disclosed the Restructuring Agreement in its SEC filings); (ii) the "hold" placed by the DMHC on the Minority Interest Transaction was "controversial" because it was contrary to MPW's expectation that the Minority Interest Transaction would not require DMHC approval; (iii) MPW would not have had any idea when the Minority Interest Transaction might be approved since the July 2023 DMHC Order indicated that the DMHC intended to thoroughly investigate the circumstances of the Minority Interest Transaction, including the "blocking rights" granted to MPT Picasso, and as a Wells Fargo analyst observed, "regulatory snags have a tendency to drag on" (indeed, as noted, the DMHC's review ultimately dragged on for nearly ten months after submission of the June 2023 NMM until the DMHC finally approved the Minority Interest Transaction in April 2024, but only after Defendant Hamner signed the April 2024 Undertakings); (iv) the Fallback Provision in the Restructuring Agreement (which attempted to replicate the economics of a conversion of the PHP Convertible Note into equity) did not address the adverse impact were the DMHC to invalidate the Minority Interest Transaction; (v) recognition of the $68 million Q2 2023 Prospect Gain violated GAAP, for the reasons discussed above; and (vi)

recognition of the $68 million Q2 2023 Prospect Gain as revenue was clearly related to the DMHC approval process since that process created a contingency that barred recognition of that revenue until the contingency was resolved.

44.    After the publication of MPW's false and misleading "rebuttal" of the *WSJ* article, MPW's stock price partially reversed its earlier decline, but still closed down at $6.93 per share on August 18, 2023, a decline of $0.57 per share, or 7.6%, from the prior close of $7.50 per share on August 17, 2023. This decline represented a loss of $341 million in market capitalization (based on approximately 598 million MPW shares outstanding as of August 18, 2023).

45.    Three days later, on August 21, 2023, a J.P. Morgan analyst downgraded MPW from "Neutral" to "Underweight," and reduced its price target from $9.00 per share to $7.00 per share. Likewise, a Wells Fargo analyst reduced its price target for MPW from $8.00 per share to $7.00 per share, and advised investors "to monitor developments related to" the DMHC's approval since "regulatory snags have a tendency to drag on" (which, as noted, is precisely what happened).

46.    The Wells Fargo analyst also questioned "how the $68m of PHP equity made it into MPW's revenue line" since it was a non-cash item that would not be converted into cash until MPW monetized its equity interest in Prospect's managed care business. Another analyst at Hedgeye Risk Management ("Hedgeye"), a leading independent provider of real-time investment research and an online financial media company, was more blunt denigrating the $68 million Q2 2023 Prospect Gain as "Bullsh*t PHP Equity Booked as Rent." These criticisms were well-founded given that (i) Defendants had repeatedly publicly stated that after December 31, 2022, MPW had begun recording rent and interest due from Prospect on a "cash only" basis, and (ii) the $68 million Q2 2023 Prospect Gain did not represent a cash receipt, but was merely a purported

increase in the value of the yet unmonetized equity in PHP Holdings issued under the Restructuring Agreement.

**MPW Continues to Violate GAAP After the Class Period**

47.     Notwithstanding the *WSJ*'s disclosure of the June 2023 NMM and the July 2023 DMHC Order, and the ongoing regulatory review of the Minority Interest Transaction by the DMHC, MPW continued to violate GAAP after the Class Period by booking another $13 million in revenue in Q3 2023 from the previously reported $82 million increase in the value of MPW's interest in Prospect's managed care business. Also in Q3 2023, MPW reported another $30 million increase in the value of MPW's interest in Prospect's managed care business. But conducting itself inconsistently, MPW did *not* book that additional increase in value as revenue in Q3 2023. Defendants provided no explanation for this inconsistent accounting treatment of increases in the value of MPW's interest in Prospect other than citing "accounting requirements."

**The DMHC's Review of the Minority Interest Transaction Drags Out Until April 2024**

48.     After the *WSJ* revealed the June 2023 NMM and the July 2023 DMHC Order, correspondence between Prospect Plan and the DMHC concerning the DMHC's review and approval of the Minority Interest Transaction continued to drag out (as Wells Fargo had predicted). In response to the DMHC's concerns about the blocking rights, Prospect Plan advised the DMHC on October 25, 2023, that, among other things, MPT Picasso Investors TRS had "assured [Prospect] Plan that it has no intention or desire to be an impediment to Plan's continued compliance" with certain prior undertakings signed by Prospect Plan concerning its funding requirements. This assurance confirmed that Prospect Plan had remained in close contact with MPT Picasso's representatives (which would have included Defendant Hamner) concerning the

back-and-forth correspondence with the DMHC concerning review and approval of the Minority Interest Transaction.

49.     On December 22, 2023, however, Prospect Plan threw in the towel with respect to conversion of the PHP Convertible Note into equity, advising the DMHC that MPT Picasso had "determined not to pursue a full conversion of the convertible note, has no current plans to convert the remaining amount of its convertible note into equity, and therefore no additional filing will be forthcoming." Based on that representation, Prospect Plan asked the DMHC to approve the Minority Interest Transaction.

50.     When the DMHC demanded an explanation for abandonment of the conversion of the PHP Convertible Note into equity, Prospect Plan explained that, among other things, "the continuing delays in approving the filings are resulting in undue expense and burden on the parties." This statement further confirms that DMHC approval of the Minority Interest Transaction was material to MPW.

51.     The DMHC finally approved the Minority Interest Transaction on April 18, 2024, pursuant to the April 2024 DMHC Order—***nearly ten months after the initial filing of the June 2023 NMM on June 23, 2023***. As a condition precedent to the approval, the DMHC obligated Defendant Hamner to sign the April 2024 Undertakings. *See* Exhibit D.

***MPW Reduces the Value of its Interest in Prospect by $360 Million***

52.     On May 29, 2024—just over a month after issuance of the April 2024 Order—MPW advised that (i) "on May 23, 2024**,** Prospect's investment bankers informed us that they had received updated indications of interest from prospective bidders for PHP Holdings," and (ii) "based on our consideration of information in the updated indications, along with consultations with our third party appraisers, we recorded as of March 31, 2024, ***a $201 million <u>unfavorable</u>***

***fair value adjustment***, *resulting in a total investment in PHP Holdings of approximately* ***$500 million*** *at March 31, 2024*."

53.     The $201 reduction in the value of MPW's interest in Prospect to $500 million as of March 31, 2024, constituted a 50% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call.

54.     Then in its Q2 2024 Form 10-Q filed on August 9, 2024, MPW advised that it had further adjusted the value of its investment in Prospect downward by another $160 million from $500 million to $340 million as of June 30, 2024, based on "our consideration of information in the indications of interest and discussions with the investment bankers, along with consultations with our third party appraisers."

55.     The $340 million valuation of MPW's interest in Prospect as of June 30, 2024, constituted a 66% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call. Based on timing, it is reasonable to infer that the April 2024 Undertakings and the April 2024 DMHC Order contributed to the sharp reduction in the value of MPW's interest in Prospect's managed care business in Q1 and Q2 2024—MPW's investment bankers advised MPW about the reduced bids on ***May 23, 2024***, just over a month after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order. Moreover, the total reduction in value reported in Q1 and Q2 2024—$360 million—closely matched the drop in value that occurred (approximately $340 million) when the *WSJ* revealed the existence of the June 2023 NMM and the July 2023 DMHC Order on August 18, 2023.

* * *

56.     In sum, as evidenced by the substantial decline in the market value of MPW's securities when the *WSJ* disclosed the June 2023 NMM and the July 2023 DMHC Order on August

18, 2023, Defendants' materially false and misleading statements and omissions during the Class Period concerning MPW's investment in Prospect led Plaintiffs and other Class members to acquire MPW shares during the Class Period at artificially inflated prices, which resulted in substantial losses when the truth was revealed.

<u>**JURISDICTION AND VENUE**</u>

57.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

58.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act.

59.    Venue is proper in this District under 15 U.S.C. § 78aa(a) because an act or transaction constituting the violations alleged herein occurred in this District. Specifically, MPW's stock traded under the ticker "MPW" on the New York Stock Exchange ("NYSE"), which is headquartered in this District. *See Avalon Holdings Corp. v. Gentile*, 2019 WL 4640206, at *4 (S.D.N.Y. Sept. 24, 2019) (venue proper for Exchange Act claim in Southern District of New York under 15 U.S.C. § 78aa(a) because stock traded on the NYSE) (citing *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003)). Additionally, MPW maintains corporate office space in New York City. Venue is also proper in this District under 28 U.S. Code § 1391(b).

60.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

61.    Lead Plaintiff John Cuomo acquired MPW securities at artificially inflated prices during the Class Period, as set forth in his previously-filed Certification (Dkt. No. 18-3), and was damaged as a result of the revelation of the alleged corrective disclosures, and materialization of undisclosed risks.

62.    Additional Plaintiff Christopher Armstrong acquired MPW securities at artificially inflated prices during the Class Period, as set forth in his previously-filed Certification (Dkt. Nos. 1-1 and 1-2), and was damaged as a result of the revelation of the alleged corrective disclosures, and materialization of undisclosed risks.

63.    Defendant MPW is a Maryland corporation with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35242. MPW's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "MPW".

64.    Defendant Edward K. Aldag, Jr. ("Aldag") served as MPW's CEO and President at all relevant times. Aldag was also Chairman of MPW's board of directors ("Board") at all relevant times.

65.    Defendant R. Steven Hamner ("Hamner") served as MPW's Executive Vice President and CFO at all relevant times. Hamner was also a member of the Board at all relevant times.

66.    Defendant J. Kevin Hanna ("Hanna") served as MPW's Vice President, Controller, and CAO at all relevant times.

67.    Defendants Aldag, Hamner, and Hanna are sometimes referred to herein collectively as the "Individual Defendants."

68.     The Individual Defendants possessed the power and authority to control the contents of MPW's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of MPW's SEC filings and press releases alleged herein to be materially false and misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with MPW, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

69.     MPW and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**1.     Applicable Accounting Standards**

70.     Public reporting companies like MPW are required to prepare their publicly filed financial statements in accordance with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures defining accepted accounting practice at a particular point in time.

71.     Since 1973, the SEC has entrusted the maintenance of GAAP to the Financial Accounting Standards Board ("FASB"), which periodically updates or revises GAAP in light of new accounting and legal developments. The Accounting Standards Codification ("ASC") published by the FASB is the single authoritative source of GAAP for public reporting companies like MPW.

72.    SEC regulations (17 C.F.R § 210.4-01(a)(1)) state that "[f]inancial statements filed with the Commission **which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate**, despite footnote or other disclosures, unless the Commission has otherwise provided."

73.    Additionally, SEC regulations (17 C.F.R. § 229.601(b)(31)) obligate CEOs and CFOs of public reporting companies like MPW to certify in annual reports on Form 10-K, and quarterly reports on Form 10-Q, that they (i) have reviewed the applicable annual or quarterly report, and it does not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," (ii) "are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," and (iii) have . . . [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes **in accordance with generally accepted accounting principles**." MPW's Form 10-Q for Q2 2023 contained the foregoing certifications signed by Defendants Aldag and Hamner.

74.    Several ASCs promulgated by FASB are relevant to an understanding of the GAAP violations committed by Defendants. *First*, ASC 825-10, allows companies to value financial assets using what is known as the "fair value option." Under ASC 820-10-35-37, fair value reporting provides for three distinct levels of inputs when valuing financial assets. Level 1 assets can be valued using observable market inputs such as daily stock prices. Level 2 assets cannot be valued using readily-available market inputs, but can be accurately valued using comparable and

observable data points. Level 3 assets have no independent market prices, and thus their value cannot be determined from observable inputs such as publicly quoted market prices. Instead, Level 3 assets must be valued using unobservable inputs such as a company's own data, and known risks that other entities in a like situation would consider when pricing the assets.[8]

75.     Here, as discussed below, MPW disclosed that it valued its interest in Prospect as a Level 3 asset using fair value accounting principles. Yet, MPW's SEC filings do not indicate that MPW ever took DMHC's regulatory review of the Minority Interest Transaction into account when valuing its interest in Prospect even though the DMHC's review increased the risk that the Minority Interest Transaction might be invalidated. Such a risk would discount the value of MPW's interest in Prospect.

76.     *Second*, ASC-450-10-20 defines a contingency as "[a]n existing condition, situation, or *set of circumstances involving uncertainty as to possible gain* (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Thus, under ASC-450-10-20, a "gain contingency" is "[a]n existing condition, situation, or *set of circumstances involving uncertainty as to possible gain to an entity*

---

[8] *See* ASC 820-10-35-53 ("Unobservable inputs shall be used to measure fair value to the extent that relevant observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. However, the fair value measurement objective remains the same, that is, an exit price at the measurement date from the perspective of a market participant that holds the asset or owes the liability. *Therefore, unobservable inputs shall reflect the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk.*"); ASC 820-10-35-54 ("Assumptions about risk include the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and the risk inherent in the inputs to the valuation technique. *A measurement that does not include an adjustment for risk would not represent a fair value measurement if market participants would include one when pricing the asset or liability.*"); ASC 820-10-35-54A ("A reporting entity shall develop unobservable inputs using the best information available in the circumstances, *which might include the reporting entity's own data*.").

that will ultimately be resolved when one or more future events occur or fail to occur." Here, as noted, no later than June 20, 2023, Defendants were aware of regulatory risk in the form of uncertainty as to whether the DMHC would approve the Minority Interest Transaction, thus rendering DMHC approval of the Minority Interest Transaction a "gain contingency."

77.    *Third*, ASC 450-30-25-1 provides that a "contingency that might result in a gain usually ***should not be reflected in the financial statements because to do so might be to recognize revenue before its realization***." In other words, the ASC generally bars the recognition of a gain subject to a contingency before the contingency is resolved because doing so constitutes the premature recognition of revenue that might never be realized if the contingency resolves unfavorably. Here, as noted, MPW prematurely recognized the Q2 2023 Prospect Gain as revenue before the contingency regarding DMHC approval was resolved, thus recognizing revenue before its realization.

78.    *Fourth*, ASC 450-30-50-1 provides that "[a]dequate disclosure shall be made of a contingency that might result in a gain, but care shall be exercised to avoid misleading implications as to the likelihood of realization." Here, MPW made no disclosure in its SEC filings or other public communications concerning the June 2023 NMM, or the DMHC's review of the Minority Interest Transaction under the July 2023 DMHC Order.

79.    *Fifth*, under ASC 855-10-20, there are two types of subsequent events that can occur *after* the closing date for financial statements, but *before* the release of such financial statements to the public. The first type of subsequent events (Type I) consist of "material events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet." Here, the issuance of the July 2023 DMHC Order *after* June 30, 2023 (the balance sheet date for Q2 2023), but *before* August 8, 2023 (the release date of Q2 2023 results), provided

additional evidence concerning a condition that existed before June 30, 2023, *i.e.*, the regulatory risk posed to the Minority Interest Transaction by the DMHC's request that review and approval of the Minority Interest Transaction under Section 1399.65 proceed as a notice of material modification. This risk was apparent to Defendants no later than June 20, 2023 (the date by which Prospect Plan would have been obligated to share the June 2023 NMM with Defendant Hamner and other MPW representatives for comment before submitting it to the DMHC on June 23, 2023).

80.      *Sixth*, under ASC 855-10-25-1A, an SEC filer like MPW "shall evaluate subsequent events through the date the financial statements are issued," and under ASC 855-10-25-1, "[a]n entity **shall recognize** in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet [i.e., Type 1], including the estimates inherent in the process of preparing financial statements." ASC 855-10-55-1 provides the following example of a subsequent event—analogous to the issuance of the July 2023 DMHC Order—that must be recognized under ASC 855-10-25-1:

> ***If the events that gave rise to litigation had taken place <u>before</u> the balance sheet date*** and that litigation is settled after the balance sheet date but before the financial statements are issued or are available to be issued, for an amount different from the liability recorded in the accounts, then the settlement amount should be considered in estimating the amount of liability recognized in the financial statements at the balance sheet date.

81.      Here, as noted, MPW recognized the Q2 2023 Prospect Gain as revenue, even though the issuance of the July 2023 DMHC Order was a Type 1 subsequent event that provided additional evidence concerning regulatory risk that was already apparent no later than June 20, 2023, because of the DMHC's insistence that review and approval of the Minority Interest Transaction under Section 1399.65 proceed as a notice of material modification. The July 2023 DMHC Order thus heightened the uncertainty posed by the existing contingency of DMHC

approval of the Minority Interest Transaction. By booking the $68 million Q2 2023 Prospect Gain despite the heightened uncertainty posed by the July 2023 DMHC Order, MPW violated GAAP.[9]

82.    In addition to the above GAAP principles, also relevant to the allegations herein is MPW's internal accounting policy, which calculates two non-GAAP metrics commonly used by investors and analysts to evaluate REITs like MPW—FFO and NFFO:

> Investors and analysts following the real estate industry utilize funds from operations, or FFO, as a supplemental performance measure. FFO, reflecting the assumption that real estate asset values rise or fall with market conditions, principally adjusts for the effects of GAAP depreciation and amortization of real estate assets, which assumes that the value of real estate diminishes predictably over time. We compute FFO in accordance with the definition provided by the National Association of Real Estate Investment Trusts, or Nareit, which represents net income (loss) (computed in accordance with GAAP), excluding gains (losses) on sales of real estate and impairment charges on real estate assets, plus real estate depreciation and amortization, including amortization related to in-place lease intangibles, and after adjustments for unconsolidated partnerships and joint ventures.

> In addition to presenting FFO in accordance with the Nareit definition, we disclose *normalized FFO, which adjusts FFO for items that relate to unanticipated or non-core events or activities or accounting changes that, if not noted, would make comparison to prior period results and market expectations less meaningful to investors and analysts*.[10]

---

[9] The second type of subsequent events (Type II) consist of events or transactions that "provide evidence about conditions that did *not* exist at the date of the balance sheet but arose subsequent to that date." While, under ASC 855-10-25-3, an "entity shall not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date but before financial statements are issued or are available to be issued," ASC 855-10-50-2 provides that "[s]ome non-recognized subsequent events may be of such a nature *that they must be disclosed to keep the financial statements from being misleading*. For such events, an entity shall disclose the following: a. The nature of the event [and] b. an estimate of its financial effect, or a statement that such an estimate cannot be made." ASC 855-10-55-2 provides the following example of a Type II subsequent event: "[s]ettlement of litigation *when the event giving rise to the claim took place after the balance sheet date* but before financial statements are issued or are available to be issued."

[10] MPW's exclusion of items relating to "non-core events" from NFFO is analogous to the definition of "revenue" in the ASC Master Glossary, which defines "revenue" as comprised of "[i]nflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities *that constitute the entity's ongoing major or central operations*."

83.     As discussed below, MPW's recognition of the Q2 2023 Prospect Gain as revenue in MPW's income statement, and failure to disclose the June 2023 NMM and the July 2023 DMHC Order, violated ASC 450-30-25-1, ASC 450-30-50-1, and ASC 855-10-25-1. Notwithstanding these GAAP violations, Defendants Aldag and Hamner certified the Q2 2023 Form 10-Q reporting the Prospect Gain as compliant with GAAP, and Hanna signed the Q2 2023 Form 10-Q.

84.     Further, inclusion of the Q2 2023 Prospect Gain in NFFO for 2023 violated MPW's own internal accounting policy concerning calculation of NFFO, which should exclude gains like the $68 million Q2 2023 Prospect Gain that derive from "non-core events or activities" like the Restructuring Transactions in order to avoid making comparison to "prior period results and market expectations less meaningful to investors and analysts."

## 2.     Additional Applicable SEC Regulations

85.     The SEC requires a reporting company to file a Form 8-K within four business days after the occurrence of an event required to be disclosed in a Form 8-K. Item 1.01 of Form 8-K requires a reporting entity to disclose the date, the parties, and a brief description of the material terms and conditions of any "material definitive agreement not made in the ordinary course of business." A "material definitive agreement means an agreement that provides for obligations that are material to and enforceable against the registrant."

86.     Under Item 8.01 of Form 8-K, a "registrant may, at its option, disclose under this Item 8.01 any events, ***with respect to which information is not otherwise called for by this Form***, that the registrant deems of importance to security holders." Thus, when certain information is otherwise called for by Form 8-K—such as under Item 1.01—a reporting company cannot rely on Item 8.01 to disclose such information.

87.     Item 601 of the SEC's Regulation S-K requires publicly-traded companies to attach a "material contract . . . [that] is executed or becomes effective during [a] reporting period" as "an exhibit to the Form 10–Q or Form 10–K filed for the corresponding period" (17 C.F.R. § 229.601(a)(4)). The regulation defines a "material contract" as a "contract not made in the ordinary course of business that is material to the registrant and is to be performed in whole or in part at or after the filing of [a quarterly or annual report]." (17 C.F.R. § 229.601(b)(10)(i)(A)).

### 3.     The History of MPW's Relationship With Prospect

88.     MPW is a REIT formed in 2003 to acquire and lease hospitals and other healthcare facilities. As of December 31, 2022, MPW had investments in 444 facilities and approximately 44,000 licensed beds in 31 states in the U.S., seven countries in Europe, Australia, and in Colombia in South America.

89.     In August 2019, MPW invested approximately $1.5 billion in a portfolio of acute care hospitals in three states (California, Pennsylvania, and Connecticut) operated by Prospect.

90.     Beginning in 2020, Prospect struggled through the COVID-19 pandemic due to falling admissions, surgeries, and ER visits. As a result of the COVID-related decline in hospital activity, and the impact of higher labor and other costs due to inflation, Prospect experienced a decline in cash flows during 2022.

91.     On October 5, 2022, MPW announced the sale of three Prospect hospital facilities in Connecticut to Yale New Haven Health ("Yale") for approximately $457 million ("Connecticut Hospital Sale"). According to MPW's 2022 Form 10-K filed on March 1, 2023 ("2022 Form 10-K"), the Connecticut Hospital Sale was "expected to close in 2023 subject to certain regulatory approvals and the completion of Yale's acquisition of the hospital operations from Prospect."[11]

---

[11] As of the close of Q2 2024 on June 30, 2024, the Connecticut Hospital had still not closed. Instead, Yale sued Prospect to exit the agreement on the ground that Prospect violated the terms

92.     On February 23, 2023, in connection reporting its Q4 2022 and Full Year 2022 results, MPW announced that it was recording a $283 million impairment charge with respect to Prospect consisting of (i) a real estate impairment of approximately $171 million related to four properties in Pennsylvania leased to Prospect, and (ii) a write-off of approximately $112 million in unbilled Prospect rent. MPW also provided an estimate of NFFO in 2023 of $1.50 to $1.65 per share.

93.     Subsequently, in its 2022 Form 10-K, MPW reiterated that it had recorded a $283 million impairment charge with respect to Prospect in Q4 2022 consisting of a "$171 million impairment on the Pennsylvania real estate and a $112 million reserve on non-cash rent." MPW further disclosed that it expected to "record rent on our Prospect leases on a *cash only basis* for the foreseeable future."

94.     MPW's challenges with respect to Prospect were a material concern since, as of December 31, 2022, Prospect was MPW's third largest tenant on a "total asset basis" with assets attributable to MPW's relationship with Prospect valued at $1.48 billion, or 7.5% of total assets. The 2022 Form 10-K further disclosed under a section entitled "Concentration of Credit Risks," that revenue from Prospect represented more than 10% of MPW's total revenue in 2022. For this reason, as one J.P. Morgan analyst observed, MPW's stock price was "extremely sensitive" to "headlines and decisions" related to Prospect.

---

of the agreement, and left the facilities in "dire" condition. *See* https://www.healthcaredive.com/news/yale-new-haven-health-prospect-medical-holdings-lawsuit-connecticut-hospital-acquisitions/715489/. In turn, Prospect has sued Yale to close the transaction, alleging that Yale "actively worked to prevent" the deal closing in a bid to get a lower purchase price, and "knew it was purchasing struggling hospitals" and had agreed to acquire the facilities on an "as-is" basis. *See* https://www.healthcaredive.com/news/prospect-lawsuit-yale-new-haven-connecticut-acquisition/718436/

95.    To address its challenges concerning Prospect, MPW decided to reallocate capital away from real estate tied to Prospect by, among other steps, restructuring Prospect's debt and acquiring an equity interest in Prospect's managed care business that could be monetized. On the Q4 2022 Call held on February 23, 2023, Aldag described the plan for MPW to recover its investment in Prospect by taking a stake in Prospect's managed care business via an equity interest in PHP Holdings, and then monetizing that interest via a sale or recapitalization of the managed care business (which he said was currently worth $1 billion):

> In conjunction with Prospect's continuing progress in improving its East Coast operations and strategies, we have decided to fully exit our non-California Prospect investments and reallocate that capital to new investments.
>
> ***At the end of this period of transition, we expect that we will have recovered and have available for reinvestment, most or all of our original investment plus any interim deferrals of rent through the following; as we have alluded to in recent months, Prospect owns a valuable managed care business that we believe, <u>based on third-party offers and negotiations and independent valuations is currently worth about $1 billion</u>***.
>
> More immediately, we continue to expect the pending sale to the Yale New Haven Health System of our Connecticut hospitals to close by late next quarter. We do anticipate also that as hospital operations and financial results improve over the next several quarters, our Pennsylvania hospitals will become increasingly attractive acquisition targets. And proceeds from their future sale will provide additional resources for reinvestment.
>
> The accounting adjustment in the fourth quarter to recognize an impairment acknowledges the possibility that such proceeds may be less than our original investment. ***However, we expect the value of the managed care business will significantly exceed the aggregate amount of the fourth quarter impairment***.

96.    Thereafter, Hamner provided guidance for MPW's NFFO in 2023 based on assumptions about Prospect's payment of rent and interest in 2023, and the timing of any monetization of MPW's anticipated interest in Prospect's managed care business:

> [O]ur 2023 guidance estimates take into account the range of our expectations about rent and interest that may not be paid during that period. So, today, we are providing our estimate of calendar 2023 normalized FFO. The following may help investors

bridge from our fourth quarter 2022 normalized FFO annualized run rate of about $1.71 to our guidance range of approximately $1.50 to $1.65 for normalized FFO [in 2023] on a calendar basis.

Starting with the $1.71. Contractual rent escalations will add about $0.05 a share and the impact of rent and interest income from acquisitions and dispositions and the Common Spirit Utah transaction, their related cash proceeds and interest expense with respect to transactions in the fourth quarter and through today, is an aggregate pro forma of another $0.03 a share.

So, those estimates on their own would yield a guidance estimate of approximately $1.79 of normalized FFO on a Prospect-neutral basis. *That is as if Prospect paid all its 2023 rent and interest obligations.*

Our estimates of potential outcomes regarding Prospect range from a worst-case scenario, in which case we would recognize no rent or interest, to our more reasonably expected likely outcome that we recognize most of our California and Connecticut rent, but nothing from the Pennsylvania investment.

The per share range of these scenarios would be 2023 normalized FFO of between $1.50 and $1.65 and that is what we reported in this morning's press release.

Even at the $1.65 high end of our 2023 guidance, *it does not consider incremental FFO that would be created by the recycling of our current investment in our Prospect East Coast investment, assuming succession [sic] the restructuring and monetization of Prospect's managed care business*.

97.    Based on Defendant Hamner's comments above, MPW expected that it would recoup its equity interest in Prospect's managed care business via a monetization of that business in the form of a sale or recapitalization, and *only then* would recognize the cash receipts from such monetization as FFO.

98.    During the Q&A session that followed prepared remarks, Hamner and Aldag further addressed the Minority Interest Transaction:

**Austin Wurschmidt** (KeyBanc Capital Markets)

*And then I was hoping that you could maybe share with us how to think about sort of the monetization of the managed care? Do you expect to receive proceeds, I guess, from the sale of their managed care business? Or could you end up in some scenario with just a partial investment in that business down the line that maybe takes longer to monetize and ultimately reinvest the proceeds?* I mean, is

there any time line you can give us on when you expect to received that investment? Or proceeds from that investment?

**Steven Hamner**
Yes, I think it's the 12 to 18 months that Ed mentioned earlier. That business, as probably many on this call are aware, is *very, very vibrant, very, very attractive right now* . . .

And to try to anticipate kind of beyond a 12 to 18-month sale process, which could involve any number of alternatives, and I won't mention them here. *But that's our expectation is that -- we hope not to end up with a long-term equity type investment, and we don't think that's the likely outcome. We think it's more likely that there will be a sale or a recapitalization that will recover at least and possibly more than our investment in the East Coast properties*.

**Edward Aldag**
You're absolutely right. It is our intent as we work through this to push forward sales sooner rather than later, but there are other issues that [we] have to work through.

4.    **MPW Reports Results for Q1 2023, Including Developments**
      **With Respect to Prospect**

99.    On April 27, 2023, via a Form 8-K, MPW issued a press release reporting net income of $0.05 per share, and NFFO of $0.37 per share, in Q1 2023 (which ended on March 31, 2023). The press release advised that included in Q1 2023 net income is "approximately $90 million of impairment and other non-cash charges related to the expected sale of hospitals and *no rent or interest revenue recognized from Prospect leases or loan investments*."

100.    On April 27, 2023, MPW held a conference call with analysts to discuss Q1 2023 results ("Q1 2023 Call"). With respect to Prospect-related matters, Defendant Aldag advised analysts that the Connecticut Hospital Sale "continues to move along positively." Aldag also stated that Prospect's "managed care business continues to grow its membership and its profits. It continues to exceed budgets. *We remain confident that our overall investment in prospect will be fully realizable from that investment*."

41

101.    Later on the Q1 2023 Call, Defendant Hamner explained that MPW's results in Q1 2023 reflected, among other things, no rent or interest revenue recognized from Prospect leases or loan investments since as "we reported last quarter, we are currently recognizing prospect rental income *only as cash is received, and prospect paid no rent or interest during the quarter*." Hamner further explained on the Q1 2023 Call that unpaid rent from Prospect would be converted into an equity interest in Prospect's managed care business via PHP Holdings: Prospect's "rent deferral, whatever it may be, goes into our interest in the managed care company."

102.    In its Form 10-Q for Q1 2023 ("Q1 2023 Form 10-Q"), filed on May 10, 2023, MPW disclosed that, in late March 2023, Prospect received a binding commitment from several lenders that was expected to provide Prospect with liquidity to pay down certain debt. Alongside these commitments from third-party lenders, MPW also disclosed that it had agreed to pursue certain anticipated transactions with Prospect that would result in the following:

- maintaining the master lease covering six California hospitals with no changes in rental rates or escalator provisions, and with the expectation that Prospect will begin making cash payments for approximately 50% of the contractual monthly rent due on these California properties starting in September 2023;

- transitioning the Pennsylvania properties back to Prospect in return for a mortgage on the facilities;

- providing up to $75 million in a loan secured by a first lien on Prospect's accounts receivable and certain other assets;

- *obtaining a non-controlling ownership interest in PHP Holdings* (the managed care business of Prospect), equal in value to unpaid rent and interest, approximately $264 million in outstanding loans, and various other obligations due and owing at the time such interest would be conveyed; and

- completing the previously disclosed Connecticut Hospital Sale.

103.    The Q1 2023 Form 10-Q further disclosed that as part of the above series of anticipated "capital restructuring transactions," MPW originated a $50 million convertible loan

("$50M Convertible Note") to PHP Holdings, which was "convertible into equity of PHP Holdings."

104.    Additionally, the Q1 2023 Form 10-Q clarified that both rent *and* interest from Prospect were being recognized on a *cash basis* ("[i]n the first quarter of 2023, [MPW] began accounting for Prospect revenue on a cash basis and did not recognize any rent or interest revenue in the quarter.").

105.    As of March 31, 2022, Prospect remained MPW's third largest tenant on a "total asset basis" with assets attributable to MPW's relationship with Prospect valued at $1.53 billion, or 7.8% of total assets.

### 5.    MPW and Prospect Enter Into the Restructuring Agreement

106.    On May 23, 2023, to effectuate the Restructuring Transactions, Prospect, PHP Holdings, and various other Prospect affiliates entered into the Restructuring Agreement with various MPW affiliates, including MPT Picasso. *See* Exhibit A.

107.    The Restructuring Agreement was signed by Defendant Hamner on behalf of MPT Picasso and other MPW affiliates that were parties to the Restructuring Agreement in his capacity as CFO and Executive Vice President of those affiliates.

108.    Among the Restructuring Transactions provided for under the Restructuring Agreement was the Minority Interest Transaction providing for the issuance by PHP Holdings to MPT Picasso of a minority equity interest in PHP Holdings consisting of the Initial PHP Preferred Units valued at approximately $75 million, or 49% of PHP Holdings' net equity value. The Restructuring Agreement also provided for the issuance of the PHP Convertible Note to MPT Picasso with an original principal amount of approximately $646 million.

109.     Issuance of the minority interest in PHP Holdings to MPT Picasso pursuant to the

Minority Interest Transaction was accompanied by certain governance rights pursuant to the LLC

Agreement, dated May 23, 2023, and signed by Defendant Hamner on behalf of MPT Picasso.

110.     Section 3.2(c) of the Restructuring Agreement provided that the issuance of the

Initial PHP Preferred Units and PHP Convertible Note by PHP Holdings to MPT Picasso was

intended to fully satisfy certain obligations owed by Prospect to MPW with a face value of

approximately $721 million (i.e., $646M+75M). As per Exhibit A to the Restructuring Agreement,

those obligations consisted of the following:

| Obligations Released for Equity Interests | Amount |
|---|---|
| Proceeds from sale of Connecticut and Pennsylvania facilities | $203M |
| Principal of two outstanding loans | $264M |
| Principal of outstanding convertible note | $50M |
| Past due rent and past due interest on outstanding loans and note | $204M |
| Total | $721M |

111.     Section 3.2(c) of the Restructuring Agreement also provided that PHP Holdings

was issuing the PHP Convertible Note in lieu of issuing additional PHP Preferred Units to MPT

Picasso because the issuance of additional PHP Preferred Units (over and above the Initial PHP

Preferred Units issued) was subject to the regulatory approval of, *inter alia*, the Director of the

DMHC. In turn, (i) Section 4.1(b) of the Restructuring Agreement obligated Prospect Plan to

promptly submit "***a notice of material modification by or on behalf of Prospect Health Plan, Inc.***

***to the DMHC***, which notifies and requests the approval [of] the DMHC of the [conversion of the

PHP Convertible Note into equity in PHP Holdings];" and (ii) Section 4.1(c) of the Restructuring

Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates

that signed the Restructuring Agreement with at least three (3) business days to review and provide comments on the notice of material modification to be submitted to the DMHC under Section 4.1(b) ("Three Business Day NMM Review Requirement").

112.    In contrast, the Restructuring Agreement did not require Prospect to seek DMHC approval before issuing the Initial PHP Preferred Units to MPT Picasso pursuant to the Minority Interest Transaction. Plainly, MPW and Prospect did not expect that the Minority Interest Transaction would require DMHC approval

113.    Section 4.4 of the Restructuring Agreement provided that, upon receipt of all regulatory approvals—including from the DMHC—MPT Picasso would be entitled in "Phase II" of the Restructuring Transactions to convert the PHP Convertible Note into additional equity in PHP Holdings. The Restructuring Agreement contemplated receiving all such approvals by no later than November 30, 2023. However, under the Fallback Provision in Section 4.1(e) of the Restructuring Agreement, if DMHC approval for conversion of the PHP Convertible Note into equity was not timely received before consummation of a sale of PHP Holdings, MPT Picasso was entitled to receive a share of the proceeds from any such sale equal to the share of the proceeds that it would have otherwise received from such sale had it converted the PHP Convertible Note into equity. The Fallback Provision did not address what would happen if the DMHC required approval of the Minority Interest Transaction and then failed to approve that transaction.

114.    As evidenced by the May 23, 2023 press release announcing the Restructuring Transactions (*see* next paragraph), the Restructuring Agreement was plainly a "material contract" under Item 601 of SEC's Regulation S-K since it was concededly "not made in the ordinary course of business," and was "to be performed in whole or in part" over time. Yet, MPW did not attach the Restructuring Agreement as an exhibit to its Q2 2023 Form 10-Q, even though the

Restructuring Agreement was executed on May 23, 2023, during Q2 2023. Nor did MPW attach the Restructuring Agreement to any of its subsequent Form 10-Qs or Form 10-Ks.

115.    Had MPW attached the Restructuring Agreement to its Form 10-Q for Q2 2023 filed with the SEC on August 9, 2023, MPW investors would have learned that conversion of the PHP Convertible Note into equity was subject to the approval of the DMHC under Section 4.1(b) of the Restructuring Agreement. They would have also learned that MPW did *not* expect to require DMHC approval for the Minority Interest Transaction. The failure to attach the Restructuring Agreement as an exhibit to the Q2 2023 Form 10-Q thus evidences an intent to conceal information regarding DMHC approval from MPW investors.

**6.    MPW Announces the Restructuring Transactions**

116.    On May 23, 2023, via a Form 8-K, MPW issued the May 2023 Release announcing the Restructuring Transactions. According to the May 2023 Release, "MPT continues to have strong conviction in the embedded value of the Prospect platform and has structured its master leases and security agreements to provide collateral value in addition to its real estate interests, ***including interests in the equity of Prospect's managed care business***." The May 2023 Release further stated that MPW expected to "reconstitute" its Prospect-related assets, by among other things:

- A $457 million investment in MPT's Connecticut real estate which, as previously announced, Yale New Haven Health is expected to acquire in a transaction that is expected to close during 2023's third quarter. MPT's investment was expected to be fully recovered through cash proceeds of $355 million at closing, ***and equity interests in Prospect's managed care business valued at $103 million***;

- A first lien mortgage loan of $150 million, ***and equity interests in the managed care business valued at $100 million***, resulting from the transfer to Prospect of Pennsylvania real estate with a book value of $250 million; and

- Loans aggregating approximately $264 million, and accrued rent and interest of approximately $56 million, along with the previously announced $50 million convertible

loan to PHP Holdings (the managed care entity of Prospect) ***are expected to be recovered through equity interests in the managed care business***.

117.    Based on the foregoing disclosures, the market value of MPW's equity interest in Prospect's managed care entity, PHP Holdings, as a result of the Restructuring Transactions, was estimated at $573 million (reduced from the face value of $721.6 million reflected in the Restructuring Agreement, based on a discount for lack of marketability that MPW never adequately explained):

| Source of Equity Interest | Amount |
|---|---|
| Proceeds from Connecticut Hospital Sale | $103M |
| Transfer of Pennsylvania real estate | $100M |
| Aggregated loans (i.e., $151M Mortgage Loan and $112M Term Loan) | $264M |
| Convertible loan | $50M |
| Accrued rent and interest (2022) | $56M |
| **Total** | **$573M**[12] |

118.    The May 2023 Release, however, failed to disclose the existence of the Restructuring Agreement and its material terms, including the need for DMHC approval to convert the PHP Convertible Note into equity, and implementation of the Minority Interest Transaction without prior DMHC approval. The failure to disclose the Restructuring Agreement thus rendered the May 2023 Release materially false and misleading because reasonable MPW investors would have understood from its contents that the issuance of an equity interest in Prospect's managed care business to MPW was a "done deal" without any further requirements or conditions outside

---

[12] *See* footnote 2 above.

the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW.

119.    On May 25, 2023, MPW filed a Form 8-K ("May 2023 Form 8-K") disclosing the Restructuring Transactions, which attached the May 2023 Release as an exhibit. The Restructuring Transactions were disclosed under Item 8.01 of the May 2023 Form 8-K, thus conceding the materiality of the Restructuring Transactions. But since the Restructuring Transactions were concededly material, the Restructuring Agreement governing the Restructuring Transactions was "a material definitive agreement," and thus MPW was obligated to describe the material terms of the Restructuring Agreement under Item 1.01 of the May 2023 Form 8-K. Instead, apparently to avoid disclosing anything about DMHC approval, MPW provided an incomplete description of the Restructuring Transactions under Item 8.01 of the May 2023 Form 8-K, and made no disclosure of the Restructuring Agreement under Item 1.01. That rendered the May 2023 Form 8-K materially misleading because reasonable MPW investors would have understood from the Form 8-K that the issuance of equity interests in Prospect's managed care business to MPW was a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW.

120.    And that is in fact what reasonable MPW investors took away from the announcement of the Restructuring Transactions. For example, on May 25, 2023, the Motley Fool investment website published an article entitled "***With a Major Tenant Issue Addressed****, Is Medical Properties Trust's Ultra-High-Yielding Dividend Finally Safe?*" The article observed that under the Restructuring Transactions, MPW was "making a big shift in its relationship with Prospect," essentially exchanging "rental income from hospital real estate for upside potential in the managed-care business," the value of which will ideally grow, and enable MPW "***to eventually***

48

*sell its equity interests at a profit*." In another article entitled "*Medical Properties Trust Got A*

*Base Hit*," an investor opined that by virtue of the Restructuring Transactions, "it does appear that

MPW management can now **put the Prospect issues in the 'resolved' column** so that management

can now tackle more issues."

121. Plainly, reasonable MPW investors would have deemed it important to learn about

the emergence of any regulatory risk to the Restructuring Transactions, including the Minority

Interest Transaction. As discussed below, MPW failed to advise MPW investors about developing

regulatory risk to the Minority Interest Transaction from the DMHC.

### 7. Prospect Plan Files the June 2023 NMM With the DMHC To Secure Approval of the Minority Interest Transaction

122. Prospect's managed care business, Prospect Plan, is regulated by the State of

California. Under Section 1399.65(a)(1) of Article 10.2 of Chapter 2 of Division 2 of the California

Health and Safety Code, a health care service plan like Prospect Plan that intends to "enter into an

agreement resulting in its purchase, acquisition, *or control by*, *any entity*" must "**give notice to,**

**and secure prior approval from**, the [director of the DMHC]."

123. Under Section 1399.65(a)(2), the relevant agreement may not be completed until

the Director approves the transaction that is the subject of the agreement.

124. Under Section 1399.65(a)(3), a health care service plan like PHP Holdings'

subsidiary, Prospect Plan, seeking approval of an agreement to consummate a transaction

described in subsection (a)(1) must file "all the information necessary for the director to make the

determination to approve, **conditionally approve**, or **disapprove**" the agreement.

125. Under Section 1352(b) of Article 3 of Chapter 2.2 of Division 2 of the California

Health and Safety Code, requests for approval of a change in control are made by filing a notice

of material modification with the DMHC: "[p]rior to a material modification of its plan or

49

operations, a plan shall give notice thereof to the director, who shall, within 20 business days or such additional time as the plan may specify, by order approve, disapprove, suspend, or postpone the effectiveness of the change."

126.    As noted, the Restructuring Agreement did not contemplate that the Minority Interest Transaction would require DMHC approval. But as per the June 2023 NMM, at some point after execution of the Restructuring Agreement, the DMHC had "expressed a preference that the submission" of the Minority Interest Transaction "be processed as a notice of material modification." Although Prospect Plan disputed that the Minority Interest Transaction required DMHC approval under Section 1399.65, it agreed to "provide the information and documentation that would ordinarily be submitted in connection with a notice of material modification." Accordingly, on June 23, 2023, before the close of MPW's Q2 2023, Prospect Plan filed the June 2023 NMM (Filing No. 20232846) seeking DMHC approval of the Minority Interest Transaction, which it depicted in the following chart:



127.    The June 2023 NMM contended that the Minority Interest Transaction was not a change of "control" requiring DMHC approval under Section 1399.65 since it transferred only a minority interest in PHP Holdings to MPT Picasso. The June 2023 NMM acknowledged, however, that (i) "MPT was not previously included in PHP's chain of ownership and the Minority Interest Transaction was not [merely] an internal restructuring," and (ii) pursuant to the Minority Interest Transaction, MPT Picasso had been granted "blocking rights with respect to certain major decisions of [PHP Holdings]." While the June 2023 NMM argued that these blocking rights "do not entitle [MPT Picasso] to exercise direction or control over the day-to-day business or governance of [PHP Holdings] or [Prospect Plan], the care of any subscribers or enrollees or any decisions regarding health plan contracting or provider networks, and that [MPT Picasso] is simply a passive investor in [PHP Holdings]," MPT Picasso's blocking rights subsequently became a subject of substantial concern for the DMHC.

128.    As noted, Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates that signed the Restructuring Agreement with at least three (3) business days to review and provide comments on the notice of material modification to be submitted to the DMHC. Due to this Three Business Day NMM Review Requirement, it is reasonable to infer that no later than June 20, 2023, Defendants would have been aware that the Minority Interest Transaction had unexpectedly become subject to regulatory risk insofar as the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or disapprove the Minority Interest Transaction altogether, which would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

8.    **The DMHC Postpones the Effectiveness and Prohibits the Implementation of the Minority Interest Transaction Pending the DMHC's Further Regulatory Review**

129.    On July 20, 2023, in response to the June 2023 NMM, the DMHC sent the July 2023 DMHC Letter to Prospect Plan postponing the effectiveness and prohibiting the implementation of the Minority Interest Transaction, until the Director issued an order approving the Minority Interest Transaction:

> Re: ***Notice of Material Modification Proposing Minority Interest Transaction Filed June 23, 2023***; Filing No. 20232846
>
> The Department of Managed Health Care (Department) reviewed information submitted in the above-referenced Notice of Material Modification (Notice) filed by Prospect Health Plan, Inc. (Plan) for compliance with the Knox-Keene Health Care Service Plan Act of 1975, as amended.
>
> \* \* \*
>
> ***Enclosed is Order No. 20232846***, issued pursuant to Health and Safety Code section 1352(b), postponing the terms of the Notice. The Order incorporates by reference the Department's findings and comments as set forth in the attached Comment Table. ***The Order postpones the effectiveness of the material modification of the Plan or its operations as proposed in the Notice, and thereby prohibits the Plan from implementing the terms of the Notice until the Director issues a subsequent Order approving the Notice***.
>
> ***The Order is issued because at this time the Department finds the Notice does not demonstrate compliance with the Act and Rules and further amendment is necessary as set forth in the Department's attached comments***. Pursuant to Health and Safety Code section 1354, the Plan has a right to a hearing upon the issuance of an Order postponing a material modification if the Plan makes a written request within thirty (30) days after the date of mailing of the enclosed Order.

130.    The "Comment Table" attached to the July 2023 DMHC Letter requested additional information concerning the Minority Interest Transaction, including (i) a thorough description of the blocking rights granted to MPT in connection with the Minority Interest Transaction; (ii) explanations concerning why MPT was granted blocking rights, the circumstances under which such blocking rights may be exercised, and the effects of MPT exercising the blocking rights; and (iii) copies of all relevant agreements related to the Minority Interest Transaction.

131.    The July 2023 DMHC Order referenced in the July 2023 DMHC Letter stated that the Minority Interest Transaction constituted a change of "control" within the meaning of the statute:

> Pursuant to Health and Safety Code section 1352(b), the terms of the Notice of Material Modification filed on June 23, 2023, *proposing a change of control resulting from a Minority Interest Transaction*, *are postponed as of the date set forth below for the reasons stated in the letter attached hereto and incorporated herein by reference*. This Order shall remain in effect until revoked or superseded by further Order of the Director.

132.    In sum, the July 2023 DMHC Order, and the July 2023 DMHC Letter and attached Comments Table (*see* Exhibit C), evidenced the intent of the DMHC to thoroughly investigate the circumstances of the Minority Interest Transaction (including the blocking rights granted to MPT Picasso), and thus heightened the regulatory risk already apparent no later than June 20, 2023, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or might not approve the Minority Interest Transaction altogether.

133.    DMHC requested a response from Prospect Plan within thirty (30) days. On August 15, 2023, DMHC granted Prospect Plan's request to postpone its response to September 13, 2023.

**9.     MPW Reports Results for Q2 2023, Including $68 Million in Revenue From a Purported Increase in the Value of Equity in PHP Holdings Received by MPW**

134.    On August 8, 2023, via a Form 8-K, MPW issued a press release ("Q2 2023 Release") reporting a net loss of $0.07 per diluted share, and NFFO of $0.48 per diluted share, in Q2 2023 (which ended on June 30, 2023). Reducing the net loss, and boosting NFFO, was the $68 million Q2 2023 Prospect Gain. As the Q2 2023 Release explained:

> *Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share) from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect").* In accordance with accounting requirements, the value of MPT's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.

135.    The Q2 2023 Release further advised that MPW was narrowing its 2023 calendar estimated range of (i) net income to $0.33 to $0.37 per share, and (ii) NFFO to $1.53 to $1.57 per share. According to the Q2 2023 Press Release, the ranges took into account "Prospect-related income from the expected resumption of partial California rental payments, ***recognition of the PHP equity value received in the second quarter*** and other amounts."

136.    Recognizing the non-cash $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 to boost NFFO was inconsistent with the accounting treatment of non-cash gain from Prospect-related assets previously described by Hamner on the Q1 2023 Call on April 27, 2023: "[as] we reported last quarter, we are currently recognizing prospect rental income ***only as cash is received, and prospect paid no rent or interest during the quarter***."

137.    On August 8, 2023, MPW conducted the Q2 2023 Call to discuss Q2 2023 results. With respect to Prospect-related matters, Aldag advised analysts that the "managed care business continues to be profitable and on track to meet revenue and EBITDA targets and timelines. ***They are still planning for a monetization event of the managed care business in 2024***." Aldag further advised that the "Yale, Connecticut transaction is still progressing to close pursuant to the APA, [and] neither we nor Prospect are aware of any opposition to this transaction."

138.    Later on the call, Hamner advised that MPW "***recognized about $68 million in Prospect rent and interest. This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for interest in Prospect's managed care business***." Hamner then explained how the $82 million "increase" in the value of the "equity interest" issued to MPW in connection with the Restructuring Transactions enabled MPW to recognize the $68 million Q2 2023 Prospect Gain:

In brief summary, you will recall our May 23rd announcement that as of the end of the first quarter, we carried these assets at approximately $573 million. After obtaining updated valuations and an appraisal to determine marketability discounts, *the estimated value of our interest in managed care as of the May closing was approximately $655 million*. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from the sale to Yale of our Connecticut hospitals. *<u>Accordingly</u>, we recognized in the second quarter the rent and interest that <u>would have been collected</u> in 2023 through the May closing date*.

139.    Subsequently, during Q&A, an analyst asked why MPW had not revised its NFFO guidance in connection with the announcement of the Restructuring Transactions in May 2023.

Hamner responded in relevant part:

[T]he transaction happened on May 23rd and as I tried to point out earlier, we had multiple validations, multiple independent third parties who took different perspectives on the value of the managed care business. It's a private company.

It's not uncomplicated that what Prospect has done is to extract various different operations and subsidiaries from across the Prospect ownership and put it into a single operating company and measure that and then provide that information to the appraisers and so forth, such that. We only got something that the auditors were able to look at and we were confident in the $655 million value. *That didn't happen on May 23rd. <u>It didn't happen for six-plus weeks afterwards</u>* . . . *[W]e just simply didn't have the information until more recently.*[13]

---

[13] Notably, "six-plus" weeks after May 23, 2023, fell *after* the closing date for MPW's Q2 2023 on June 30, 2023. Yet, MPW recognized the $82 million increase in Q2 2023.

140.    After the Q2 2023 Call, analysts at Jefferies, J.P Morgan and Truist observed in their reports that adding the extra $0.11 share to NFFO from the receipt of equity in PHP Holdings allowed MPW to handily beat prior analyst estimates for NFFO in Q2 2023 of between $0.36-$0.39 per share. The J.P Morgan analyst added that "we did not explicitly anticipate this sort of income to materialize, and we suspect that others on the Street did not either." A Hedgeye analyst was more blunt, denigrating the $68 million Q2 2023 Prospect Gain as "Bullsh*t PHP Equity Booked as Rent" that should be excluded when calculating FFO-related metrics since it was non-cash revenue:

**Medical Properties Trust, Inc. (MPW)**
Earnings Variances

| Amounts in 000s, Except per Share Data | Actual | Modeled | $ | Per Share |
|---|---|---|---|---|
| **Income Statement Variances** | | | | |
| **Revenues:** | | | | |
| Rent Billed | 247,491 | 245,562 | 1,829 | 0.00 |
| Straight-Line Rent | (39,329) | 56,443 | (95,772) | (0.16) |
| Income from Financing Leases | 68,468 | 13,203 | 55,265 | 0.09 |
| Interest & Other Income | 60,765 | 38,594 | 22,171 | 0.04 |
| **Total Revenues** | 337,395 | 354,202 | (16,807) | (0.03) |
| **Expenses:** | | | | |
| Interest | 104,470 | 101,682 | (2,788) | (0.00) |
| Real Estate Depreciation & Amortization | 364,403 | 371,860 | | |
| Property-Related | 24,676 | 14,200 | (10,476) | (0.02) |
| Acquisition Expenses | | | | |
| Loan Impairment Charge | | | | |
| General & Administrative | 35,604 | 38,114 | 2,510 | 0.00 |
| **Total Expenses** | 529,153 | 525,857 | | 0.00 |
| **GAAP Operating Income** | (191,758) | (171,654) | | |
| **Other Income / (Expense):** | | | | |
| Gain on Sale of Real Estate | 167 | | | |
| Real Estate Impairment Charges | | | | |
| Earnings from Equity Interests | 12,224 | 11,216 | 1,008 | 0.00 |
| Debt Refinancing & Unutilized Financing Costs | (816) | | | |
| Other (incl MTM Adj. on Equity Securities) | (10,512) | | (10,512) | (0.02) |
| Total Other | 1,063 | 11,216 | | |
| **Income Before Income Tax** | (190,695) | (160,438) | | |
| Income Tax Expense | 148,262 | (5,000) | 153,262 | 0.26 |
| **Net Income** | (42,433) | (165,438) | | |
| Discontinued Operations | | | | |
| Noncontrolling Interests | 396 | | | |
| **Net Income Attributable to MPT Common** | (42,037) | (165,438) | | |
| Participating Interests | (468) | (500) | 31 | 0.00 |
| **Net Income Less Participating Securities** | (42,505) | (165,938) | | |
| Wtd. Avg. Shares / Units - Diluted | 598,344 | 598,344 | | |

| Core FFO & AFFO Variances | Actual | Modeled | $ | Per Share |
|---|---|---|---|---|
| Net Income Less Participating Securities | (42,506) | (165,938) | | |
| Adjustments: | | | | |
| Real Estate Depreciation & Amortization | 364,403 | 371,860 | | |
| Real Estate Depreciation & Amortization - Disc. Ops. | | | | |
| JV Share of D&A | 17,841 | 18,000 | | |
| Gain on Sale of Real Estate | (167) | | | |
| Real Estate Impairment Charges | | | | |
| **NAREIT FFO** | 339,571 | 224,022 | 115,549 | 0.19 |
| Write-Off (Recovery) of Straight-Line Rent & Other | 95,642 | | | |
| Transaction Costs from Non-Real Estate Dispositions | | | | |
| Debt Refinancing Costs | | | | |
| Loan Impairment Charge | | | | |
| Release of Valuation Allowance | | | | |
| Litigation & Other | 2,502 | 5,000 | (2,498) | |
| Non-Cash FV Adjustments | 8,374 | | | |
| Tax Rate Change | (157,230) | | | |
| Deferred Financing & Unutilized Financing Costs | 816 | | | |
| **Core / Normalized FFO** | 289,675 | 224,022 | 60,653 | 0.10 |
| **Core FFO / Share - Diluted** | 0.48 | 0.38 | | 0.10 |
| Adjustments: | | | | |
| Share-Based Compensation | 10,800 | 11,888 | (1,088) | (0.00) |
| Debt Costs Amortization | 5,203 | 4,000 | | |
| Rent Deferral, Net | 2,380 | | | |
| Straight-Line Rent Revenue & Other | (60,825) | (62,808) | | |
| **Reported Core / Normalized AFFO** | 247,233 | 182,102 | 65,131 | 0.11 |
| **Reported Core AFFO / Share - Diluted** | 0.41 | 0.30 | | 0.11 |
| Bullsh*t PHP Equity Booked as Rent | (68,000) | | | |
| **Hedgeye Adjusted AFFO** | 179,233 | 182,102 | (2,868) | (0.00) |
| **Hedgeye Adjusted AFFO / Share - Diluted** | 0.30 | 0.30 | | (0.00) |

141.    In a report issued several weeks later after disclosure of the July 2023 DMHC Order, a Wells Fargo analyst agreed with Hedgeye, questioning "***how the $68m of PHP equity made it into MPW's revenue line***," given that it was a non-cash gain that would not be converted into cash until MPW monetized its equity interest in Prospect's managed care business.

142.    These criticisms were well-founded since MPW had stated in its 2022 Form 10-K that it expected to "record rent on our Prospect leases on ***a cash only basis*** for the foreseeable

future," and later clarified in its Q1 2023 Form 10-Q that interest on loans to Prospect were also only being recognized on a cash basis. Further, Hamner had stated on the Q1 2023 Call on April 27, 2023, that "[as] we reported last quarter, we are currently recognizing prospect rental income *only as cash is received, and prospect paid no rent or interest during the quarter*." Yet, the $68 million Q2 2023 Prospect Gain was recognized as "revenue" in Q2 2023 even though it derived from an increase in the value of MPW's interest in Prospect that did not generate any cash.

143.    On August 9, 2023, a day after the Q2 2023 Call, MPW filed its Q2 2023 Form 10-Q, which disclosed the following accounting for the Restructuring Transactions:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including . . . e) *obtain[ing] a <u>non-controlling ownership interest</u> in PHP Holdings of approximately $654 million*, after applying a discount for lack of marketability, *consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings* . . . This non-controlling ownership interest [valued at $654 million] was received in exchange for unpaid rent and interest through December 2022, *previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million*, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.[14]

---

[14] Concerning the valuation of MPW's investment in Prospect, the Q2 2023 Form 10-Q disclosed:

> [O]ur convertible loan and equity investment in PHP Holdings [is] recorded at fair value based on Level 3 inputs, by using a discounted cash flow model, which requires significant estimates of our investee such as projected revenue and expenses and appropriate consideration of the underlying risk profile of the forecasted assumptions associated with the investee. We classify our valuations of equity investments as Level 3, as we use certain unobservable inputs to the valuation methodology that are significant to the fair value measurement, and the valuations require management judgment due to the absence of quoted market prices. For the cash flow models, our observable inputs include use of a capitalization rate and discount rate (which is based on a weighted-average cost of capital) *and our unobservable input includes an adjustment for a marketability discount ("DLOM")*. In regard to the underlying projections used in the discounted cash flow model, such projections are provided by the investees. However, we will modify such projections as needed based on our review and analysis of historical

144.    While it reported the Restructuring Transactions, the Q2 2023 Form 10-Q failed to attach the Restructuring Agreement as an exhibit. This failure violated Item 601 of the SEC's Regulation S-K requiring publicly-traded companies to attach a "material contract . . . [that] is executed or becomes effective during [a] reporting period" as "an exhibit to the Form 10–Q or Form 10–K filed for the corresponding period" (17 C.F.R. § 229.601(a)(4)). Since the Restructuring Transactions was material, the Restructuring Agreement governing the Restructuring Transactions was also material, and had to be attached as an exhibit to the Q2 2023 Form 10-Q, since Q2 2023 was the period in which the Restructuring Agreement was executed and became effective. Because MPW failed to attach the Restructuring Agreement to the Q2 2023 Form 10-Q, MPW investors had no inkling whatsoever concerning the need for regulatory approval by the DMHC to consummate any aspect of the Restructuring Transactions.

145.    The Q2 2023 Form 10-Q, as well as the Q2 2023 Release, and the statements on the Q2 2023 Call regarding the Restructuring Transactions, all failed to disclose the June 2023 NMM and the July 2023 DMHC Order, and thus the statements therein regarding the equity interest in PHP Holdings issued to MPW were rendered misleading by the omission of critical qualifying information concerning pending regulatory action posing a substantial risk to the validity of that equity interest, *i.e.*, that (i) on June 23, 2023, Prospect had submitted the June 2023 NMM seeking approval of the Minority Interest Transaction under Section 1399.65 in response to

---

results, meetings with key members of management, and our understanding of trends and developments within the healthcare industry.

Based on the above disclosure, the *only* unobservable input applied by MPW was the adjustment for marketability (concerning which no calculations were disclosed). Thus, it is clear that when reporting Q2 2023 results, MPW failed to adjust the value of its investment in Prospect for risk and uncertainty related to DMHC approval of the Minority Interest Transaction.

the DMHC's unexpected request to process review and approval of the Minority Interest Transaction as a notice of material modification; and (ii) on July 20, 2023, the DMHC had issued the July 2023 DMHC Order, which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction pending the DMHC's further review of the circumstances of the Minority Interest Transaction. Disclosure of the June 2023 NMM and the July 2023 DMHC Order would have significantly altered the total mix of information for MPW investors by making them aware of pending regulatory action posing a substantial risk to the validity of the equity interest in PHP Holdings issued to MPW, *i.e.*, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether, which would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement.

146.    Recognition of the $68 million Q2 2023 Prospect Gain in Q2 2023 also violated GAAP because that $68 million was a "gain" subject to contingencies (*i.e.*, DMHC's approval of the Minority Interest Transaction, and the conversion of the PHP Convertible Note into equity in PHP Holdings). GAAP (specifically ASC 450-30-25-1) prohibits the recognition of a "gain" that is subject to a "contingency" until the contingency is resolved favorably.

147.    Moreover, because it postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction, the July 2023 DMHC Order was a Type I subsequent event providing additional evidence concerning a condition (*i.e.*, uncertainty about DMHC's approval of the Minority Interest Transaction) of which Defendants were aware no later than June 20, 2023. Thus, GAAP (specifically ASC 855-10-25-1) obligated MPW to recognize the effect of the July 2023 DMHC Order in its Q2 2023 financial statements by not recognizing the contingent $68 million Q2 2023 Prospect Gain as revenue in Q2 2023. And because it violated

GAAP, recognition of the $68 million Q2 2023 Prospect Gain was presumptively misleading under 17 C.F.R § 210.4-01(a)(1), which states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles **will be presumed to be misleading or inaccurate**."

148.     Notwithstanding these GAAP violations, Defendant Hanna signed the Q2 2023 Form 10-Q, and Defendants Aldag and Hamner each falsely certified the Q2 2023 Form 10-Q as compliant with GAAP, and as not containing any materially false and misleading statements or omissions.

149.     Finally, by including the $68 million Q2 2023 Prospect Gain in NFFO, MPW violated its own accounting policy concerning calculation of NFFO, which is supposed to exclude gain like the Q2 2023 Prospect Gain from non-core events like the Restructuring Transactions in order to avoid making comparison to "prior period results **and market expectations less meaningful to investors and analysts**."

**10.    The *WSJ* Reveals the Existence of the June 2023 NMM and the July 2023 DMHC Order**

150.     On August 18, 2023, the *WSJ* published an article revealing the existence of the July 2023 DMHC Order postponing the effectiveness and prohibiting the implementation of the Minority Interest Transaction, noting among other things that MPW had (i) failed to disclose the need for regulatory approval when it disclosed the Restructuring Transactions on May 23, 2023, and (ii) failed to disclose the July 2023 DMHC Order in its Q2 2023 Form 10-Q, even as it reported $68 million in gain in Q2 2023 from the equity received in Prospect's managed care business. *See* Exhibit E. The *WSJ* article stated in relevant part:

> *The nation's largest hospital landlord said an unusual transaction that provided crucial financial support for one of its biggest tenants was a done deal. It wasn't.*

The deal was good news for both companies, and for communities across the country concerned that their local hospitals could go broke. **The landlord, Medical Properties Trust, announced the transaction in May. When it reported quarterly results on Aug. 8, it said the arrangement boosted its own revenue.**

**But a California state regulator on July 20 ordered that the transaction between MPT and Prospect Medical Holdings be put on hold, according to the order that the regulator sent to Prospect. MPT didn't disclose the regulator's order when it reported second-quarter results, or in its quarterly report filed the next day with the Securities and Exchange Commission.**

\* \* \*

The Prospect deal was designed to alleviate financial stress for both it and MPT. Before the deal, Prospect had stopped paying rent, closed two hospitals near Philadelphia, and owed MPT hundreds of millions of dollars. MPT's own finances are under scrutiny by investors, its shares are down by half over the past year, and it has already suffered large losses on Prospect, its third-largest tenant. **_If the deal is killed by regulators, it would further pressure the two companies' finances_.**

\* \* \*

MPT announced the deal with Los Angeles-based Prospect on May 23, saying it would receive equity in Prospect's managed-care business—PHP Holdings—in lieu of cash payment for $573 million of loans, unpaid rent and interest, and other amounts owed. PHP Holdings owns a small health insurer, Prospect Health Plan, as well as other businesses.

**MPT didn't disclose whether the transaction with closely held Prospect would require regulatory approval.** Last week MPT said it owned 49% of PHP Holdings.

**It isn't clear how Prospect would pay MPT if the regulator, the California Department of Managed Health Care, rejected the deal permanently.** The department oversees Prospect Health Plan.

\* \* \*

MPT and Prospect have provided different descriptions, at different points in time, of the details of their deal. **The California regulator appears to be concerned about how much control MPT would have over Prospect Health Plan.** The deal is unusual in part because MPT, a REIT, would get a big stake in a health insurer. When the deal was announced, MPT didn't say what its percentage ownership of PHP Holdings would be. Prospect Health Plan has about 73,000 managed-care enrollees in five Southern California counties. PHP Holdings' other businesses include physician-practice groups.

Prospect Health Plan notified the California regulator of the [Restructuring Transactions] in a June 23 filing that said an MPT subsidiary had "acquired a 49%

equity interest" in PHP Holdings, the health plan's parent, on May 23. The health plan said MPT acquired its stake by converting $370 million of loans, unpaid rent and interest, and other amounts owed by Prospect Medical Holdings into equity in PHP Holdings. The health plan called MPT a passive investor. It said the deal wasn't a change of control and didn't need the regulator's advance approval.

"The equity interests acquired by MPT are not 'voting' interests, although MPT was granted blocking rights with respect to certain major decisions" of PHP Holdings, the health plan said. The June 23 filing didn't provide details about the blocking rights.

***The [DMHC] on July 20 issued the [July 2023 DMHC Order] putting the deal on hold. It characterized the deal's terms as "proposing a change of control." The [DMHC] said the order would "remain in effect until revoked or superseded by further order of the director." In an accompanying letter, the regulator said the order "prohibits the plan from implementing the terms" until further notice, because the health plan's proposal "does not demonstrate compliance" with state law.***

The [DMHC] also sent the health plan a 12-page list of comments and requests for information. ***It asked for "a thorough description of the blocking rights," and an explanation of "the circumstances when MPT may exercise those blocking rights."*** The health plan's responses are due Sept. 13, after the regulator granted a deadline extension.

***

When MPT reported second-quarter results last week, its description of the equity deal differed significantly from its previous explanation in May—and from what Prospect Health Plan told the California regulator in June. When MPT last week said it had taken a 49% equity interest in PHP Holdings, that percentage figure matched what the health plan had said. MPT, however, said its "non-controlling ownership interest" was worth $654.5 million as of June 30—based on updated valuations—and consisted of "an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings." The valuation exceeded the $370 million of Prospect obligations that the health plan in its June 23 filing had said was converted into equity.

***The Prospect deal helped MPT's income statement, too. MPT said it recorded its receipt of the $68 million equity investment as revenue; that was 20% of its second-quarter revenue. Asked what MPT's rationale was for recognizing revenue in light of the regulator's July 20 order, [an MPT spokesperson] said "this is governed by accounting regulations."***

151.    After publication of the *WSJ* article, MPW's stock price fell approximately 15% in

intraday trading. Then, at approximately 1:50 P.M., the NYSE halted trading in MPW's stock

pending an announcement by MPW. Thereafter, at approximately 2:26 P.M, in an effort to reverse

the decline, MPW issued a materially false and misleading press release ("August 2023 Release")

attacking the legitimacy of the *WSJ* article. The August 2023 Release stated in relevant part:

> Medical Properties Trust, Inc. [MPT] today responded to the most recent of several false and misleading articles published by the Wall Street Journal, in this case related to the Company's May 23, 2023 transaction with Prospect Medical Holdings ("Prospect").
>
> * * *
>
> MPT believes it is important to clarify the following facts for the investment community:
>
> - The California Department of Managed Health Care's ("DMHC") hold sent to Prospect on July 20, 2023 is a *standard, expected, and non-controversial part of the approval process* for this transaction.
> - This hold indicates that certain additional information is required prior to the issuance of final approval from the DMHC, which the Company *fully expects to obtain in due course* as it has been advised it is highly unlikely the regulators would not approve a transaction following receipt of all required information.
> - In the unlikely event that the regulator does not grant approval for the transaction, MPT's investment in PHP would remain a *convertible note with identical economics to equity ownership*.
> - As a result, DMHC's *request was deemed immaterial* to MPT's financials and thus did not require disclosure.
> - The Company's recording of its $68 million equity investment as revenue in the second quarter was *fully consistent with accounting requirements* and was entirely unrelated to the DMHC approval process. Mr. Weil's attempt to conflate the two matters has no basis in fact.

(emphasis in original)

152.    The bolded italicized statements in the August 2023 Release above were materially

false and misleading. *First*, MPW had *not* expected a "hold" on the Minority Interest Transaction

as evidenced by the fact that the Restructuring Agreement did not condition the Minority Interest

Transaction on DMHC approval. MPW investors would not have been aware of this nuance

because MPW had never disclosed the material terms of the Restructuring Agreement.

153.    *Second*, the "hold" imposed by DMHC was "controversial" given that it was contrary to the expectation that DMHC approval of the Minority Interest Transaction would not be required.

154.    *Third*, MPW could not have expected DMHC to provide approval in due course. In fact, MPW would have had no idea when the Minority Interest Transaction might be approved since the July 2023 DMHC Order, and the July 2023 DMHC Letter (and the "Comments Table" annexed thereto) confirmed that the DMHC intended to thoroughly investigate the circumstances surrounding the Minority Interest Transaction, including the blocking rights granted to MPT Picasso (which blocking rights, as discussed below, became a central concern of the DMHC that prevented approval of the Minority Interest Transaction for months until it was addressed to the satisfaction of the DMHC in the April 2024 Undertakings signed by Defendant Hamner; *see* Exhibit D).

155.    Ultimately, as discussed below, DMHC's review lasted for nearly ten months after submission of the June 2023 NMM until the DMHC finally approved the Minority Interest Transaction on April 18, 2024, but only after MPT Picasso agreed to the April 2024 Undertakings signed by Hamner. Absent agreement to the April 2024 Undertakings, the DMHC would not have approved the Minority Interest Transaction.

156.    *Fourth*, while the Fallback Provision in the Restructuring Agreement attempted to replicate the economics of a conversion of the PHP Convertible Note into equity, the Fallback Provision did not address what would happen if the DMHC invalidated the Minority Interest Transaction. In fact, if the DMHC had disapproved the Minority Interest Transaction, it would have derailed the Restructuring Transactions by invalidating the issuance of equity in PHP

Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

157.    *Fifth*, the recognition of the $68 million Q2 2023 Prospect Gain was *not* "fully consistent with accounting requirements" because, as noted above, such recognition violated GAAP by recognizing gain as revenue before resolution of a critical contingency (*i.e.*, DMHC approval of the Minority Interest Transaction).

158.    After the publication of MPW's materially false and misleading press release purporting to rebut the *WSJ* article, MPW's stock price partially reversed its earlier decline, but still closed down at $6.93 per share on August 18, 2023, a decline of $0.57 per share, or 7.6%, from the prior close of $7.50 per share on August 17, 2023, resulting in a loss of $341 million in market capitalization (based on approximately 598 million MPW shares outstanding as of August 18, 2023).

159.    The movement of MPW's stock price on August 18, 2023, is depicted in the following chart, which shows the initial decline, the halt, and then the partial reversal of the decline:



160.     A Wells Fargo analyst offered this prophetic reaction to the *WSJ* article and MPW's rebuttal, which explains why investors reacted so negatively when the *WSJ* revealed the existence of the July 2023 DMHC Order:

> MPW was quick to refute the claims made in Friday's WSJ article regarding a regulatory snag in taking over equity of Prospect's managed care entity. ***We believe investors should continue to monitor developments related to this situation; regulatory snags have a tendency to drag on***. Moreover, ***we question how the $68m of PHP equity made it into MPW's revenue line***, and believe it should be backed out of AFFO insofar that it is viewed as a cash flow proxy until the equity stake is sold.

161.     MPW did not, however, enable MPW investors to "continue to monitor developments related to" the DMHC's regulatory review. To the contrary, none of MPW's subsequent SEC filings provided any update to MPW investors concerning the status of the DMHC's regulatory review. The reason is simple: as described in the next section, that review was not going smoothly, and if MPW had disclosed the status of MPW's regulatory review in its Q3 2023 Form 10-Q as a "contingency," it could not have recognized any further 2023 Prospect Gain in Q3 2023, which would have reduced NFFO and EBITDA in 2023, which would have reduced the annual cash bonuses and equity awards to Aldag and Hamner based on those metrics.

**11.     The DMHC and Prospect Plan Engage in Months of Extensive Correspondence Culminating in DMHC Approval of the Minority Interest Transaction on April 18, 2024, On Condition That MPT Picasso Address the Blocking Rights and Not Increase Its Equity Stake in PHP Holdings Without Prior DMHC Approval**

162.     On September 11, 2023, Prospect Plan responded to the July 2023 DMHC Letter. The response submitted, among other things, a copy of the Restructuring Agreement (annexed hereto as Exhibit A), and an organizational chart explaining the relationship between MPW and MPT Picasso (annexed hereto as Exhibit B). Prospect Plan also sought to reassure the DMHC that the blocking rights granted to MPT Picasso did not include the right to make decisions concerning

day-to-day operational or governance matters, or decisions that could impact the delivery of care to members of Prospect Plan.

163.    On October 11, 2023, DMHC responded. Among other questions, it asked whether the terms of the relevant LLC agreement governing MPT Picasso's rights as an investor in PHP Holdings would permit MPT Picasso to (i) "upstream funds" from Prospect Plan in violation of an "undertaking" ("20130836 Undertaking") that Prospect Plan had previously filed with the DMHC, and (ii) prevent "an infusion of cash" into Prospect Plan "if an infusion of cash were required for [Prospect Plan] to maintain the tangible net equity requirements" in certain applicable regulations and the 20130836 Undertaking.

164.    On October 25, 2023, Prospect Plan responded. It advised that while MPT Picasso's rights as an investor in PHP Holdings would not permit it to require Prospect Plan to upstream funds in violation of the 20130836 Undertaking, such rights could "arguably permit MPT Picasso to prevent an infusion of cash into Prospect Plan if an infusion of cash were required for Prospect Plan to maintain the tangible net equity requirements." Prospect Plan sought to reassure the DMHC, however, that "(i) it is in MPT Picasso Investors TRS's best interests to ensure that [Prospect] Plan remains in compliance with applicable law and DMHC Undertakings, and (ii) ***MPT Picasso Investors TRS has reinforced the same and assured Plan that it has no intention or desire to be an impediment to Plan's continued compliance***." Prospect Plan's response on October 25, 2023, thus evidences that Prospect Plan had discussed the status of the DMHC approval process with representatives of MPW, and sought and received their input.

165.    On December 22, 2023, Prospect Plan wrote to the DMHC to advise that, after further consideration, MPT Picasso had "determined not to pursue a full conversion of the convertible note, has no current plans to convert the remaining amount of its convertible note into

equity, and therefore no additional filing will be forthcoming." Based on that representation, Prospect Plan asked the DMHC to approve the Minority Interest Transaction.

166.    On January 5, 2024, the DMHC responded to Prospect Plan's notification of MPT Picasso's decision not to pursue conversion of the PHP Convertible Note into equity:

> *[E]xplain what happened to motivate MPT to discontinue its plan to convert the remaining amount of its convertible note into equity*. Explain why MPT discontinued its plan to convert the remaining amount of its convertible note into equity. Provide an accurate accounting of the value of the remaining amount of MPT's convertible note. Describe MPT's rights and authority to convert the remaining amount of its convertible note into equity and any conditions precedent to MPT exercising those rights to convert the remaining amount of its convertible note into equity in Plan or any of its affiliates.
>
> [E]xplain[] how MPT's decision not to currently pursue plans to convert the remaining amount of its convertible note into equity impacts Plan or any of Plan's affiliates' business and business plans.

167.    On January 15, 2024, Prospect Plan explained that MPT Picasso had determined not to convert the PHP Convertible Note into equity in part because "*the continuing delays in approving the filings are resulting in undue expense and burden on the parties*." This statement further confirms that DMHC approval of the Minority Interest Transaction was material to MPW.

168.    Three months later, the DMHC finally approved the Minority Interest Transaction on condition that MPT Picasso and various Prospect affiliates agree to the April 2024 Undertakings signed by Defendant Hamner on behalf of MPT Picasso to, among other things, (i) initiate a regulatory review before Prospect Plan engaged in any transaction that would result in its purchase or acquisition; (ii) not convert the PHP Convertible Note into equity in PHP Holdings, or otherwise issue additional equity interests in Prospect Plan or any of its affiliates to MPT Picasso, without the prior approval of the DMHC; and (iii) address the DMHC's concerns with respect to the blocking rights:

### Change of Control

Plan will not merge, consolidate, or initiate a single or series of transactions resulting in its purchase, acquisition, or control by, any entity, including another health care service plan or a health insurer licensed under the Insurance Code, without first submitting a Pre-Filing Request Form (DMHC 10-195) and attending a Pre-Filing conference with the Department. After the Pre-Filing conference, the DMHC will determine whether the proposed transaction(s) require the Plan to file a Notice of Material Modification. This includes individual transactions which, when considered cumulatively with any other transactions within a three-year period, could impact ownership interest.

### Equity Interest

Before MPT Picasso Investors TRS, LLC (MPTP) may take any additional equity interest in Plan or any of its affiliates, Plan will first file a Notice of Material Modification, in accordance with the standards set forth in Section 1352 of the Act and Rule 1300.52.4, requesting prior Department approval of MPTP taking additional equity interest in Plan or any of its affiliates and await an order from the Department before transferring any equity interest from Plan or any of its affiliates to MPTP.

### Phase II Transactions

Plan will not initiate the transactions described as the Phase II Transactions in Article IV of the Amended and Restated Master Restructuring Agreement filed in eFile No. 20232846, without first filing a Notice of Material Modification, and securing approval from the director. The Notice will detail the total cumulative aggregation of ownership interests that will occur from all phases of transactions. This includes not only the Phase II Transactions but also any other transactions that, when combined with Phase II and any potential future transactions, impact ownership interest.

### Minimum Tangible Net Equity

The Plan is required to maintain 200% of tangible net equity (TNE) at all times. Further, the Plan shall not use Secured Affiliate Receivables to meet the TNE requirements.

### Restrictions on Upstreaming of Funds

The Plan shall not declare or pay dividends, make other distributions of cash or property or in any other way upstream any funds or property to its shareholders or any of the Parties' affiliates (collectively, "Affiliate Company Distributions") if such actions would cause any of the following:

(a) The Plan to fail to maintain, at all times, 200 percent of the minimum TNE (which annualized amount shall be calculated by multiplying the applicable current quarter revenues and expenditures by four) required by Rule 1300.76; or

(b) Result in insufficient working capital or insufficient cash flow necessary to provide for the retirement of existing or proposed indebtedness of the Plan, as required by Rule 1300.75.1(a);
or (c) Adversely affect the ability of the Plan to provide or arrange for health care services.

169.    On April 10, 2024, Defendant Hamner signed the April 2024 Undertakings on behalf of MPT Picasso. *See* Exhibit D.

170.    On April 18, 2024, after execution of the undertakings, the DMHC issued the April 2024 DMHC Order approving the Minority Interest Transaction (which it characterized as a "change of control"). A letter accompanying the April 2024 DMHC Order wrote that it was "subject to and conditioned upon the Plan's full compliance with the Undertakings attached to the Order." *See* Exhibit D.

### 12.    MPW Reports Results for Q3 2023, Including $13 Million in Additional Revenue From the Purported $82 Million Increase in the Value of MPW's "Equity Interest" in PHP Holdings

171.    On October 26, 2023, while the DMHC approval process remained ongoing, MPW issued a press release ("Q3 2023 Release") via a Form 8-K reporting "[n]et income of $0.19 and Normalized Funds from Operations ("NFFO") of $0.38 for the 2023 third quarter on a per diluted share basis and *including approximately $0.02 per share from MPT's receipt of <u>non-cash</u> and non-recurring investment consideration in PHP Holdings ("PHP") in lieu of third quarter cash rent and interest contractually owed by Prospect Medical Holdings ("Prospect")*."

172.    In other words, NFFO in Q3 2023 was boosted by "*roughly $13 million ($0.02 per diluted share) from the receipt of an investment in PHP in lieu of cash for third quarter contractually owed rent and interest revenue from Prospect*." The Q3 2023 Release advised that recognition of the $13 million Q3 2023 Prospect Gain "completes [MPW's] accounting for the

70

receipt of its investment in PHP," and that the "combined amount of approximately $82 million recorded in the second and third quarters is not intended to represent cash currently **_and is not expected to recur_**." The Q3 2023 Release further advised that MPW was "narrowing its estimate of per share NFFO [for 2023] to $1.56 to $1.58," indicating that the "ranges include the recognition of PHP investment value received in the second and third quarters."

173.    In sum, as in Q2 2023, recognition of revenue from the previously reported $82 million increase in the value of the equity interest issued to MPW under the Restructuring Transactions boosted NFFO, even though (i) the contingency relating to DMHC approval of the Minority Interest Transaction remained unresolved (thus again violating GAAP's bar against recognizing contingent gain), and (ii) the Restructuring Transactions generating the previously reported $82 million increase in value were not part of MPW's core operations (thus again violating MPW's internal accounting policy regarding calculation of NFFO, which excludes gain derived from non-core events like the Restructuring Transactions).

174.    The Q3 2023 Release separately announced "an approximate $30 million fair market value adjustment due to updated assumptions related to the value of MPT's investment received in the second quarter of 2023." Yet, inconsistently, even though this newly reported $30 million increase in value—like the previously reported $82 million in increase in value—resulted from a purported increase in the value of the equity issued to MPW under the Restructuring Transactions, it was _not_ recognized as revenue.

175.    On October 26, 2023, MPW conducted an earnings call ("Q3 2023 Call"). On that call, Hamner addressed the recognition of $13 million Q3 2023 Prospect Gain from "contractually owed rent and interest revenue" as a result of MPW's receipt of an "equity interest" in PHP Holdings:

*[S]imilar to our second quarter results*, we recognized about $13 million or $0.02 per share in noncash prospect rent and interest. As a reminder, *this is an accounting requirement resulting from the recapitalization transactions that we announced in May of this year, which included MPT's exchange of certain real estate and other assets for interest in prospects managed care business, PHP Holdings LLC*. This noncash and prospect nonrecurring $13 million recognized as a portion of the rent and interest that would have been collected in 2023's third quarter.

Moving forward, *we do not expect to be required* to book any additional rent and interest in connection with the May recapitalization. Just to be clear, our year-to-date statement of cash flows will not reflect either this or the $68 million recognized last quarter.

Third, the approximate $47 million in noncash fair value adjustments is primarily comprised of about a $20 million adjustment to our investment in Swiss Medical and *about a $30 million adjustment to our interest in PHP holding* . . . *To be clear, the PHP fair value adjustment is separate from the $13 million that I just described* . . . this [$30 million] is an estimate of fair value, and there is no assurance that any such estimate will ultimately be realized. Prospect expects to begin marketing the company soon, and we continue to expect a transaction in 2024.

176.    Hamner's statement that recognition of the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain as revenue was an "accounting requirement" was materially false. To the contrary, as shown, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited recognition of the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain as revenue because such gain remained subject to a contingency (*i.e.*, DMHC approval of the Minority Interest Transaction).

177.    On November 9, 2023, MPW filed its Form 10-Q for Q3 2023 ("Q3 2023 Form 10-Q"). Concerning MPW's investment in Prospect it stated:

[MPW] obtain[ed] a non-controlling ownership interest in PHP Holdings of approximately $654 million, after applying a discount for lack of marketability, consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings (collectively, the "Prospect Transaction"). This non-controlling ownership interest was received in exchange for unpaid rent and interest through December 2022, *previously unrecorded rent and interest revenue in 2023 totaling approximately $82 million (including approximately $13 million that was recorded as revenue in the 2023 third quarter)*, our $151 million

mortage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.[15]

178.    The Q3 2023 Form 10-Q, however, failed to disclose the June 2023 NMM and the July 2023 DMHC Order, even though *both* occurred well before the end date of Q3 2023 on September 30, 2023. That is, as of September 30, 2023, it remained uncertain whether the DMHC would approve the Minority Interest Transaction. Yet, in the Q3 2023 Form 10-Q, Defendants continued to violate GAAP by ignoring the contingency created by the June 2023 NMM and the July 2023 DMHC Order, and instead recognized another $13 million in gain from the previously reported $82 million increase in the value of the equity interests issued to MPW under the Restructuring Transactions. Notwithstanding these GAAP violations, Defendant Hanna signed the Q3 2023 Form 10-Q, and Defendants Aldag and Hamner each falsely certified the Q3 2023 Form 10-Q as compliant with GAAP, and as not materially false and misleading.

### 13.    MPW Beats Guidance for NFFO in 2023, But Only Because of the Improper Recognition of $82 Million in Prospect Gain in 2023 in Violation of GAAP

179.    As noted above, when reporting Q3 2023 results, MPW had guided for FY 2023 NFFO of $1.56 to $1.58 per share. On February 21, 2024, MPW announced its Q4 2023 and FY 2023 results, including NFFO of $1.59 per share for FY 2023, which beat the high end of the guidance for FY 2023 NFFO of $1.58 per share.

180.    After MPW reported Q4 2023 and FY 2023 results, including NFFO beating guidance, MPW's stock price closed up 5.56%. Thus, boosting NFFO in 2023 by recognizing the $68 million Q2 2023 Prospect Gain also boosted MPW's stock price.

---

[15] While the Q2 2023 Prospect Gain was reported as approximately $68 million, and the Q3 2023 Prospect Gain was reported as approximately $13 million, the combined total was reported as approximately $82 million since the actual amount of the Q2 2023 Prospect Gain was $68.8 million.

181.    According to MPW's Form 10-K, the NFFO of $1.59 per share in 2023 represented total NFFO in 2023 of $951,066,000. That $951,066,000 of NFFO in 2023, however, was boosted by the approximately $82 million in Prospect Gain improperly recognized in Q2 and Q3 2023 in violation of GAAP, as explained above. If that $82 million is excluded, the NFFO in 2023 drops to $869,066,000, or $1.45 per share based on approximately 598,991,000 shares outstanding as of December 31, 2023.

182.    Thus, had MPW adhered to GAAP, NFFO for 2023 would have been $1.45 per share, and *missed* the low end of guidance for NFFO for 2023 of $1.56 per share by $0.11 per share. Instead, because Defendants violated GAAP, they reported NFFO for 2023 of $1.59 per share, which beat the high end of guidance for NFFO for 2023 of $1.58 per share by $0.01 per share.

### 14.    Defendants Aldag and Hamner Were Economically Incentivized to Conceal the June 2023 NMM and the July 2023 DMHC Order, and to Improperly Recognize the $68 Million Q2 2023 Prospect Gain and $13 Million Q3 2023 Prospect Gain

183.    Aldag and Hamner had a strong economic incentive to conceal the June 2023 NMM, and the July 2023 DMHC Order, and to prematurely recognize as much Prospect Gain as possible in 2023—to boost their annual cash bonuses, and Performance-Based Share awards.

184.    Under MPW's 2022 executive compensation program, Aldag was eligible for an annual cash bonus equal to 100%, 200%, or 300% of his annual base salary, and Hamner was eligible for an annual cash bonus equal to 100%, 150%, and 225% of his annual base salary, depending on whether certain performance metrics were met or exceeded. Two of those metrics were NFFO and EBITDA.

185.    The 2022 executive compensation program ("2022 Comp Program") assigned a weighting of 50% to NFFO when calculating annual cash bonuses—the highest weighting among

all of the relevant performance metrics. The 2022 Comp Program also assigned a weighting of (i) 20% to a leverage ratio calculated as EBITDA/Interest Expense when determining annual cash bonuses, and (ii) 40% to EBITDA when determining Performance-Based Share awards.

186.    As per MPW's 2024 Annual Proxy filed on April 17, 2024, disclosing executive compensation in 2023, the formula for calculating annual cash bonuses in 2022 was retained for the 2023 Comp Program for Defendants Aldag and Hamner, while the formula for calculating Performance-Based Share awards was tweaked to increase the EBITDA weighting to 50%, as per the following chart:

| Element | Description | Objective | Pay Philosophy Element |
|---------|-------------|-----------|------------------------|
| Base Salary | Based on duties, experience, and internal pay equity | Provides a fixed level of cash compensation to attract and retain talented executives | |
| Annual Cash Bonus[1] | 50% Normalized FFO per Share | Aligns our executives with near-term financial goals and strategic priorities, which for 2023 included Normalized FFO growth and managing leverage | |
| | 20% EBITDA/Interest Expense | As we remained focused on the importance of ESG for both internal and external stakeholders, we continued to include the achievement of ESG initiatives in our annual cash bonus program as standalone assessment criteria | |
| | 10% ESG Initiatives | | |
| | 20% Qualitative Performance | Given that the majority of our compensation is based on pre-established metrics and goals, allows for a subjective assessment of performance on a more holistic basis and considers factors that may not be quantifiable | |
| Time-Based Shares | Vest ratably over 3 years | Promotes retention and aligns executives with stockholders | |
| Performance-Based Shares | 50% Strategic Transactions | Rewards executives for completing transactions aligned with the Company's current goal of paying down debt and reducing leverage, while also giving credit for strategic capital deployment | |
| | 50% EBITDA | Ensures that executives are focused on profitability and stockholder value creation through EBITDA growth in both the short-term and long-term periods | |
| | Absolute and Relative TSR Modifier[2] | Adjusts payouts to align with long-term stockholder returns on both an absolute and relative basis | |
| 2023 Stock Price Performance Award[3] | One-time award granted to SVPs that vests only if specified stock price hurdles are achieved | Award granted in December 2023 to SVPs to promote retention and further alignment with stockholders and incentivize stock price appreciation | |

187.    In connection with awarding annual cash bonuses, the 2023 Comp Program set three benchmarks for NFFO: Threshold ($1.42 per share), Target ($1.46 per share), and Maximum ($1.50 per share), and awarded Aldag and Hamner increasing percentages of their annual base

salary for hitting each benchmark (100%, 200% and 300% for Aldag, and 100%, 150%, and 225% for Hamner), as per the following charts:

**Annual Cash Bonus Plan**

**Annual Cash Bonus Opportunities**

For 2023, cash bonus opportunities for our NEOs as a percent of base salary were as follows:

| Named Executive Officer | Threshold | Target | Maximum |
|---|---|---|---|
| Edward K. Aldag, Jr. | 100% | 200% | 300% |
| R. Steven Hamner | 100% | 150% | 225% |

**Annual Cash Bonus Plan Metrics**

The cash bonus plan metrics are reviewed annually by the Compensation Committee to ensure continued alignment with our strategic goals for the upcoming year. These goals are critical to our long-term success and are designed to be challenging and rigorous to ensure that we remain focused on differentiated growth and our overall business strategy.

The 2023 cash bonus plan metrics that applied to Mr. Aldag, Mr. Hamner and Mr. McLean are set forth in the following chart:

| Performance Metric | Weighting | Threshold | Target | Maximum | 2023 Achievement |
|---|---|---|---|---|---|
| **Normalized FFO Per Share** <br> Encourages focus on profitability as measured by the most frequently used REIT earnings measurement on a per share basis; mitigates the risk of non-profitable acquisitions or other low-quality growth | 50% | $1.42 | $1.46 | $1.50 | $1.59 |
| *Targets consistent with the Company's 2023 guidance.* | | | | | |
| **EBITDA$^{(1)}$/Interest Expense Ratio** <br> Motivates management to maintain financial health and a low cost of capital | 20% | 3.0x | 3.2x | 3.4x | 3.47x |
| *The 3.2x target ratio was established based on our historical strategies and debt levels as publicly disclosed during recent years.* | | | | | |
| **Environmental, Social and Corporate Governance** <br> Encourages management to prioritize and execute on annual ESG initiatives | 10% | | Compensation Committee's Assessment | | Achieved Annual ESG Initiatives |
| *ESG accomplishments include (i) ranked by Modern Healthcare as one of the best places to work and (ii) recognized with a 2022-2023 Green Lease Leaders Silver Certification by the Institute for Market Transformation and the Department of Energy Better Building Alliance.* | | | | | |
| **Qualitative Performance Review** <br> Represents indicators of the executive's success in fulfilling his or her responsibilities to the Company and in executing its strategic business plan | 20% | | Compensation Committee's Assessment | | Target (see below) |
| *See below for additional detail on the Compensation Committee's review of qualitative performance.* | | | | | |

188.    Improperly recognizing the $68 million Q2 2023 Prospect Gain boosted NFFO in Q2 2023 by $0.11 per share. Had MPW not recognized the additional NFFO of $0.11 per share attributable to the Q2 2023 Prospect Gain, MPW's reported NFFO in 2023 would have dropped from $1.59 per share to $1.48 per share. Moreover, as noted above, in Q3 2023 (ending on September 30, 2023), MPW "doubled down" on its improper recognition of gain subject to a contingency, and recognized the $13 million Q3 2023 Prospect Gain, even though it remained

uncertain as of September 30, 2023, whether the DMHC would approve the Minority Interest Transaction.

189.    Combined, the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain resulted in the improper recognition of $82 million in 2023 Prospect Gain. Had the $82 million in Prospect Gain been excluded from revenue in 2023, NFFO in 2023 would have totaled only $1.45 per share. By improperly recognizing the $82 million in 2023 Prospect Gain, MPW boosted its NFFO in 2023 to $1.59 per share—an increase of $0.14 per share.[16]

190.    In turn, by boosting NFFO in 2023 by $0.14 per share, improper recognition of the 2023 Prospect Gain allowed Aldag and Hamner to maximize their annual cash bonuses in 2023. Specifically, in 2023, Aldag had a base salary of $1 million, and Hamner had a base salary of $675,000. Given those base salaries, and the calculation of annual cash bonuses under the formula explained above, boosting NFFO in 2023 by $0.14 per share to $1.59 per share enabled Aldag and Hamner to exceed the "Maximum" benchmark of NFFO of $1.50 per share under the formula for calculating annual cash bonuses. As per the tables below, exceeding the "Maximum" benchmark in 2023 of NFFO of $1.50 per share—instead of excluding $0.14 per share, and falling below the "Target" benchmark for NFFO of $1.46 per share—enabled (i) Aldag to boost the 50% of his annual cash bonus attributable to the NFFO metric from $500,000 to $1,500,000—an increase of $1 million, which is equal to his entire annual base salary, and 35.7% of his total annual cash bonus in 2023 of $2.8 million, and (ii) Hamner to boost the 50% of his annual cash bonus attributable to

---

[16] The math is as follows. According to MPW's Form 10-K, MPW had approximately 598,991,000 shares outstanding as of December 31, 2023. Total NFFO in 2023 was $951,066,000, or $1.59 per share. If the improperly recognized $82 million in 2023 Prospect Gain is excluded, MPW's NFFO in 2023 drops to $869,066,000, or $1.45 per share—a difference of $0.14 per share.

the NFFO metric from $337,500 to $759,375—an increase of $422,000, which is 62.5% of his entire base salary, and 28.7% of his total annual cash bonus in 2023 of $1,417,500:

| Calculation of Annual Cash Bonus Contribution from Reporting NFFO of $1.59 Per Share in 2023 and Exceeding the "Maximum" Benchmark of NFFO of $1.50 Per Share | | | | |
|---|---|---|---|---|
| Executive | Base Salary | 50% NFFO Weighting | Percentage If Exceed "Maximum" Threshold for NFFO | Annual Cash Bonus Contribution From NFFO |
| Aldag | $1,000,000 | $500,000 | 300% | $1,500,000 |
| Hamner | $675,000 | $337,500 | 225% | $759,375 |

| Calculation of Annual Cash Bonus Contribution If NFFO Per Share in 2023 Was Only $1.45 Per Share and Missed the "Target" Benchmark of NFFO of $1.46 Per Share | | | | |
|---|---|---|---|---|
| Executive | Base Salary | 50% NFFO Weighting | Percentage If Miss "Target" Threshold for NFFO | Annual Cash Bonus Contribution From NFFO |
| Aldag | $1,000,000 | $500,000 | 100% | $500,000 |
| Hamner | $675,000 | $337,500 | 100% | $337,500 |

191.    Beyond boosting NFFO in 2023, improperly recognizing the 2023 Prospect Gain in 2023 also boosted EBITDA—another performance metric used to calculate annual cash bonuses (with a 20% weighting), as well as the issuance of Performance-Based Share awards (with a 50% weighting), as per the chart above in paragraph 186.

192.    In connection with awarding annual cash bonuses, the 2023 Comp Program set three benchmarks for a ratio calculated as EBITDA/Interest Expense (as per the chart above in paragraph 187): Threshold (3.0x), Target (3.2x), and Maximum (3.4x). The 2023 Prospect Gain would have boosted the EBITDA number used in the numerator of the ratio, and thus made it easier to hit the "Maximum" benchmark. And indeed, as per the chart above in paragraph 187, the

EBITDA/Interest ratio was purportedly 3.47x in 2023, which beat the "Maximum" benchmark. Because the EBITDA/Interest Expense ratio was assigned a 20% weighting when calculating the annual cash bonus, exceeding the "Maximum" benchmark for the EBITDA/Interest ratio in 2023 ratio added another $600,000 to Aldag's annual cash bonus, and another $304,000 to Hamner's annual cash bonus, as per the following table:

| Calculation of Annual Cash Bonus Contribution Because EBITDA/Interest Ratio Exceeded "Maximum" Benchmark of 3.4x in 2023 | | | | |
|---|---|---|---|---|
| Executive | Base Salary | 20% Weighting | Percentage If Exceed "Target" Threshold for Ratio of 3.4x | Annual Cash Bonus Contribution From NFFO |
| Aldag | $1,000,000 | $200,000 | 300% | $600,000 |
| Hamner | $675,000 | $135,000 | 225% | $304,000 |

193.    Further, in 2023, MPW issued Performance-Based Share awards to Aldag and Hamner with calculated values of $8.25 million, and $4.125 million, respectively, based in part on meeting certain targets for EBITDA (which is weighted 50% for purposes of granting such awards, as noted).[17]

### 15.    MPW Sharply Decreases the Value of MPW's Investment in PHP Holdings After Entry of the April 2024 DMHC Order

194.    As noted, on December 22, 2023, Prospect Plan advised DMHC that, after further consideration, MPT Picasso had "determined not to pursue a full conversion of the convertible note, has no current plans to convert the remaining amount of its convertible note into equity, and therefore no additional filing will be forthcoming."

---

[17] MPW's SEC filings did not directly report EBITDA in 2023 (and instead reported a related metric known as "EBITDARM" in its Quarterly Supplemental Filings that is calculated using different inputs than EBITDA). Thus, it is impossible to determine based on public information the extent to which the annual cash bonuses and Performance-Based Share awards granted to Aldag and Hamner in 2023 would have declined if 2023 EBITDA was adjusted to exclude the $68 million Q2 2023 Prospect Gain, and $13 million Q3 2023 Prospect Gain.

195.    On January 15, 2024, Prospect Plan explained that MPT Picasso reached this decision because, among other things, "***the continuing delays in approving [the Minority Interest Transaction] are resulting in undue expense and burden on the parties***."

196.    Three months later, on April 18, 2024, the DMHC issued the April 2024 DMHC Order, but only after execution of the April 2024 Undertakings by Defendant Hamner (on behalf of MPT Picasso) and representatives of various Prospect affiliates agreeing, among other things, to (i) initiate a regulatory review before entering into any sale of Prospect Plan; (ii) not issue any additional equity to MPT Picasso without first securing DMHC approval (by way of filing a new notice of material modification); (iii) not convert the PHP Convertible Note into equity without first securing DMHC approval (by way of filing a new notice of material modification); and (iv) address concerns related to the blocking rights. *See* Exhibit D hereto.

197.    In the two quarters after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order, MPW recorded a sharp drop in the value of MPW's interest in Prospect. Specifically, on May 29, 2024, just over a month after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order, MPW filed its Form 10-Q for Q1 2024. The Q1 2024 Form 10-Q stated that MPW had adjusted the value of its investment in Prospect downward by $201 million as of March 31, 2024, based on updated "indications of interests" from potential bidders for PHP Holdings:

> In regard to PHP Holdings, we account for our investment (both the equity investment and convertible loan) using the fair value option method. ***On May 23, 2024, Prospect's investment bankers informed us that they had received updated indications of interest from prospective bidders for PHP Holdings***. Based on our consideration of information in the updated indications, along with consultations with our third party appraisers, ***we recorded as of March 31, 2024, a $201 million unfavorable fair value adjustment, resulting in a total investment in PHP Holdings of approximately $500 million at March 31, 2024***. Each quarter, we mark such investment to fair value as more fully described in Note 7 to the condensed consolidated financial statements.

198.    The $500 million valuation of MPW's interest in Prospect as of March 31, 2024, constituted a 50% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call.

199.    Then in its Q2 2024 Form 10-Q filed on August 9, 2024, MPW stated that it had adjusted the value of its investment in Prospect downward by another $160 million as of June 30, 2024, based on updated "indications of interests" from potential bidders for PHP Holdings:

> In regard to PHP Holdings, we account for our investment (both the equity investment and convertible loan) using the fair value option method. Prospect's investment bankers continue to work through the latest indications of interest from prospective bidders for PHP Holdings. ***Based on our consideration of information in the indications of interest and discussions with the investment bankers, along with consultations with our third party appraisers, we recorded an additional approximate $160 million unfavorable fair value adjustment in the second quarter of 2024 (total unfavorable fair value adjustment in 2024 of $360 million), resulting in a total investment in PHP Holdings of approximately $340 million at June 30, 2024.*** Each quarter, we mark such investment to fair value as more fully described in Note 7 to the condensed consolidated financial statements.

200.    The $340 million valuation of MPW's interest in Prospect as of June 30, 2024, constituted a 66% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call.

201.    Based on timing, it is reasonable to infer that the April 2024 Undertakings and the April 2024 DMHC Order contributed to the sharp reduction in the value of MPW's interest in Prospect's managed care business in Q1 and Q2 2024—MPW's investment bankers advised MPW about the reduced bids on *May 23, 2024*, just over a month after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order. Moreover, the total reduction in value reported in Q1 and Q2 2024—$360 million—closely matched the drop in value that occurred (approximately $340 million) when the *WSJ* revealed the existence of the June 2023 NMM and the July 2023 DMHC Order on August 18, 2023.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS DURING THE CLASS PERIOD

1.   **Materially False and Misleading Statements and Omissions in the May 2023 Release**

202.   On May 23, 2023, via a Form 8-K, MPW issued the May 2023 Release announcing

the Restructuring Transactions. The May 2023 Release stated in relevant part:

> Medical Properties Trust, Inc. (the "Company" or "MPW") (NYSE: MPW) today announced that affiliates of Prospect Medical Holdings ("Prospect") have completed $375 million in new financings from third-party lenders, the proceeds of which will be used to provide Prospect's hospital operations with liquidity and capitalize its managed care business for continued growth and value creation in a vibrant market for such businesses.

> *   *   *

> MPW continues to have strong conviction in the embedded value of the Prospect platform and has structured its master leases and security agreements to provide collateral value in addition to its real estate interests, ***including interests in the equity of Prospect's managed care business***. As of the end of the first quarter of 2023, MPW holds $1.6 billion in total assets related to Prospect that are expected to be reconstituted as follows:

> - An approximately $513 million investment in six leased California hospitals, subject to a master lease scheduled to resume partial rent payments in September and full rent payments at an 8.44% cash yield in March of 2024;

> - A $457 million investment in MPW's Connecticut real estate which, as previously announced, Yale New Haven Health is expected to acquire in a transaction that is expected to close during 2023's third quarter. MPW's investment is expected to be fully recovered through cash proceeds of $355 million at closing and ***equity interests in Prospect's managed care business valued at $103 million***;

> - A first lien mortgage loan of $150 million ***and equity interests in the managed care business valued at $100 million***, resulting from the transfer to Prospect of Pennsylvania real estate with a book value of $250 million;

> - Loans aggregating approximately $264 million and accrued rent and interest of approximately $56 million, along with the previously announced $50 million convertible loan to the managed care entities are expected to be recovered ***through equity interests in the managed care business***.

82

203. The bolded and italicized statements in the May 2023 Release in the preceding paragraph touting that MPW expected to receive "equity interests" in Prospect's managed care business valued at $573 million were materially false and misleading because reasonable MPW investors would have understood from those statements that the Restructuring Transactions were a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW. In reality, unbeknownst to MPW investors, (i) the Restructuring Transactions were governed by the Restructuring Agreement; and (ii) under the Restructuring Agreement, the issuance of equity in PHP Holdings to MPW was not a "done deal," but was contingent on the DMHC approving the conversion of the PHP Convertible Note into equity. Disclosure of the need for DMHC approval to convert the PHP Convertible Note into equity would have significantly altered the total mix of information for MPW investors by making them aware of the potential for regulatory risk from the DMHC with respect to the Restructuring Transactions.

**2.  Materially False and Misleading Statements and Omissions in the May 2023 Form 8-K**

204. On May 25, 2023, MPW filed the May 2023 Form 8-K disclosing the Restructuring Transactions under Item 8.01, and attaching the May 2023 Release as an exhibit, which was incorporated by reference:

> On May 23, 2023, the Company issued a press release announcing that Prospect Medical Holdings has completed certain recapitalization transactions. A copy of the press release is furnished as Exhibit 99.1 hereto and incorporated herein by reference.

205. The statements from the May 2023 Form 8-K in the preceding paragraph concerning the Restructuring Transactions were rendered materially misleading by the failure to disclose the Restructuring Agreement as a "material definitive agreement" under Item 1.01 of

Form 8-K since, unbeknownst to MPW investors, (i) the Restructuring Transactions were governed by the Restructuring Agreement; and (ii) under the Restructuring Agreement, the issuance of equity in PHP Holdings to MPW was not a "done deal," but was contingent on the DMHC approving the conversion of the PHP Convertible Note into equity. Disclosure of the need for DMHC approval to convert the PHP Convertible Note into equity would have significantly altered the total mix of information for MPW investors by making them aware of the potential for regulatory risk from the DMHC with respect to the Restructuring Transactions.

### 3. Omissions That Rendered Misleading Statements in the Q2 2023 Release, During the Q2 2023 Call, and in the Q2 2023 Form 10-Q

206.    Defendants made numerous statements in the Q2 2023 Release issued on August 8, 2023, during the Q2 2023 Call held on August 8, 2023, and in the Q2 2023 Form 10-Q filed on August 9, 2023, concerning the issuance of an equity interest in PHP Holdings to MPW in connection with the Restructuring Transactions, the value of that equity interest, and the monetization of that equity interest, as if the issuance of equity in PHP Holdings to MPW was a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW. As alleged below, those statements were rendered misleading by the failure to disclose the June 2023 NMM and the July 2023 DMHC Order in the Q2 2023 Release, during the Q2 2023 Call, and in the Q2 2023 Form 10-Q.

207.    The Q2 2023 Release stated in relevant part:

Net loss for the second quarter ended June 30, 2023 was ($42 million) (($0.07) per diluted share) compared to net income of $190 million ($0.32 per diluted share) in the year earlier period. Included in 2023 second quarter net loss is the . . . recognition of $68 million of 2023 previously unrecorded but contractually owed rent and interest revenue *from the receipt of equity in PHP Holdings LLC ("PHP")*.

NFFO for the second quarter ended June 30, 2023 was $285 million ($0.48 per diluted share) compared to $275 million ($0.46 per diluted share) in the year earlier period. Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share) *from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect")*. In accordance with accounting requirements, the value of MPT's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.

The Company is narrowing its 2023 calendar estimate of per share net income to $0.33 to $0.37 to account for second quarter results and is also narrowing its estimate of per share NFFO to $1.53 to $1.57. The ranges include Prospect-related income from the expected resumption of partial California rental payments, *recognition of the PHP equity value received in the second quarter* and other amounts.

208.    During the Q2 2023 Call, Defendant Aldag advised analysts that the "managed care business continues to be profitable and on track to meet revenue and EBITDA targets and timelines. *They are still planning for a monetization event of the managed care business in 2024*."

209.    Later during the Q2 2023 Call, Hamner advised that MPW "*recognized about $68 million in Prospect rent and interest. This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for [an equity] interest in Prospect's managed care business*." Hamner then explained how the $82 million "increase" in the value of the "equity interest" issued to MPW in connection with the Restructuring Transactions enabled MPW to recognize the $68 million in Q2 2023 Prospect Gain:

In brief summary, *you will recall our May 23rd announcement that as of the end of the first quarter, we carried these assets at approximately $573 million*. After obtaining updated valuations and an appraisal to determine marketability discounts, *the estimated value of our interest in managed care as of the May closing was approximately $655 million*. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from the sale to Yale of our Connecticut hospitals. *Accordingly, we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date*.

210.    Subsequently, during Q&A, an analyst asked why MPW had not revised its NFFO guidance in connection with the announcement of the Restructuring Transactions in May 2023, if such transactions purportedly gave rise to a gain. Hamner responded in relevant part:

> [T]he transaction happened on May 23rd and as I tried to point out earlier, we had multiple validations, multiple independent third parties who took different perspectives on the value of the managed care business. It's a private company.
>
> It's not uncomplicated that what Prospect has done is to extract various different operations and subsidiaries from across the Prospect ownership and put it into a single operating company and measure that and then provide that information to the appraisers and so forth, such that. *We only got something that the auditors were able to look at and we were confident in the $655 million value*. *That didn't happen on May 23rd. It didn't happen for six-plus weeks afterwards . . . [W]e just simply didn't have the information until more recently.*

211.    The Q2 2023 Form 10-Q stated in relevant part:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including . . . e) *obtain[ing] a non-controlling ownership interest in PHP Holdings of approximately $654 million*, after applying a discount for lack of marketability, *consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings* . . . This non-controlling ownership interest [valued at $654 million] was received in exchange for unpaid rent and interest through December 2022, *previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million*, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.

212.    The bolded and italicized portions in each of the statements in paragraphs 207-211 above appearing in the Q2 2023 Release or the Q2 2023 Form 10-Q, or made during the Q2 2023 Call, were misleading "half-truths." Specifically, the bolded and italicized portions in each of the statements above advised MPW investors that (i) MPW had received an equity interest in PHP Holdings pursuant to the Restructuring Transactions, (ii) such equity interest had purportedly increased in value by $82 million to $655 million since May 23, 2023, resulting in the recognition

of $68 million in "revenue" in Q2 2023, or (iii) such equity interest would eventually be monetized. Those statements, however, were rendered misleading by the omission of critical qualifying information concerning pending regulatory action by the DMHC posing a substantial risk to the validity of that equity interest, *i.e.*, that (i) on June 23, 2023, Prospect had submitted the June 2023 NMM seeking approval the Minority Interest Transaction under Section 1399.65 in response to the DMHC's unexpected request to process review and approval of the Minority Interest Transaction as a notice of material modification; and (ii) on July 20, 2023, the DMHC had issued the July 2023 DMHC Order, which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction pending the DMHC's fulsome review of the circumstances of the Minority Interest Transaction. Disclosure of the June 2023 NMM and the July 2023 DMHC Order that MPW held back would have significantly altered the total mix of information for MPW investors by making them aware of pending regulatory action by the DMHC posing a substantial risk to the validity of the equity interest in PHP Holdings issued to MPW, *i.e.*, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether, which would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

4.     **Materially False and Misleading Statements in the Q2 2023 Release**

213.     The Q2 2023 Press Release stated in relevant part:

NFFO for the second quarter ended June 30, 2023 was $285 million ($0.48 per diluted share) compared to $275 million ($0.46 per diluted share) in the year earlier period. ***Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share) from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect")***. In accordance with accounting requirements, the value of MPW's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.

The Company is narrowing its 2023 calendar estimate of per share net income to $0.33 to $0.37 to account for second quarter results and is also narrowing its estimate of per share NFFO to $1.53 to $1.57. The ranges include Prospect-related income from the expected resumption of partial California rental payments, ***recognition of the PHP equity value received in the second quarter*** and other amounts. The estimates are based on an existing portfolio which includes the impact of binding disposition and leasing transactions and excludes expected future contributions from development and other capital projects.

214.    The bolded and italicized statements in the Q2 2023 Release in the preceding paragraph that (i) "***[i]ncluded in 2023 second quarter NFFO is roughly $68 million . . . from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue***" from Prospect," and (ii) estimated NFFO of $1.53 to $1.57 per share for 2023 included "***recognition of the PHP equity value received in the second quarter***" ("Q2 2023 Release Statements"), were materially false and misleading because they violated GAAP. Specifically, (i) the risk that the DMHC might not approve the Minority Interest Transaction was a regulatory risk of which Defendants would have become aware no later than June 20, 2023 (due to the Three Business Day NMM Review Requirement); and (ii) the subsequent issuance of the July 2023 DMHC Order (which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction) provided additional evidence concerning that regulatory risk. In turn, the existence of that regulatory risk made any gain from the Minority Interest Transaction subject to a "contingency" (*i.e.*, uncertainly concerning whether the DMHC would approve the Minority Interest Transaction) no later than June 23, 2023, which "contingency" was confirmed by a Type 1 subsequent event (i.e., the July 2023 DMHC Order). Because of that contingency, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited MPW from recognizing as revenue any gain in Q2 2023 from MPW's receipt of equity in PHP Holdings under the Restructuring Agreement until the contingency was resolved (since an unfavorable resolution

would have invalidated the issuance of equity to MPW under the Restructuring Agreement). Nevertheless, while the contingency remained unresolved, MPW violated GAAP by prematurely recognizing the $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 on account of its receipt of equity in PHP Holdings under the Restructuring Agreement. Under the SEC's regulations (17 C.F.R § 210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in accordance with GAAP are "***presumed*** to be misleading or inaccurate."

215.    The Q2 2023 Release Statements were also materially false and misleading because they violated MPW's internal accounting policy providing that calculation of NFFO should exclude any gain from non-core events in order to avoid making "comparison to prior period results and market expectations ***less meaningful to investors and analysts***." Nevertheless, even though the $68 million Q2 2023 Prospect Gain derived from a concededly non-core event (i.e., the Restructuring Transactions), MPW did not exclude the $68 million Q2 2023 Prospect Gain from the calculation of NFFO for Q2 2023, thus concededly misleading MPW investors concerning the magnitude of NFFO for Q2 2023. As noted above, for this reason, Hedgeye added back the $68 million when calculating FFO-related metrics.

**5.    Materially False and Misleading Statements During the Q2 2023 Call**

216.    On August 8, 2023, MPW conducted the Q2 2023 Call to discuss Q2 2023 results. On that call, Defendant Hamner stated in relevant part:

> *[W]e recognized about $68 million in Prospect rent and interest. This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for [an] interest in Prospects managed care business*.
>
> In brief summary, you will recall our May 23rd announcement that as of the end of the first quarter, we carried these assets at approximately $573 million. After obtaining updated valuations and an appraisal to determine marketability discounts, the estimated value of our interest in managed care as of the May closing was approximately $655 million. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from

the sale to Yale of our Connecticut hospitals. ***Accordingly, we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date***.

217.     The bolded and italicized statements made by Hamner during the Q2 2023 Call in the preceding paragraph that (i) "***we recognized about $68 million in Prospect rent and interest . . . based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for interest in Prospects managed care business***" and (ii) "***we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date***" ("Q2 2023 Call Statements") were materially false and misleading because they violated GAAP. Specifically, (i) the risk that the DMHC might not approve the Minority Interest Transaction was a regulatory risk of which Defendants would have become aware no later than June 20, 2023 (due to the Three Business Day NMM Review Requirement); and (ii) the subsequent issuance of the July 2023 DMHC Order (which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction) provided additional evidence concerning that regulatory risk. In turn, the existence of that regulatory risk made any gain from the Minority Interest Transaction subject to a "contingency" (*i.e.*, uncertainly concerning whether the DMHC would approve the Minority Interest Transaction) no later than June 23, 2023, which "contingency" was confirmed by a Type 1 subsequent event (i.e., the July 2023 DMHC Order). Because of that contingency, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited MPW from recognizing as revenue any gain in Q2 2023 from MPW's receipt of equity in PHP Holdings under the Restructuring Agreement until the contingency was resolved (since an unfavorable resolution would have invalidated the issuance of equity to MPW under the Restructuring Agreement). Nevertheless, while the contingency remained unresolved, MPW violated GAAP by prematurely recognizing the $68 million Q2 2023 Prospect Gain as

revenue in Q2 2023 on account of its receipt of equity in PHP Holdings under the Restructuring

Agreement. Under the SEC's regulations (17 C.F.R § 210.4-01(a)(1)), financial statements filed

with the SEC that are not prepared in accordance with GAAP are "***presumed*** to be misleading or

inaccurate."

6.    **Materially False and Misleading Statements in the Q2 2023 Form 10-Q**

218.    On August 9, 2023, MPW filed the Q2 2023 Form 10-Q with the SEC reporting its

financial and operational results for Q2 2023 ending on June 30, 2023. That filing stated, in

relevant part:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including . . . e) ***obtain[ing] a non-controlling ownership interest in PHP Holdings of approximately $654 million***, after applying a discount for lack of marketability, ***consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings*** . . . ***This non-controlling ownership interest [valued at $654 million] was received in exchange for*** unpaid rent and interest through December 2022, ***previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million***, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.[18]

---

[18] The Q2 2023 Prospect Gain was 20.3% of MPW's revenue in Q2 2023.

219.    The recognition of the $68 million Q2 2023 Prospect Gain as revenue was incorporated into the "Revenues" section of MPW's income statement for Q2 2023 under "Income from financing leases" and "Interest and other income":

Condensed Consolidated Statements of Net Income
(Unaudited)

| (In thousands, except per share amounts) | For the Three Months Ended June 30, 2023 | | For the Three Months Ended June 30, 2022 | |
|---|---|---|---|---|
| **Revenues** | | | | |
| Rent billed | $ | 247,491 | $ | 241,209 |
| Straight-line rent | | (39,329) | | 58,518 |
| Income from financing leases | | 68,468 | | 51,873 |
| Interest and other income | | 60,765 | | 48,626 |
| Total revenues | | 337,395 | | 400,226 |
| **Expenses** | | | | |
| Interest | | 104,470 | | 87,730 |
| Real estate depreciation and amortization | | 364,403 | | 84,334 |
| Property-related | | 24,676 | | 21,135 |
| General and administrative | | 35,604 | | 38,858 |
| Total expenses | | 529,153 | | 232,057 |
| **Other income (expense)** | | | | |
| Gain on sale of real estate | | 167 | | 16,355 |
| Real estate and other impairment charges | | — | | — |
| Earnings from equity interests | | 12,224 | | 14,785 |
| Debt refinancing and unutilized financing costs | | (816) | | (619) |
| Other (including fair value adjustments on securities) | | (10,512) | | 2,031 |
| Total other income (expense) | | 1,063 | | 32,552 |
| (Loss) income before income tax | | (190,695) | | 200,721 |
| Income tax benefit (expense) | | 148,262 | | (10,657) |
| **Net (loss) income** | | (42,433) | | 190,064 |

220.    The (i) bolded and italicized statement made in the Q2 2023 Form 10-Q in paragraph 218 above that "*[t]his non-controlling ownership interest was received in exchange for . . . previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million*" ("Q2 2023 Form 10-Q Statement"), and (ii) income statement in paragraph 219 above with the $68 million Q2 2023 Prospect Gain included in "income from financing leases" and "interest and other income," were materially false and misleading because they violated GAAP. Specifically, (i) the risk that the DMHC might not approve the Minority Interest Transaction was a regulatory risk of which Defendants would have become aware no later than June 20, 2023 (due

to the Three Business Day NMM Review Requirement); and (ii) the subsequent issuance of the July 2023 DMHC Order (which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction) provided additional evidence concerning that regulatory risk. In turn, the existence of that regulatory risk made any gain from the Minority Interest Transaction subject to a "contingency" (*i.e.*, uncertainly concerning whether the DMHC would approve the Minority Interest Transaction) no later than June 23, 2023, which "contingency" was confirmed by a Type 1 subsequent event (i.e., the July 2023 DMHC Order). Because of that contingency, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited MPW from recognizing as revenue any gain in Q2 2023 from MPW's receipt of equity in PHP Holdings under the Restructuring Agreement until the contingency was resolved (since an unfavorable resolution would have invalidated the issuance of equity to MPW under the Restructuring Agreement). Nevertheless, while the contingency remained unresolved, MPW violated GAAP by prematurely recognizing the $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 on account of its receipt of equity in PHP Holdings under the Restructuring Agreement. Under the SEC's regulations (17 C.F.R § 210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in accordance with GAAP are "***presumed*** to be misleading or inaccurate."

221.    The Q2 2023 Form 10-Q also contained the following table ("NFFO Table") displaying the calculation of NFFO in Q2 2023:

| | For the Three Months Ended | |
| --- | --- | --- |
| | June 30, 2023 | June 30, 2022 |
| **FFO information:** | | |
| Net (loss) income attributable to MPT common stockholders | $ (42,037) | $ 189,597 |
| Participating securities' share in earnings | (469) | (345) |
| Net (loss) income, less participating securities' share in earnings | $ (42,506) | $ 189,252 |
| Depreciation and amortization | 382,244 | 101,976 |
| Gain on sale of real estate | (167) | (16,355) |
| Real estate impairment charges | — | — |
| Funds from operations | $ 339,571 | $ 274,873 |
| Write-off (recovery) of unbilled rent and other | 95,642 | 1,943 |
| Other impairment charges | — | — |
| Litigation and other | 2,502 | — |
| Share-based compensation adjustments | (4,363) | (966) |
| Non-cash fair value adjustments | 8,374 | (943) |
| Tax rate changes and other | (157,230) | (825) |
| Debt refinancing and unutilized financing costs | 816 | 619 |
| Normalized funds from operations | $ 285,312 | $ 274,701 |

222.    The NFFO Table in the preceding paragraph was materially false and misleading because it violated MPW's internal accounting policy providing that calculation of NFFO should exclude any gain from non-core events in order to avoid making "comparison to prior period results and market expectations *less meaningful to investors and analysts*." Nevertheless, even though the $68 million Q2 2023 Prospect Gain derived from a concededly non-core event (i.e., the Restructuring Transactions), MPW did not exclude the $68 million Q2 2023 Prospect Gain from the calculation of NFFO for Q2 2023, thus concededly misleading MPW investors concerning the magnitude of NFFO in Q2 2023. As noted above, for this reason, Hedgeye added back the $68 million when calculating FFO-related metrics.

223.    The Q2 2023 Form 10-Q also contained a certification ("Aldag Certification") signed by Defendant Aldag stating:

I, Edward K. Aldag, Jr., certify that:

1) I have reviewed this quarterly report on Form 10-Q of Medical Properties Trust, Inc.;

2) Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements*

*made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3) Based on my knowledge, *the financial statements, and other financial information included in this report*, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and have . . . b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding reliability of financial reporting and the preparation of financial statements for external purposes *in accordance with generally accepted accounting principles*.

224.    The bolded and italicized statements in the Aldag Certification above that (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading with respect to the period covered by this report;" (ii) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; and (iii) Q2 2023 Form 10-Q was prepared "in accordance with generally accepted accounting principles," were materially false and misleading statements because, as alleged above, the Q2 2023 Form 10-Q violated GAAP, and contained materially false and misleading statements and omissions. Moreover, given the reasonable inference that Aldag was aware of the June 2023 NMM, and the July 2023 DMHC Order (since he closely monitored the Restructuring Transactions), and that Aldag would have known that neither document was disclosed in the Q2 2023 Form 10-Q, Aldag could not have legitimately believed his statement that the Q2 2023 Form 10-Q did not omit any material fact necessary to make statements in the Q2 2023 Form 10-Q not misleading. As noted above, omission of the June 2023 NMM and the July 2023 DMHC Order from the Q2 2023 Form 10-Q rendered

misleading multiple statements therein concerning the equity interests in PHP Holdings issued to MPW.

225.    The Q2 2023 Form 10-Q also contained a certification ("Hamner Certification") signed by Defendant Hamner stating:

I, R. Steven Hamner, certify that:

1) I have reviewed this quarterly report on Form 10-Q of Medical Properties Trust, Inc.;

2) Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3) Based on my knowledge, *the financial statements, and other financial information included in this report*, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and have . . . b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding reliability of financial reporting and the preparation of financial statements for external purposes *in accordance with generally accepted accounting principles*.

226.    The bolded and italicized statements in the Hamner Certification that (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading with respect to the period covered by this report;" (ii) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; and (iii) Q2 2023 Form 10-Q was prepared "in accordance with generally accepted accounting principles," were materially false and misleading statements because, as alleged above, the Q2 2023 Form 10-Q violated GAAP, and contained

materially false and misleading statements and omissions. Moreover, given the reasonable inference that Hamner was aware of the June 2023 NMM, and the July 2023 DMHC Order (since he closely monitored the Restructuring Transactions, including signing the Restructuring Agreement, which entitled him to review the June 2023 NMM before its submission to the DMHC), and that Hamner would have known that neither document was disclosed in the Q2 2023 Form 10-Q, Hamner could not have legitimately believed his statement that the Q2 2023 Form 10-Q did not omit any material fact necessary to make statements in the Q2 2023 Form 10-Q not misleading. As noted above, omission of the June 2023 NMM and the July 2023 DMHC Order from the Q2 2023 Form 10-Q rendered misleading multiple statements therein concerning the equity interests in PHP Holdings issued to MPW.

## **LOSS CAUSATION**

227.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased MPW securities at artificially inflated prices and were damaged thereby. The price of MPW securities declined when the concealed risks materialized and/or when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

228.   Specifically, artificial inflation in the price of MPW securities was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions, as detailed above, was partially revealed to the public on August 18, 2023 by the WSJ article, as alleged herein.

229.   In response to the *WSJ* article, the price of MPW's common stock fell to a closing price of $6.93 per share on August 18, 2023, a decline of $0.57 per share, or 7.6%, from the closing price of $7.50 on August 17, 2023.

## ADDITIONAL SCIENTER ALLEGATIONS

230.    The allegations herein establish a strong inference of scienter on the part of the Defendants with respect to the materially false and misleading statements and omissions alleged herein for the following non-exclusive reasons. *First*, Prospect was MPW's third largest tenant on a "total asset basis" with assets attributable to MPW's relationship with Prospect valued at $1.48 billion, or 7.5% of MPW's total assets, as of December 31, 2022. Additionally, MPW disclosed as a "Concentration of Credit Risk" that revenue from Prospect represented more than 10% of MPW's total revenue in 2022. Thus, under the "core operations doctrine," MPW's challenges with respect to Prospect were an ongoing material concern for Aldag and Hamner, as evidenced by their detailed updates and explanations concerning MPW's restructuring efforts with respect to Prospect shared with analysts on quarterly conference calls before, during and after the Class Period, as alleged above.

231.    *Second,* the specificity of the updates and explanations concerning MPW's restructuring efforts with respect to Prospect that Aldag and Hamner shared with analysts on quarterly conference calls before, during and after the Class Period, demonstrates that both Aldag and Hamner received specific information concerning MPW's ongoing restructuring efforts with respect to Prospect, and closely monitored those efforts, and thus would have been aware of the regulatory snags with the DMHC. That is especially true with respect to Hamner who signed both the Restructuring Agreement in May 2023, and then the April 2024 Undertakings to secure DMHC approval of the Minority Interest Transaction. Thus, it is reasonable to infer that Hamner was well aware of the status and progress of the DMHC approval process from start to finish.

232.    *Third*, Aldag and Hamner benefited economically from the improper and premature recognition of the $68 million in Prospect Gain in Q2 2023 and $13 million in Prospect Gain in Q3 2023 in violation of GAAP because their annual cash bonuses and Performance-Based Share

awards were tied in part to NFFO and EBITDA, both of which were boosted by the improper and premature recognition of Prospect Gain in 2023, as alleged above.

233.   *Fourth*, both Defendants Aldag and Hamner signed Sarbanes-Oxley certifications attached to the Q2 2023 (as specified above), and Defendant Hanna signed the Q2 2023 Form 10-Q, even though the Q2 2023 Form 10-Q violated GAAP, and contained materially false and misleading statements and omissions, as alleged above.

234.   *Fifth*, by reporting the non-cash $68 million Q2 2023 Prospect Gain as revenue during Q2 2023, based on the reported $82 million increase in the value of MPW's interest in Prospect, Defendants adopted a position that was inconsistent with recent prior public statements that MPW would be recognizing rent and income from Prospect on a "cash only" basis. And then in Q3 2023, MPW reported a $30 million increase in the value of MPW's interest in Prospect, but inconsistently did *not* recognize this increase as revenue. As noted, multiple analysts sharply criticized Defendants for these blatantly inconsistent accounting shenanigans. Moreover, as noted, in an April 2024 letter to Aldag, Senators Warren and Markey accused MPW of playing accounting games with rent with respect to a different tenant to "bolster its stock price, and report lucrative cash flows." Thus, multiple third parties have perceived that Defendants deliberately manipulated MPW's accounting to derive economic benefits.

235.   *Sixth*, in violation of Item 601 of the SEC's Regulation S-K requiring publicly-traded companies to attach a "material contract . . . [that] is executed or becomes effective during [a] reporting period" as "an exhibit to the Form 10–Q or Form 10–K filed for the corresponding period" (17 C.F.R. § 229.601(a)(4)), MPW failed to attach the Restructuring Agreement as an exhibit to its Q2 2023 Form 10-Q, despite disclosing the Restructuring Transactions in the Q2 2023 Form 10-Q. This failure was particularly significant for Hamner who (i) signed the

Restructuring Agreement on behalf of MPT Picasso and other MPW affiliates, and was thus personally aware of the material terms of the Restructuring Agreement, and (ii) certified the Q2 2023 Form 10-Q, despite the failure to attach the Restructuring Agreement as an exhibit to the Q2 2023 Form 10-Q. The failure to attach the Restructuring Agreement as an exhibit to MPW's Q2 2023 Form 10-Q—or to *any other* SEC filing by MPW—evidences an intent to conceal the material terms of the Restructuring Agreement from MPW investors.

## CLASS ACTION ALLEGATIONS

236.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all individuals who and entities that purchased or otherwise acquired MPW securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

237.    The members of the Class are so numerous that joinder of all members is impracticable. As noted, MPW had approximately 598,991,000 shares outstanding as of December 31, 2023. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MPW or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

238.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

239.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

240.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants violated the federal securities laws by the acts and omissions alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of MPW, so as to render such statements materially false and misleading;

- whether the Individual Defendants caused MPW to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of MPW securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

241.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

242.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- MPW securities are traded in an efficient market on the NYSE;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold MPW securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

243.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

244.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR
## AND BESPEAKS CAUTION DOCTRINE

245.    The protections applicable to forward-looking statements do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

246.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures the Company or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of the Company who knew that the statement was untrue or misleading when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

247.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

248.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

249.    As specified above, during the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs

and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MPW securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire MPW securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

250.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MPW securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MPW's finances and business prospects.

251.    By virtue of their positions at MPW, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants

were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

252.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of MPW, the Individual Defendants had knowledge of the details of MPW's internal affairs.

253.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MPW. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MPW's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MPW securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning MPW's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired MPW securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon materially false and misleading statements disseminated by Defendants, and were damaged thereby.

254.    During the Class Period, MPW securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MPW securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of MPW securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of MPW securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and other Class members.

255.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating materially false and misleading statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

257.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258.    During the Class Period, the Individual Defendants participated in the operation and management of MPW, and conducted and participated, directly and indirectly, in the conduct

of MPW's business affairs. Because of their senior positions, they knew the adverse non-public information about MPW's misstatement of income and expenses and false financial statements.

259.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MPW's financial condition and results of operations, and to correct promptly any public statements issued by MPW which had become materially false or misleading.

260.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MPW disseminated in the marketplace during the Class Period concerning MPW's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MPW to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of MPW within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MPW securities.

261.   Each of the Individual Defendants, therefore, acted as a controlling person of MPW. By reason of their senior management positions and/or being directors of MPW, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MPW to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of MPW and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

262.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MPW.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives, and Lead Counsel as Class Counsel;

B.      Requiring Defendants to pay all damages sustained by Plaintiffs and the Class by reason of the acts and omissions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  October 30, 2024                       Respectfully submitted,

                                                                POMERANTZ LLP

                                                                */s/ Jonathan D. Park*
                                                                Jeremy A. Lieberman
                                                                Jonathan D. Park
                                                                600 Third Avenue, 20th Floor
                                                                New York, New York 10016
                                                                Telephone: (212) 661-1100
                                                                Facsimile: (917) 463-1044
                                                                jalieberman@pomlaw.com
                                                                jpark@pomlaw.com

                                                                *Lead Counsel for the Proposed Class*

                                                                WOHL & FRUCHTER LLP
                                                                Joshua E. Fruchter
                                                                25 Robert Pitt Drive, Suite 209G
                                                                Monsey, New York 10952
                                                                Telephone: (845) 290-6818
                                                                Facsimile: (718) 504-3773

jfruchter@wohlfruchter.com

*Additional Counsel for Plaintiffs*