# EXHIBIT A

Execution Version

## AMENDED AND RESTATED
## MASTER RESTRUCTURING AGREEMENT
**(Vista Investment)**

**THIS AMENDED AND RESTATED MASTER RESTRUCTURING AGREEMENT** (this "Agreement") is made and entered into effective as of this 23rd day of May, 2023, by and among **PROSPECT MEDICAL HOLDINGS, INC.**, a Delaware corporation ("Prospect Medical"), **PHP HOLDINGS, LLC**, a Delaware limited liability company ("PHP Holdings"), **PROSPECT HEALTHCARE FACILITIES MANAGEMENT, LLC** f/k/a PHC HoldCo, Inc., a Delaware limited liability company ("ManageCo"), and each of their respective undersigned Affiliates (such Affiliates, together with Prospect Medical, PHP Holdings, and ManageCo, collectively, the "Prospect Parties") on the one hand, and **MPT PICASSO INVESTORS TRS, LLC**, a Delaware limited liability company ("MPT Picasso TRS"), and its undersigned Affiliates (such Affiliates, together with MPT Picasso TRS, collectively, the "MPT Parties") on the other hand. The Prospect Parties and the MPT Parties are herein sometimes referred to individually as a "Party" and collectively, as the "Parties".

## W I T N E S E T H:

**WHEREAS**, the capitalized terms used in these recitals and throughout this Agreement have the respective meanings ascribed to them in the Glossary of Defined Terms attached hereto as ***ANNEX A***;

**WHEREAS**, (a) the Master Lease I Lessors and Master Lease I Lessees are parties to Master Lease I, pursuant to which such Master Lease I Lessors lease to such Master Lease I Lessees certain real property and improvements consisting of multiple healthcare facilities, as more particularly described in Master Lease I; (b) the Master Lease II Lessors and Master Lease II Lessees are parties to Master Lease II, pursuant to which such Master Lease II Lessors lease to such Master Lease II Lessees certain real property and improvements consisting of multiple healthcare facilities, as more particularly described in Master Lease II; (c) the MPT Foothill Lender, Alta Newport, and Foothill Propco (as assignee) are parties to the Foothill Mortgage Loan Agreement, pursuant to which the MPT Foothill Lender made certain mortgage loans to Alta Newport, as evidenced by the Foothill Mortgage Loan Note and secured by, among other things, the Foothill Mortgage (and Alta Newport assigned all of its rights, title, and interest to the Foothill Facility (and certain related realty assets described therein) to Foothill Propco as described in Section 3.1(c) hereof); (d) the MPT TRS Lender made a term loan to Prospect Medical in the amount of One Hundred Twelve Million Nine Hundred Thirty Seven Thousand Two Hundred Four and No/100 Dollars ($112,937,204.00), which term loan is evidenced by the TRS Note; and (e) MPT Picasso TRS made a convertible term loan to PHP Holdings in the amount of Fifty Million and No/100 Dollars ($50,000,000.00), which convertible term loan is evidenced by the MPT Advance Convertible Note;

**WHEREAS**, the Released Defaults of certain of the Prospect Parties currently exist under the foregoing documents and certain other agreements entered into by certain of the Prospect Parties in connection therewith, each being subject to the Forbearance Agreement;

**WHEREAS**, pursuant to the terms of that certain Term Sheet dated March 30, 2023 between MPT Picasso TRS and Prospect Medical (as amended or modified from time to time, the "Restructuring Term Sheet"), the Parties now desire: (a) that the MPT Parties agree to release, waive, and refrain from exercising available rights and remedies against the Prospect Parties and their respective Affiliates with respect to, the Released Defaults, and (b) that the Parties engage in the Equity Rollover Transactions and the Restructuring Transactions herein described, it being the intent of the Parties that PHP Holdings obtained prior hereto, and will hereafter own at all times, all of the Managed Care Business which will be operated separately from the portfolio of other entities previously owned and controlled by Prospect Medical;

-1-

**WHEREAS**, in connection therewith, the Parties desire to amend and restate the Original Restructuring Agreement in order to effect the Equity Rollover Transactions and the Restructuring Transactions as further described herein; and

**WHEREAS**, as a result of the direct and indirect benefits (financial and otherwise) that each of the Prospect Parties and the MPT Parties has derived, and will continue to derive, from the  transactions described in this Agreement, as a condition to the release and waiver of the Released Defaults and consummation of the Equity Rollover Transaction and the Restructuring Transactions as described herein, the Parties desire to enter into this Agreement and the other Restructuring Documents, to reflect certain additional rights, covenants, and obligations of the Parties.

**NOW, THEREFORE**, in consideration of the promises and mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby amend and restate the Original Restructuring Agreement as set forth herein and agree as follows:

### ARTICLE I
### DEFINED TERMS; INTERPRETATION

**1.1.    Certain Defined Terms**.   Capitalized terms used herein shall have the respective meanings ascribed to them in the Glossary of Defined Terms attached hereto as ***ANNEX A***.

**1.2.    Interpretation; Terms Generally**. The definitions set forth in Section 1.1 and elsewhere in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless otherwise indicated, the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The words "herein", "hereof" and "hereunder" and words of similar import shall be deemed to refer to this Agreement (including the Schedules and Exhibits) in its entirety and not to any part hereof, unless the context shall otherwise require. All references herein to parties, Articles, Sections, Schedules and Exhibits shall be deemed to refer to parties, Articles, Sections and Schedules of, and Exhibits to, this Agreement, unless the context shall otherwise require. Unless the context shall otherwise require, any references to any agreement or other instrument or statute or regulation are to it as amended and supplemented from time to time (and, in the case of a statute or regulation, to any corresponding provisions of successor statutes or regulations). Any reference in this Agreement to a "day" or number of "days" that does not refer explicitly to a "Business Day" or "Business Days" shall be interpreted as a reference to a calendar day or number of calendar days.  If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

### ARTICLE II
### ACKNOWLEDGMENTS; RELEASES AND WAIVERS

**2.1.    General Inducement**.   The Outstanding Obligations represent valid and enforceable, secured, cross-collateralized, and cross-defaulted indebtedness obligations of substantial value of Prospect Medical owed to the MPT Parties. The preferred financial rights granted to the holder of PHPH Series A-1 Preferred Units, together with the consent rights related to major decisions granted to the holder of PHPH Series A-1 Preferred Units (including, without limitation, the right of MPT Picasso TRS to consent to any bankruptcy, dilutive events, incurrence of debt, insolvency, liquidation or dissolution of PHP Holdings), are a material inducement to the applicable MPT Parties to enter into this Agreement, to waive, release and

-2-

refrain from exercising the MPT Parties' rights and remedies with respect to the Released Defaults, and to participate in the Equity Rollover Transaction and the Restructuring Transactions contemplated herein.

**2.2.    Outstanding Obligations**.  The Prospect Parties hereby acknowledge that the amount of each of the Outstanding Obligations as of the date hereof is the amount set forth in the attached ***EXHIBIT A***, and that certain of the Outstanding Obligations are cross-collateralized and guaranteed by Prospect Medical pursuant to, and to the extent provided in, the Master Lease I, Master Lease II, the Foothill Mortgage Loan Documents, the TRS Note, the MPT Advance Convertible Note, and any other related agreements and security documents entered into by certain of the Prospect Parties in connection therewith.

**2.3.    Financial and Structural Matters**.  The Parties hereby acknowledge and agree that the transactions contemplated herein are being entered into by each of them based upon the following assumptions:

(a)    the ownership and structure of the Prospect Parties and their respective Subsidiaries as reflected on the Organizational Chart attached hereto as ***EXHIBIT B*** (the "Prospect Organizational Chart") are complete, true, and correct in all respects on the date hereof, effective immediately following the closing of the Phase I Transactions;

(b)    the aggregate *net equity value* of PHP Holdings and its Subsidiaries is equal to One Hundred Fifty-Three Million Six Hundred Sixty-Two Thousand Four Hundred Two Dollars Twenty-Six Cents ($153,662,402.26) (the "PHPH Net Equity Value") and, for the purposes of issuance of any of PHP Holdings' Equity Interests or any convertible notes (including, as applicable, the PHPH Series A-1 Preferred Units issued upon conversion of such convertible notes) to MPT Picasso TRS as contemplated herein on the date hereof, the PHPH Net Equity Value of PHP Holdings shall be used for purposes of determining the amount and value of such PHP Holdings' Equity Interests or convertible notes received by MPT Picasso TRS;

(c)    on the date hereof, PhysicianCo Term Loan Lenders have made a term loan to PHPH MidCo and Physician Holdings (collectively, the "PhysicianCo Term Loan Borrowers") in the aggregate original principal amount of Three Hundred Seventy-Five Million and No/100 Dollars ($375,000,000.00) ( the "PhysicianCo Term Loan");

(d)    on the date hereof, MPT Picasso TRS provided a delayed draw term loan facility to Prospect Medical in the maximum principal amount of Seventy-Five Million and No/100 Dollars ($75,000,000.00), pursuant to the terms of the HospitalCo Term Loan Agreement; and

(e)    PHP Holdings shall conduct its business as a Bankruptcy Remote Entity at all times after the date hereof in accordance with the terms hereof.

**2.4.    Satisfaction of Released Defaults**.

(a)    Immediately upon consummation of the Phase I Transactions contemplated in this Agreement, each of the Released Defaults shall, without further action by the MPT Parties, for themselves and their heirs, personal representatives, administrators, successors, and assigns (collectively, including the MPT Parties, the "MPT Releasing Parties"), be forever expressly released, cured, discharged, and waived, unconditionally and irrevocably as against the Prospect Parties and their respective Affiliates, and each of their heirs, personal representatives, officers, directors, managers, employees, administrators, agents, successors, and assigns (collectively, the "Prospect Released Parties").

-3-

(b)      Each MPT Releasing Party, for itself and on behalf of any other MPT Releasing Party, acknowledges that the legal requirements of many states provide substantially the following:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The MPT Parties for itself and on behalf of any MPT Releasing Parties understand that the foregoing gives the MPT Releasing Parties the right not to release existing claims of which the MPT Releasing Parties are not aware, unless the MPT Releasing Parties voluntarily choose to waive this right. Having been so apprised, but subject in all respects to Section 2.4(e) hereof, the MPT Parties for itself and on behalf of any MPT Releasing Parties nevertheless hereby voluntarily elect to and waive the rights described above solely with respect to the Released Defaults (or such other comparable statute, rule, regulation or order), and elect to assume all risks for claims that exist, existed or may hereafter exist in its favor, known or unknown, suspected or unsuspected, solely arising out of or related to the Released Defaults, in each case, effective upon the date hereof. The MPT Parties for itself and on behalf of any MPT Releasing Parties acknowledge and agree that the foregoing waiver is an essential and material term of the release of the Released Defaults by the MPT Releasing Parties and that, without such waiver, the Prospect Released Parties would not have agreed to the terms of this release.

(c)      The MPT Parties hereby represent and warrant to the Prospect Parties that the MPT Parties have no actual knowledge (and without inquiry by any such MPT Party) that any "Event of Default" (as defined in the applicable Obligation Documents) exists as of the date hereof other than the Released Defaults and the Uncured Defaults.

(d)      At least two (2) days prior to the Closing Date of each of the Phase II Transactions and the Phase III Transactions, each of the MPT Parties, on the one hand, and Prospect Parties, on the other hand, will (i) provide to one another an updated list of Events of Default then in existence as of such date that are actually known by such Parties, and (ii) represent and warrant to one another that such Parties have no actual knowledge (and without inquiry by any such Party) that any Event of Default exists as of such Closing Date other than such updated Events of Defaults described per clause (i) hereof (collectively, the "Default Representation").

(e)      Notwithstanding the foregoing, the MPT Parties are not waiving or refraining from exercising any rights or remedies with respect to any default or Event of Default that is not a Released Default *as of the date hereof* (including any future Event of Default), and expressly reserve the right to exercise all such rights and remedies with respect to any such other default or Event of Default (including any Uncured Defaults) in accordance with the applicable agreements (including, without limitation, any failure to pay rents, interests, or other amounts payable after the date hereof in accordance with their applicable terms). The existence of any new Events of Default, if any, occurring after the date hereof shall not effect or delay the closing of the Phase II Transactions or the Phase III Transactions. This is not a waiver, release, or extension of any future requirement or other obligation under any of Master Lease I, Master Lease II, the Foothill Mortgage Loan Documents, the TRS Note, the MPT Advance Convertible Note, the Phase I Convertible Note, the Pennsylvania Restructuring Documents, the Amended and Restated Security Agreements, or any other related agreements, and this provision is without prejudice to, and the MPT Parties expressly reserve any and all rights and remedies thereunder, under applicable law, or otherwise with respect to any such future requirements or other obligations.

-4-

(f)      Without limiting the generality of the foregoing subsection, the Prospect Parties hereby acknowledge the existence of the Uncured Defaults and shall take all actions reasonably necessary to cure such defaults in all respects within thirty (30) Business Days following the date hereof; provided, however, the Prospect Parties may enter into a payment plan or other arrangement, which would be deemed to satisfy the Prospect Parties' obligations in this Section 2.4(f), so long as such payment plan or other arrangement is approved in advance by the MPT Parties (which shall be in the MPT Parties' sole discretion but not to be unreasonably delayed). Any failure to cure any of such Uncured Defaults within the specified time period shall be deemed an Event of Default under the applicable Obligation Documents.

**2.5.      Release and Waiver of MPT Parties**.  Contemporaneously herewith, each of the Prospect Parties has executed and delivered to the MPT Parties a Release and Waiver Agreement in the form attached hereto as **_EXHIBIT C_**.  As of the Closing Date of each of the Phase II Transactions and the Phase III Transactions, the Prospect Parties shall simultaneously execute and deliver to the MPT Parties an additional Release and Waiver Agreement, to be effective as of each such Closing Date.

**2.6.      Termination of Forbearance Agreement**.  The Forbearance Agreement is hereby terminated, and shall be of no further force or effect after the date hereof.

**2.7.      Termination of Collateral Assignments of Assignable Option Agreement**. The Collateral Assignments are hereby terminated, and shall be of no further force or effect after the date hereof.

**ARTICLE III**
**PHASE I TRANSACTIONS**

The Phase I Transactions are comprised of the events provided in this ARTICLE III, which Phase I Transactions are occurring as of the Closing Date of the Phase I Transactions (unless expressly otherwise provided):

**3.1.      PhysicianCo Term Loan; Transfer and Leaseback of Foothill Facility; Redemption of Series A-2 Preferred Units**.  As a condition to the MPT Parties entering into this Agreement and effecting the transactions contemplated herein, on the date hereof:

(a)      PhysicianCo Term Loan.  The PhysicianCo Term Loan Lenders and the PhysicianCo Term Loan Borrowers have entered into the PhysicianCo Term Loan Agreement, pursuant to which the PhysicianCo Term Loan Lenders have made a term loan to the PhysicianCo Term Loan Borrowers in the original principal amount of Three Hundred Seventy-Five Million and No/100 Dollars ($375,000,000.00), of which the sum of One Hundred Thirty-One Million Four Hundred Sixty-Nine Thousand Four Hundred Eighty-Nine Dollars Fifty-Three Cents ($131,469,489.53) will be distributed by PHPH Midco to PHP Holdings and Fifty-Six Million Four Hundred Sixty-Nine Thousand Four Hundred Eighty-Nine Dollars Fifty-Three Cents ($56,469,489.53) will be distributed by PHP Holdings to Prospect Medical (immediately prior to MPT Picasso TRS acquiring any Equity Interests in PHP Holdings).

(b)      Intercreditor Agreements.  The PhysicianCo Term Loan Lenders and certain of the MPT Parties (and their Affiliates) have entered into the PhysicianCo Intercreditor Agreement and the HospitalCo Intercreditor Agreement, pursuant to which they have agreed upon (i) the priority of their Encumbrances on certain collateral securing their respective obligations and liabilities from certain of the Prospect Parties, and (ii) certain of their other respective rights and remedies, as set forth therein.

-5-

(c)     Transfer and Leaseback of Foothill Facility. Prior to the consummation of the Phase I Transactions, (i) Alta Newport transferred, assigned, and conveyed all of its rights, title, and interest to the Foothill Facility (and certain related realty assets described therein) to Foothill Propco (subject in all respects to the Foothill Mortgage and all obligations owed by Alta Newport to the MPT Foothill Lender under the other Foothill Mortgage Loan Documents), and (ii) Foothill Propco leased the Foothill Facility to Alta Newport pursuant to that certain Hospital Lease Agreement, dated May 16, 2023 ("Foothill Lease"), and which Foothill Lease is secured as set forth therein. Contemporaneously with the closing of the balance of the Phase I Transactions, the Foothill Mortgage and all obligations owed by Alta Newport and Foothill Propco to the MPT Foothill Lender under the other Foothill Mortgage Loan Documents will be released in accordance with Section 3.5(a).

(d)     Redemption of Outstanding Series A-2 Preferred Units. Prior to the date hereof, PHP Holdings issued 32,402,885 Series A-2 Preferred Units as follows: (i) 29,795,354 PHPH Series A-2 Preferred Units to Prospect Provider Group, LLC ("PPG"), and (ii) 2,607,531 PHPH Series A-2 Preferred Units to PHS Holdings, LLC ("PHS"). Prior to the consummation of the Phase I Transactions, PHP Holdings redeemed all of such 32,402,885 Series A-2 Preferred Units from PPG and PHS pursuant to the Redemption Agreements and, as a result thereof, there are no PHPH Series A-2 Preferred Units issued and outstanding as of the date hereof.

**3.2.    Issuance of Preferred Units and Convertible Notes for Certain Outstanding Obligations**.

(a)     PHPH Series A-1 Preferred Units.  Immediately following the consummation of the transactions contemplated in Section 3.1, on the date hereof:

>    (i)     Pursuant to the Series A-1 Subscription Agreement, MPT Picasso TRS has received PHPH Series A-1 Preferred Units comprising Forty-Nine Percent (49%) of the outstanding Equity Interest in PHP Holdings, which the Parties hereby agree the value of which equals Seventy-Five Million Two Hundred Ninety-Four Thousand Five Hundred Seventy-Seven Dollars Eleven Cents ($75,294,577.11) (based upon the PHPH Net Equity Value);

>    (ii)     each of PHP Holdings, MPT Picasso TRS, and Prospect Medical has entered into the PHP Holdings LLC Agreement (pursuant to which ManageCo shall serve as the manager thereof following the date hereof); and

>    (iii)     in accordance with the terms of the PHP Holdings LLC Agreement, each of the Subsidiaries of PHP Holdings (but not including Prospect Health Plan, Inc. solely to the extent prohibited by applicable laws or regulations), has amended (or, no later than ten (10) days following the Closing Date of the Phase I Transactions will, amend) its respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents to include certain provisions and protections for the benefit of MPT Picasso TRS (collectively, the "PHPH Subsidiary Amendments").

(b)     PHP Convertible Notes.  Contemporaneously herewith, PHP Holdings has issued MPT Picasso TRS the "Phase I Convertible Note" in the original principal amount of Six Hundred Forty-Six Million Three Hundred Thirty-Seven Thousand Five Hundred Ninety-Seven Dollars Seventy-Four Cents ($646,337,597.74), which amount the Parties intend to equal the following:

>    (i)     the Phase I Outstanding Obligations described in Section 3.2(c) hereof, *less*

-6-

(ii)     the agreed upon value of the PHPH Series A-1 Preferred Units issued to MPT Picasso TRS as set forth above in <u>Section 3.2(a)</u> hereof.

(c)     <u>Phase I Outstanding Obligations</u>.  MPT Picasso TRS is accepting the Phase I Convertible Note in lieu of additional PHPH Series A-1 Preferred Units because issuance of any additional PHPH Series A-1 Preferred Units to MPT Picasso TRS on the date hereof beyond those described in <u>Section 3.2(a)</u> hereof requires certain regulatory notices and approvals (as described in <u>Section 4.1</u> hereof) and, thus, the issuance of such PHPH Series A-1 Preferred Units and Phase I Convertible Note, on a combined basis, are intended to be in full and complete satisfaction of the following Outstanding Obligations (collectively, the "<u>Phase I Outstanding Obligations</u>"):

(i)     the outstanding balance (if any) of the MPT Advance Convertible Note described in <u>Section 3.3</u> hereof;

(ii)     the Deferred Amounts and Outstanding Property Insurance described in <u>Section 3.4</u> hereof;

(iii)    the outstanding balance of the Foothill Mortgage Loan Note described in <u>Section 3.5(a)</u> hereof;

(iv)    the outstanding balance of the TRS Note described in <u>Section 3.6</u> hereof;

(v)     the Agreed Pennsylvania Shortfall Amount as described in <u>Section 3.7</u> hereof; and

(vi)    the Agreed Connecticut Shortfall Amount as described in <u>Section 5.1</u> hereof.

Subject to the specific terms and conditions of this Agreement, the priority of payment and amounts allocated to the Phase I Outstanding Obligations shall be allocated and applied in accordance with, as applicable, Master Lease I, Master Lease II, the Foothill Mortgage Loan Documents, the TRS Note, any other existing Obligation Documents, and as otherwise determined by the MPT Parties in their sole and absolute discretion, provided however, such allocation shall in no event result in less than the full and complete satisfaction of the Phase I Outstanding Obligations.

**3.3.     <u>MPT Advance Convertible Note</u>**.  MPT Picasso TRS hereby notifies PHP Holdings, pursuant to Section 5(a)(i) of the MPT Advance Convertible Note, of MPT Picasso TRS's election to convert the outstanding aggregate principal amount of the MPT Advance Convertible Note and any accrued but unpaid interest thereon as of the date hereof, in full, into PHPH Series A-1 Preferred Units, which PHPH Series A-1 Preferred Units have been authorized and reserved for issuance pursuant to the PHP Holdings LLC Agreement. Notwithstanding anything to the contrary set forth in the MPT Advance Convertible Note, contemporaneously herewith: (a) the original principal amount of Fifty Million and No/100 Dollars ($50,000,000.00) of the MPT Advance Convertible Note and accrued but unpaid interest thereon in the amount of Five Hundred Eighty-Eight Thousand Eight Hundred Eighty-Eight and 89/100 Dollars ($588,888.89) have been fully satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in <u>Section 3.2</u> hereof, and (b) as a result of the full satisfaction of all amounts owed under the MPT Advance Convertible Note pursuant to the Phase I Transactions, (i) the MPT TRS Lender has cancelled the MPT Advance Convertible Note and returned the same to Prospect Medical, (ii) the MPT Advance Convertible Note shall be deemed terminated and of no further force or effect, and (iii) PHPH shall have no further obligations thereunder and all obligations set forth thereunder shall be immediately deemed satisfied in full and extinguished in their entirety, including with respect to any interest amounts accrued prior to the date hereof.  The Parties

4872-7950-5502v14
1038442-980002

acknowledge that: (1) prior to the closing of the Phase I Transactions, PHP Holdings is a wholly-owned and controlled Subsidiary of Prospect Medical, (2) MPT Picasso TRS is a wholly-owned and controlled Subsidiary (directly or indirectly) of MPT Op, and (3) the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note are being made to MPT Picasso TRS for the respective benefit of the Parties.  MPT Picasso TRS represents and warrants that immediately prior to the conversion of the MPT Advance Convertible Note, MPT Picasso TRS is the sole owner of and sole beneficiary under the MPT Advance Convertible Note and has not transferred, pledged, hypothecated or otherwise encumbered the MPT Advance Convertible Note or any amounts due thereunder.

**3.4.    Deferred Amounts and Outstanding Property Insurance**.  The aggregate outstanding amounts of: (i) the Deferred Base Rent, (ii) the Deferred Interest, (iii) the accrued but unpaid base interest under the Foothill Mortgage Loan Note, and the TRS Note through the date hereof, and (vi) to the extent not included in the foregoing clauses, all Deferred Base Rent and Deferred Interest that may hereafter be deferred as described in the Term Sheet (collectively, the "Deferred Amounts"), are equal to One Hundred Ninety-Three Million Nine Hundred Seventy-Five Thousand One Hundred Seventy-Five Dollars Ninety-Six Cents ($193,975,175.96).  The aggregate amount of Outstanding Property Insurance is Seven Hundred Eight-Three Thousand Seven Hundred Eight and No/100 Dollars ($783,708.00).

(a)    Satisfaction of Deferred Amount and Outstanding Property Insurance.  At the closing of the Phase I Transactions contemporaneously herewith, all of the Deferred Amounts and Outstanding Property Insurance have been satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof.

(b)    Acknowledgements.  The Parties acknowledge that as of immediately prior to the closing of the Phase I Transactions: (i) Alta Newport, the Master Lease I Lessees, and the Master Lease II Lessees are wholly-owned and controlled Subsidiaries (directly or indirectly) of Prospect Medical, and PHP Holdings is owned by Prospect Medical, PPG and PHS, (ii) Prospect Medical guarantees their respective obligations to the MPT Parties pursuant to certain of the Obligation Documents, (iii) the MPT Foothill Lender, the Master Lease I Lessors, the Master Lease II Lessors, and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (iv) the satisfaction in full, of the Deferred Amounts and Outstanding Property Insurance by Prospect Medical as set forth in this agreement, to the applicable MPT Parties, and the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note to MPT Picasso TRS, are being made for the respective benefit of the Parties.

**3.5.    Foothill Transaction**.

(a)    Mortgage Payment.  Contemporaneously herewith, Prospect Medical has paid the sum of One Hundred Sixty Million Four Hundred Four Thousand Two Hundred and No/100 Dollars ($160,404,200.00), which amount is comprised of the sum of (and full satisfaction of) (i) the Tranche I Advance, (ii) the Tranche 2 Advances, and (iii) the Tranche 2 Additional Interest (in each case owed by Alta Newport and Foothill Propco and to the MPT Foothill Lender), by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof. Contemporaneously therewith, the MPT Foothill Lender has caused the Foothill Mortgage to be terminated and released in the official records of Orange County, California.

(b)    Acknowledgements.  The Parties acknowledge that as of immediately prior to the closing of the Phase I Transactions: (i) Alta Newport, the Master Lease I Lessees, and the Master Lease II Lessees are wholly-owned and controlled Subsidiaries (directly or indirectly) of Prospect Medical, and PHP Holdings

-8-

is owned by Prospect Medical, PPG and PHS, (ii) Prospect Medical guarantees their respective obligations to the MPT Parties pursuant to certain of the Obligation Documents, (iii) the MPT Foothill Lender, the Master Lease I Lessors, the Master Lease II Lessors, and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (iv) the satisfaction in full, of the Deferred Amounts by Prospect Medical as set forth in this agreement, to the applicable MPT Parties, and the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note to MPT Picasso TRS, are being made for the respective benefit of the Parties.

**3.6.** **TRS Note**.  Contemporaneously herewith, (a) the original principal amount of One Hundred Twelve Million Nine Hundred Thirty Seven Thousand Two Hundred Four and No/100 Dollars ($112,937,204.00) of the TRS Note has been fully satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof, and (b) as a result of the full satisfaction of all amounts owed under the TRS Note pursuant to the Phase I Transactions, the MPT TRS Lender has cancelled the TRS Note and returned the same to Prospect Medical.  The Parties acknowledge that: (1) as of immediately prior to the closing of the Phase I Transactions PHP Holdings is owned by Prospect Medical, PPG and PHS, (2) both the MPT TRS Lender and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (3) the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note are being made to MPT Picasso TRS for the respective benefit of the Parties.

**3.7.** **Pennsylvania Transaction**.

(a)    Purchase and Sale; Intercompany Lease.

(i)    Contemporaneously herewith: (A) the Pennsylvania Lessors and Prospect CCMC have entered into the Pennsylvania Purchase Agreement, pursuant to which the Pennsylvania Lessors have sold and conveyed to Prospect CCMC, and Prospect CCMC has purchased and accepted from the Pennsylvania Lessors, all of the Pennsylvania Lessors' respective right, title and interest in and to the Pennsylvania Facilities (and certain related assets described therein) for an aggregate purchase price of Two Hundred Fifty Million and No/Dollars ($250,000,000.00) (the "Pennsylvania Purchase Price"), of which amount has been contemporaneously paid as set forth in Section 3.7(b) below, and (B) each of the Pennsylvania Facilities, Pennsylvania Lessors, and Pennsylvania Lessees have been severed and removed from Master Lease I and Master Lease II, as applicable.

(ii)    Immediately after the transactions described in clause (i) hereof: (A) Prospect CCMC leased the Pennsylvania Facility commonly known as "Delaware County Memorial Hospital" to Prospect DCMH pursuant to a lease agreement between them, and (B) Prospect DCMH joined in the execution and delivery of the Amended and Restated Security Documents, and (C) Prospect DCMH delivered that certain Subordination and Attornment Agreement, dated of even date herewith, to the Pennsylvania Mortgage Lenders (as described below) and their Affiliates (the "Pennsylvania Subordination and Attornment Agreement").

(b)    Payment of the Pennsylvania Purchase Price.  The Pennsylvania Purchase Price is being paid as follows:

(i)    *Pennsylvania Mortgage Loan*. One Hundred Fifty Million and No/100 Dollars ($150,000,000.00) of the Pennsylvania Purchase Price has been satisfied by the issuance of a

-9-

mortgage loan in such amount (plus an additional Five Million Two Hundred Twenty-Two Thousand Five Hundred Seventeen Dollars and Fifty-Four Cents ($5,222,517.54) for transfer taxes, as contemplated in Section 11.15(b) hereof) made by the Pennsylvania Lessors (hereinafter also referred to as the Pennsylvania Mortgage Lenders) to Prospect CCMC (hereinafter also referred to as the Pennsylvania Mortgage Borrower) in accordance with that certain Real Estate Loan Agreement, dated of even date herewith, by and among the Pennsylvania Mortgage Borrower and the Pennsylvania Mortgage Lenders (the "Pennsylvania Mortgage Loan Agreement"), and which:

> (A)    is evidenced by a Promissory Note, dated of even date herewith, made by the Pennsylvania Mortgage Borrower in favor of the Pennsylvania Mortgage Lenders (the "Pennsylvania Mortgage Loan Note"), with a term of five (5) years, and which will bear interest at: (1) a per annum rate of Nine Percent (9%), to be paid in kind from March 1, 2024 thru May 31, 2025 (which shall be added to the principal balance of the Pennsylvania Mortgage Loan Note), and (2) a per annum rate of Twelve Percent (12%), payable in cash thereafter, and

> (B)    will be cross-defaulted and cross-collateralized in the same manner as the obligations under Master Lease I and Master Lease II, and otherwise secured by, among other things, that certain Mortgage, Security Agreement and Fixture Filing, dated of even date herewith, made by Prospect CCMC in favor of the Pennsylvania Mortgage Lenders (the "Pennsylvania Mortgage") and the Amended and Restated Security Documents.

(ii)    *PHPH Series A-1 Preferred Units or Convertible Note*.  One Hundred Million and No/100 Dollars ($100,000,000.00) (the "Agreed Pennsylvania Shortfall Amount") of the Pennsylvania Purchase Price has been satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof.  The Parties acknowledge that: (i) the Pennsylvania Mortgage Borrower is a wholly-owned and controlled Subsidiary (directly or indirectly) of Prospect Medical, and as of immediately prior to the closing of the Phase I Transactions PHP Holdings is owned by Prospect Medical, PPG and PHS, (ii) Prospect Medical guarantees their respective obligations to the MPT Parties pursuant to certain of the Obligation Documents, (iii) both the Pennsylvania Mortgage Lenders and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (iv) the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note are being made to MPT Picasso TRS for the respective benefit of the Parties.

(iii)    *Remaining Pennsylvania Purchase Price*.  In lieu of any further consideration for the Pennsylvania Purchase Price, MPT Picasso TRS has received a right to receive certain distributions on an accelerated, profits-interest basis under the distribution provisions of the PHP Holdings LLC Agreement.

(c)    Taxes, Insurance, Utilities.  All utility charges, insurance, and real and personal property taxes related to the Pennsylvania Facilities: (i) for any periods (or portions thereof) ending on or prior to the date hereof shall be the responsibility of the Pennsylvania Lessees and their Affiliates pursuant to the terms of Master Lease I and Master Lease II, and (ii) for any periods (or portions thereof) ending after the date hereof, shall be the responsibility of Pennsylvania Mortgage Borrower and their Affiliates pursuant to the terms of the Pennsylvania Mortgage Loan Agreement.  In no event shall any of the MPT Parties have any responsibility for payment of such amounts, *provided*, *however*, for the avoidance of doubt, MPT Parties

4872-7950-5502v14
1038442-980002

must pay the amounts owed by it pursuant to <u>Section 11.15</u> of this Agreement (which shall be added to the Pennsylvania Mortgage Loan Note).

**3.8.** **Connecticut Master Agreement**. In connection with the transactions contemplated above, on the date hereof: (i) the applicable Prospect Parties and the applicable MPT Parties have entered into that certain Amendment to Connecticut Master Agreement, dated of even date herewith (the "<u>Amendment to Connecticut Master Agreement</u>"), pursuant to which the parties have modified the Connecticut Master Agreement to address the transactions to be consummated in accordance with this Agreement (including <u>ARTICLE V</u> hereof), and (ii) such Prospect Parties have delivered to such MPT Parties the written consent from Yale New Haven Health Services Corporation to such Amendment to Connecticut Master Agreement, as required pursuant to the terms and conditions of the Underlying Acquisition Agreement (as defined in the Connecticut Master Agreement) (the "<u>Yale Consent</u>").

**3.9.** **Phase I Deliverables**.

(a)    <u>Deliverables by Prospect Parties</u>. Prior to or contemporaneously herewith, the applicable Prospect Parties have delivered (or caused to be delivered) to the MPT Parties the following:

(i)    Copies of the PhysicianCo Term Loan Agreement, and all other loan documents entered into or delivered by any of the Prospect Parties or any of their Affiliates in connection therewith, duly executed by the applicable Prospect Parties and the PhysicianCo Term Loan Lenders;

(ii)    PhysicianCo Intercreditor Agreement, duly executed by the PhysicianCo Term Loan Lenders and the applicable Prospect Parties;

(iii)    Evidence reasonably satisfactory to the MPT Parties of repayment in full of the indebtedness and other obligations outstanding under the ABL Credit Agreement dated as of February 22, 2018 among PMH, as borrower, JPMorgan Chase Bank, N.A, as administrative agent and issuing bank, the lenders party thereto and the other agents, arrangers and bookrunners identified therein, as amended from time to time .

(iv)    Master Lease I Amendment, duly executed by the Master Lease I Lessees;

(v)    Master Lease II Amendment, duly executed by the applicable Master Lease II Lessees;

(vi)    the Amended and Restated Security Documents, duly executed by the applicable Prospect Parties and their applicable Affiliates;

(vii)    the PHP Holdings Pledge Agreement, duly executed by PHP Holdings;

(viii)    the Intercompany Subordination Agreement, duly executed by the applicable Prospect Parties and their applicable Affiliates;

(ix)    Amendments to each of the existing Memoranda of Lease relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(x)    Amendments to each of the existing Assignment of Rents and Leases relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the

-11-

addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(xi)    Redemption Agreements, duly executed by PHP Holdings, Prospect Medical, and each of PPG and PHS (respectively);

(xii)    Series A-1 Subscription Agreement, duly executed by PHP Holdings and Prospect Medical;

(xiii)    PHP Holdings LLC Agreement, duly executed by PHP Holdings, and Prospect Medical;

(xiv)    PHPH Subsidiary Amendments, duly executed by PHP Holdings and its applicable Subsidiaries (to the extent available, it being understood that certain PHPH Subsidiary Amendments may be delivered no more than ten (10) days following the closing of the Phase I Transactions);

(xv)    Service Mark Assignment Agreement, duly executed by Prospect Medical and Prospect Medical Systems, LLC;

(xvi)    Trademark License Agreement, duly executed  by Prospect Medical and PMH;

(xvii)    Phase I Convertible Note, duly executed by PHP Holdings;

(xviii)    An amendment to the Support Services Agreement, duly executed by PHP Holdings and Prospect Medical;

(xix)    Termination of Foothill Loan Agreement and Foothill Mortgage, duly executed by Alta Newport and Prospect Medical;

(xx)    Copies of the Foothill Lease and any other documents entered into by any of the Prospect Parties or their Affiliates in connection therewith, duly executed by the applicable Prospect Parties;

(xxi)    Pennsylvania Purchase Agreement, the Pennsylvania Mortgage Loan Agreement, the Pennsylvania Mortgage Loan Note, the Pennsylvania Subordination and Attornment Agreement, and each of the other Pennsylvania Restructuring Documents, duly executed by the applicable Pennsylvania Lessees and their applicable Affiliates;

(xxii)    Amendment to Connecticut Master Agreement, duly executed by the applicable Prospect Parties;

(xxiii)    Copy of the Yale Consent (to the Amendment to Connecticut Master Agreement);

(xxiv)    Evidence of Letter of Credit (if available, or within 30 days hereafter);

(xxv)    A Release and Waiver Agreement, duly executed by all of the Prospect Parties;

(xxvi)    Resolutions or consents of the respective governing bodies of each of the Prospect Parties authorizing their respective execution, delivery, and performance of this Agreement and all other documents or agreements to be executed by any of them in connection herewith (including, without

-12-

limitation, any such documents and agreements to be entered into by any of the Prospect Parties after the date hereof) (collectively, the "Prospect Parties' Resolutions");

(xxvii) An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of Prospect Medical on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries (other than PHP Holdings and its Designated Subsidiaries):

    (A)    certifying to the MPT Parties on behalf of all of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) all of the representations and warranties of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries set forth in this Agreement and the other Restructuring Documents are true and correct as of the date hereof, and (2) Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries as of the date hereof;

    (B)    certifying to the MPT Parties on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) with respect to Prospect Medical, as to the Certificate of Incorporation and Bylaws, each as in effect from the date of this Agreement, (2) with respect to each of Prospect Medical's Designated Subsidiaries and Other Applicable Subsidiaries, as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect from the date of this Agreement, and (3) a copy of each of the applicable Prospect Parties' Resolutions from Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries; and

    (C)    providing specimen signatures of the officers or authorized agents of each of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries;

(xxviii) An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of PHP Holdings on behalf of PHP Holdings and its Designated Subsidiaries:

    (A)    certifying to the MPT Parties on behalf of all of PHP Holdings and such Designated Subsidiaries that: (1) all of the representations and warranties of PHP Holdings and such Designated Subsidiaries set forth in this Agreement (subject to the disclosures made in the Disclosure Schedules) and the other Restructuring Documents are true and correct as of the date hereof, and (2) PHP Holdings and such Designated Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by PHP Holdings and such Designated Subsidiaries as of the date hereof;

-13-

4872-7950-5502v14
1038442-980002

(B)    certifying to the MPT Parties on behalf of PHP Holdings and such Designated Subsidiaries that: (1) with respect to PHP Holdings, as to the Certificate of Formation and the PHP Holdings LLC Agreement, each as in effect from the date of this Agreement, (2) with respect to each of PHP Holdings' Designated Subsidiaries, as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect from the date of this Agreement, and (3) a copy of each of the applicable Prospect Parties' Resolutions from PHP Holdings and such Designated Subsidiaries; and

(C)    providing specimen signatures of the officers or authorized agents of each of PHP Holdings and such Designated Subsidiaries;

(xxix)  Certificates of existence and good standing of each of the Prospect Parties, their respective Designated Subsidiaries, and the Other Applicable Subsidiaries, dated within thirty (30) days prior to the date hereof, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(xxx)  A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable Prospect Parties; and

(xxxi)  Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the MPT Parties reasonably deems necessary to effectuate the transactions contemplated hereby.

(b)    Deliverables by MPT Parties.  Contemporaneously herewith, the applicable MPT Parties have delivered (or caused to be delivered) to the Prospect Parties the following:

(i)    PhysicianCo Intercreditor Agreement, duly executed by the applicable MPT Parties;

(ii)    Series A-1 Subscription Agreement, duly executed by MPT Picasso TRS;

(iii)   PHP Holdings LLC Agreement, duly executed by MPT Picasso TRS;

(iv)    Cancelled Foothill Mortgage Loan Note;

(v)    Termination of Foothill Loan Agreement and Foothill Mortgage, duly executed by MPT Foothill Lender;

(vi)    Cancellation of TRS Note;

(vii)   Cancellation of the MPT Advance Convertible Note;

(viii)  Pennsylvania Purchase Agreement, the Pennsylvania Mortgage Loan Agreement, the Pennsylvania Mortgage Loan Note, the Pennsylvania Subordination and Attornment Agreement, and each of the other Pennsylvania Restructuring Documents, duly executed by the applicable Pennsylvania Lessors and their applicable Affiliates;

-14-

(ix)     Master Lease I Amendment, duly executed by the applicable Master Lease I Lessors;

(x)      Master Lease II Amendment, duly executed by the applicable Master Lease II Lessors;

(xi)     the Amended and Restated Security Documents, duly executed by the applicable MPT Parties and their applicable Affiliates;

(xii)    the PHP Holdings Pledge Agreement, duly executed by MPT Picasso TRS;

(xiii)   [Intentionally Omitted];

(xiv)    Amendments to each of the existing Memoranda of Lease relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(xv)     Amendments to each of the existing Assignment of Rents and Leases relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(xvi)    Amendment to Connecticut Master Agreement, duly executed by the applicable MPT Parties;

(xvii)   Resolutions or consents of the respective governing bodies of each of the MPT Parties authorizing their respective execution, delivery, and performance of this Agreement and all other documents or agreements to be executed by any of them in connection herewith (including, without limitation, any such documents and agreements to be entered into by any of the MPT Parties after the date hereof) (collectively, the "MPT Parties' Resolutions");

(xviii)  An Officers' Certificate in form and substance reasonably satisfactory to the Prospect Parties and executed by a duly authorized executive officer of MPT OP:

    (A)      certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) all of the representations and warranties of the MPT Parties set forth in this Agreement and the other Restructuring Documents are true and correct as of the date hereof, and (2) the applicable MPT Parties have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by such MPT Parties as of the date hereof;

    (B)      certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) with respect to each of the MPT Parties, as to each of such MPT Parties' respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect from the date of this Agreement, and (2) a copy of each of the MPT Parties' Resolutions; and

-15-

4872-7950-5502v14
1038442-980002

(C)     providing specimen signatures of the officers or authorized agents of each of the MPT Parties;

(xix)   Certificates of existence and good standing of each of the MPT Parties, dated within thirty (30) days prior to the date hereof, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(xx)    A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable MPT Parties; and

(xxi)   Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the Prospect Parties reasonably deems necessary to effectuate the transactions contemplated hereby (it being acknowledged by the Prospect Parties that certain affidavits typically provided by owners of real property may be limited due to the Prospect Parties' sole use and possession of the Facilities prior to the date hereof).

**ARTICLE IV**
**PHASE II TRANSACTIONS**

The Phase II Transactions are comprised of the events provided in this ARTICLE IV, which Phase II Transactions are occurring as of the Closing Date of the Phase II Transactions (unless expressly otherwise provided):

**4.1.    Regulatory Consents and Approvals**.

(a)     Promptly following the date hereof, Prospect Medical and the other applicable Prospect Parties shall take all actions necessary to obtain any approval or consent of, or to provide written notification to, any Governmental Body or any other Person that is required in connection with the Prospect Parties' (and their respective Affiliates') consummation and performance of the Phase II Transactions, including, without limitation: (i) filing all reports or other documents required or requested by any Governmental Bodies concerning the transactions contemplated hereby (including without limitation, the health care regulatory filings set forth in Section 4.1(b)), (ii) comply within the timeframe set forth in such request or if no timeframe is requested then within a commercially reasonable time period after receiving the request (recognizing that time is of the essence), and any other requests by any Governmental Body for additional information concerning such Phase II Transactions, (iii) take all actions necessary to obtain any approval or consent of, or to provide written notification to, any other Governmental Body or any other Person described in Section 7.3 hereof and (iv) take any other actions required by Governmental Bodies or any other Person to approve such Phase II Transactions, to allow the applicable Governmental Body or Person to approve the Phase II Transactions as promptly as possible.  Notwithstanding anything in this Section 4.1 to the contrary, the MPT Parties acknowledge and agree that the Prospect Parties will not be required to incur unreimbursed costs, be deemed to be in breach of this Section 4.1 or agree to conditions not currently known, or anticipated, by any of the Prospect Parties as of the date hereof (whether in kind or magnitude) if any conditions imposed on the Prospect Parties by the Governmental Body or non-approval by a Governmental Body of any approval required under this Agreement is a direct result of the information provided or omission of information by the MPT Parties, or the structure required by the MPT Parties to

-16-

comply with applicable REIT requirements (and the MPT Parties shall be responsible for all costs associated with such changes).

(b)     The Prospect Parties shall promptly: (i) submit a notice of material modification by or on behalf of Prospect Health Plan, Inc. to the DMHC, which notifies and requests the approval the DMHC of the Phase II Transactions, (ii) submit an application and request for the issuance of a temporary pharmacy license (and subsequently the issuance of a permanent license) with the California Board of Pharmacy in connection with the pharmacy license issued to Alta Newport for the operations of its pharmacy, which license will allow the continued operation of the pharmacy at its current location, and (iii) submit an application with the CDPH as required by applicable Law.

(c)     The Prospect Parties shall permit the MPT Parties and their representatives to review and provide comments within five (5) Business Days after receipt by the applicable MPT Parties to any documents to be submitted to any Governmental Bodies or any other Person in connection with any material regulatory consents or approvals.  Notwithstanding the foregoing, for the filings set forth in Section 4.1(b), the MPT Parties will provide comments within three (3) Business Days after receipt of such documents. Subject to the last sentence of Section 4.1(a), the Prospect Parties shall (i) incorporate any comments from the MPT Parties with respect to (A) the MPT Parties' legal, tax, accounting, or financial status which comments shall be limited to changes the MPT Parties required to comply with applicable REIT requirements or PHP Holdings' operation as a Bankruptcy Remote Entity, or (B) known to the Prospect Parties of the date hereof and directly related to the structure and subsequent documentation of the Phase I Transactions or Phase II Transactions and which comments are not inconsistent with the terms of this Agreement, and (ii) consider any other comments provided by the MPT Parties, in good faith, which are received within the timeframes set forth in this Section 4.1(c).

(d)     To the extent any information is necessary or required by law from any of the MPT Parties for the submission, processing, and/or granting of any such notices or approvals, the applicable MPT Parties will cooperate with the applicable Prospect Parties and promptly provide such information to the applicable Prospect Parties.  The Parties intend that the foregoing conditions are to be completed and all such regulatory approvals, consents and confirmations shall be obtained by the Prospect Parties no later than November 30, 2023, to the extent that each applicable Governmental Body is able to provide such consent, approval or confirmation prior to such date, and shall act in good faith and cooperate in all material respects to meet such intended deadline.

(e)     Notwithstanding anything to the contrary in this Agreement, in the event of an Organic Change (as defined in the Phase I Convertible Note) or similar event, if:

(i)     Prospect Medical and the other applicable Prospect Parties are unable to obtain the approvals or consents of any Governmental Body and other Persons contemplated by this Section 4.1 that are necessary to allow MPT Picasso TRS to convert the Phase I Convertible Note (as described in Section 4.4 below) (the "Required Consents") prior to the occurrence of any Organic Change or similar event; and

(ii)     as a result of the inability to convert due to the circumstances described in Section 4.1(e)(i) above:

(A)     the aggregate amount that MPT Picasso TRS would receive at the time of such Organic Change from the sum of (1) the Convertible Amounts (as defined in the Phase I Convertible

-17-

Note) payable under the Phase I Convertible Note as of the date of such Organic Change, and (2) the distributions of "Available Cash" pursuant to the PHP Holdings LLC Agreement in connection with such Organic Change or similar event, is *less than*

(B)    the aggregate amount that MPT Picasso TRS would have received solely from distributions of Available Cash pursuant to the PHP Holdings LLC Agreement had MPT Picasso TRS fully converted the Phase I Convertible Note prior to such Organic Change or similar event,

(such difference, a "Conversion Shortfall"), then the Convertible Amount due and payable under the Phase I Convertible Note immediately prior to the occurrence of such Organic Change or similar event in accordance with the terms of the Phase I Convertible Note shall automatically be increased by an amount equal to such Conversion Shortfall and, for all other purposes to the fullest extent permitted by applicable laws, MPT Picasso TRS shall be treated as if the Phase I Convertible Note has been fully converted as of the occurrence of such Organic Change or similar event.  It is hereby understood and agreed that the Parties intend that MPT Picasso TRS' economic and financial rights shall not be diminished for any reason due to Prospect Medical's and the other applicable Prospect Parties' failure to obtain the Required Consents prior to such Organic Change or similar event, and that each of the Parties shall act in good faith, take all actions reasonably necessary, and otherwise reasonably cooperate in all material respects to fulfill such intent of the Parties, including providing one another reasonable access to financial and other information reasonably necessary to determine and agree upon the amount of any Conversion Shortfall.  Nothing in this subsection is intended to limit or modify the Parties' rights to bring an action for breach of contract or for specific performance (and to seek other equitable relief) in connection with any breach or violation, or any attempted breach or violation, of the provisions of this Article.

**4.2.    Transfer of Alta Newport to PHP Holdings**.  Immediately following the receipt of all requisite approvals from Governmental Bodies in accordance with Section 4.1 hereof, the Prospect Parties shall cause: (a) Alta Newport to be merged with and into Foothill Propco, with Alta Newport being the surviving entity that will thereafter be owned by PHPH MidCo (the "Merger"), and (b) Alta Newport and Foothill Propco to terminate the Foothill Lease (and any related security documents). As consideration for the Merger of Alta Newport with and into Foothill Propco, Prospect Medical shall exchange the number of Class A-1 Units held by Prospect Medical representing reasonable value for Alta Newport, as mutually agreed to by the Parties, into PHPH Series A-2 Preferred Units, and will transfer such PHPH Series A-2 Preferred Units to Alta Hospitals System, LLC, a California limited liability company ("ALTA"). PHP Holdings will record such transfer and issuance of PHPH Series A-2 Preferred Units to ALTA, which such units shall at all times prior to the Merger be reserved by PHPH for issuance pursuant to this Section 4.2. The MPT Parties hereby approve the exchange, transfer and issuance of PHPH Series A-2 Preferred Units to ALTA.

**4.3.    Joinder to Management Agreement**.  Contemporaneously with the transactions contemplated in Section 4.2 hereof, PHP Holdings, ManageCo and Alta Newport shall enter into the Management Agreement with ManageCo, pursuant to which ManageCo shall serve as an "eligible independent contractor" as defined in Section 856(d)(9)(A) of the Code (an "EIK") to manage and operate any and all Health Care Facilities now or hereafter owned or leased by PHP Holdings and its Subsidiaries (but, for sake of clarity, any such Management Agreement will not cover the regulated operations of Prospect Health Plan, Inc. as conducted on the date hereof) during the term of the Management Agreement, and which Management Agreement shall provide that, at all times that MPT Picasso TRS, or any of its Affiliates shall own any Equity Interest (or securities convertible into Equity Interest) in PHP Holdings: (a) ManageCo shall remain an EIK and manage all aspects of operating such Health Care Facilities, including control of

-18-

4872-7950-5502v14
1038442-980002

day-to-day operations, (b) the Management Agreement may not be terminated, amended, modified or supplemented without the prior written consent of MPT Picasso TRS and any of its Affiliates which then directly hold any Equity Interests (or securities convertible into Equity Interests) in PHP Holdings, and (c) ManageCo will earn an arm's-length management fee for services rendered under the Management Agreement.

**4.4.    Conversion of Phase I Convertible Note**.  Following the receipt of all requisite approvals or confirmations from Governmental Bodies in accordance with Section 4.1 hereof, if MPT Picasso TRS determines in its reasonable discretion that all principal, interests and other amounts payable under the Phase I Convertible Note, as applicable may then be converted on a dollar-for-dollar basis into the applicable Equity Interests provided therein (based upon the PHPH Net Equity Value) in compliance with all applicable laws (including, without limitation, any provisions of the Code relating to real estate investment trusts), then MPT Picasso TRS may deliver written notice at any time thereafter of such conversions (in whole or in part) to PHP Holdings, which conversions shall be effective immediately upon receipt of such written notice by PHP Holdings.  PHP Holdings, Prospect Medical, and MPT Picasso TRS shall execute and deliver to one another such documents and instruments as may be reasonably necessary to: (a) evidence the issuance of such PHPH Series A-1 Preferred Units by PHP Holdings to MPT Picasso TRS in connection with any such whole or partial conversion, and (b) make all such PHPH Series A-1 Preferred Units subject to the PHP Holdings LLC Agreement (which shall be amended and modified by the applicable Parties if and to the extent necessary to complete such issuance).

**4.5.    Phase II Deliverables**.

(a)    Deliverables by Prospect Parties.  On or prior to the Closing Date of the Phase II Transactions, each of the applicable Prospect Parties shall deliver (or cause to be delivered) to the MPT Parties the following:

(i)    Copies or evidence of all material regulatory notices, consents and approvals required from each such Governmental Body pursuant to the terms of Section 4.1 (or confirmation from such a Governmental Body that the closing of the Phase II Transactions will not cause a lapse in the applicable license or permit), to the extent such Governmental Body is able to provide such notice, consent, approval or confirmation prior to the Closing Date;

(ii)    Management Agreement, duly executed by ManageCo, PHP Holdings, and all of its applicable Subsidiaries (including Alta Newport) that constitute "Operators" as such term is defined in the Management Agreement;

(iii)    Copies of all Merger documents entered into by the applicable Prospect Parties as contemplated in Section 4.2 hereof, including, without limitation, the Certificate of Merger filed with the California Secretary of State which provides for a merger date as of the Closing Date of the Phase II transactions, the applicable Agreement and Plan of Merger (or similar instrument), all applicable governing body approvals from the Prospect Parties approving the Merger, and evidence of all applicable notices provided to Governmental Bodies;

(iv)    To the extent applicable, amendments to the PHP Holdings LLC Agreement and any other documents reasonably necessary to evidence the issuance of the PHPH Series A-1 Preferred Units, duly executed by PHP Holdings, Prospect Medical, and any other members of PHP Holdings (other than MPT Picasso TRS);

-19-

4872-7950-5502v14
1038442-980002

(v)      A Release and Waiver Agreement, duly executed by all of the Prospect Parties in favor of the MPT Parties;

(vi)      A Default Representation, duly executed by all of the Prospect Parties;

(vii)      An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of Prospect Medical on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries (other than PHP Holdings and its Designated Subsidiaries):

(A)      certifying to the MPT Parties on behalf of all of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) all of the representations and warranties of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries set forth in this Agreement (subject to the disclosures made in the Disclosure Schedules, as updated pursuant to Section 11.10) and the other Restructuring Documents are true and correct as of such Closing Date, and (2) Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries as of such Closing Date;

(B)      certifying to the MPT Parties on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) with respect to Prospect Medical, as to its Certificate of Incorporation and Bylaws, each as in effect on such Closing Date, (2) with respect to each of Prospect Medical's Designated Subsidiaries and the Other Applicable Subsidiaries as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect on such Closing Date, and (3) a copy of each of the applicable Prospect Parties' Resolutions from Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries; and

(C)      providing specimen signatures of the officers or authorized agents of each of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries;

(viii)      An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of PHP Holdings on behalf of PHP Holdings and its Designated Subsidiaries:

(A)      certifying to the MPT Parties on behalf of all of PHP Holdings and such Designated Subsidiaries that: (1) all of the representations and warranties of PHP Holdings and such Designated Subsidiaries set forth in this Agreement and the other Restructuring Documents are true and correct as of such Closing Date, and (2) PHP Holdings and such Designated Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring

-20-

4872-7950-5502v14
1038442-980002

Documents to be delivered, performed, observed and complied with by PHP Holdings and such Designated Subsidiaries as of such Closing Date;

(B)    certifying to the MPT Parties on behalf of PHP Holdings and such Designated Subsidiaries that: (1) with respect to PHP Holdings, as to the Certificate of Formation and the PHP Holdings LLC Agreement, each as in effect on such Closing Date, (2) with respect to each of PHP Holdings' Designated Subsidiaries, as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect on such Closing Date, and (3) a copy of each of the applicable Prospect Parties' Resolutions from PHP Holdings and such Designated Subsidiaries; and

(C)    providing specimen signatures of the officers or authorized agents of each of PHP Holdings and such Designated Subsidiaries;

(ix)    Certificates of existence and good standing of each of the Prospect Parties, their respective Designated Subsidiaries, and the Other Applicable Subsidiaries, dated within thirty (30) days prior to such Closing Date, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(x)    A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable Prospect Parties; and

(xi)    Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the MPT Parties reasonably deems necessary to effectuate the transactions contemplated hereby.

(b)    Deliverables by MPT Parties.    On or prior to the applicable Closing Date of the Phase II Transactions each of the applicable MPT Parties shall deliver (or cause to be delivered) to the Prospect Parties the following:

(i)    Amendments to the PHP Holdings LLC Agreement and any other documents reasonably necessary to evidence the issuance of the PHPH Series A-1 Preferred Units, duly executed by MPT Picasso TRS, if applicable;

(ii)    A Default Representation, duly executed by the MPT Parties;

(iii)    An Officers' Certificate in form and substance reasonably satisfactory to the Prospect Parties and executed by a duly authorized executive officer of MPT OP:

(A)    certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) all of the representations and warranties of the MPT Parties set forth in this Agreement and the other Restructuring Documents are true and correct as of such Closing Date, and (2) the applicable MPT Parties have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be

-21-

delivered, performed, observed and complied with by such MPT Parties as of such Closing Date;

(B)    certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) with respect to each of the MPT Parties, as to each of such MPT Parties' respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect on such Closing Date, and (2) each of the MPT Parties' Resolutions remain true, correct and in full force and effect as of such Closing Date; and

(C)    providing specimen signatures of the officers or authorized agents of each of the MPT Parties;

(iv)    Certificates of existence and good standing of each of the MPT Parties, dated within thirty (30) days prior to such Closing Date, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(v)    A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable Prospect Parties; and

(vi)    Cancellation of the Phase I Convertible Note (if and only to the extent that it is fully converted); and

(vii)    Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the Prospect Parties reasonably deems necessary to effectuate the transactions contemplated hereby.

## ARTICLE V
## PHASE III TRANSACTIONS

The Phase III Transactions are comprised of the events provided in this ARTICLE V, which Phase III Transactions are occurring as of the Closing Date of the Phase III Transactions (unless expressly otherwise provided):

**5.1.    Connecticut Transaction**.  The aggregate purchase price (the "Connecticut Purchase Price") for the "Acquired Assets" (as defined in the Connecticut Master Agreement) is Four Hundred Fifty-Seven Million Nine Hundred Forty-Two Thousand Nine Hundred Ninety-Eight and No/100 Dollars ($457,942,998.00).  The Parties intend that the Connecticut Transaction and the other transactions described in this Article shall be consummated no later than September 30, 2023, and shall act in good faith and cooperate in all material respects to meet such intended deadline.  The Parties have amended the Connecticut Master Agreement contemporaneously with this Agreement in order to evidence the obligations of the Parties hereunder.

(a)    Satisfaction of Shortfall.  At the Closing of the Connecticut Transaction in accordance with the Connecticut Master Agreement, the applicable Prospect Parties shall pay (or cause to be paid) to the applicable MPT Parties an amount equal to the Net Transaction Proceeds (as defined in the Master Connecticut Agreement) of Three Hundred Fifty-Five Million and No/100 Dollars

-22-

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers on the date first written above.

**MPT PARTIES:**

**MPT PICASSO INVESTORS TRS, LLC**

By:      MPT Operating Partnership, L.P.
Its:      Sole Member

By:_____

Name:   R. Steven Hamner
Title:    Executive VP & CFO

**MPT TRS LENDER PMH, LLC**

By:      MPT Development Services, Inc.
Its:      Sole Member

By:_____

Name:   R. Steven Hamner
Title:    Executive VP & CFO

Signature Page 1 of 4
Amended and Restated
Master Restructuring Agreement

**MPT OF UPPER DARBY PMH, LLC**
**MPT OF MANCHESTER PMH, LLC**
**MPT OF ROCKVILLE PMH, LLC**
**MPT OF SPRINGFIELD PMH, LLC**
**MPT OF RIDLEY PARK PMH, LLC**
**MPT OF UPLAND PMH, LLC**
**MPT OF WATERBURY PMH, LLC**

By:     MPT Operating Partnership, L.P.
Its:     Sole Member of each above-referenced entity

By:_____

Name:   R. Steven Hamner
Title:   Executive VP & CFO

**MPT OF VAN NUYS PMH, L.P.**

By:     MPT of Van Nuys PMH GP, LLC
Its:     General Partner

**MPT OF HOLLYWOOD PMH, L.P.**
By:     MPT of Hollywood PMH GP, LLC
Its:     General Partner

**MPT OF LOS ANGELES PMH, L.P.**
By:     MPT of Los Angeles PMH GP, LLC
Its:     General Partner

**MPT OF CULVER CITY PMH, L.P.**
By:     MPT of Culver City PMH GP, LLC
Its:     General Partner

**MPT OF BELLFLOWER PMH, L.P.**
By:     MPT of Bellflower PMH GP, LLC
Its:     General Partner

**MPT OF NORWALK PMH, L.P.**
By:     MPT of Norwalk PMH GP, LLC
Its:     General Partner

**MPT OF TUSTIN PMH, L.P.**
By:     MPT of Tustin PMH GP, LLC
Its:     General Partner

By:     MPT Operating Partnership, L.P.
Its:     Sole Member of each above-referenced
         General Partner entity.

By:_____

Name:   R. Steven Hamner
Title:   Executive VP & CFO

Signature Page 2 of 4
Amended and Restated
Master Restructuring Agreement

**PROSPECT PARTIES:**

**PROSPECT MEDICAL HOLDINGS, INC.**

By:_____
Name: Samuel Lee
Title: Chief Executive Officer

**PROSPECT HEALTHCARE FACILITIES MANAGEMENT, LLC**

By:_____
Name: Samuel Lee
Title: Chief Executive Officer

**PHP HOLDINGS, LLC**

By:     Prospect     Healthcare     Facilities
        Management, LLC
Title:  Manager

By:_____
Name: Samuel Lee
Title: Chief Executive Officer

**PROSPECT INTERMEDIATE HOLDINGS, LLC**

By:     PHP Holdings, LLC
Title:  Sole Member

        By:     Prospect   Healthcare   Facilities
                Management, LLC
        Title:  Manager

        By:_____
        Name: Samuel Lee
        Title: Chief Executive Officer

**PROSPECT DCMH, LLC**

By:_____
Name: Samuel Lee
Title: Senior Vice President

**PROSPECT CCMC, LLC**

By:_____
Name: Samuel Lee
Title: Senior Vice President

*Signature Page 3 of 4*
*[Signature Page to Amended and Restated*
*Master Restructuring Agreement]*



**PROSPECT MANCHESTER HOSPITAL, INC.**

By:_____
Name: Samuel Lee
Title: Senior Vice President

**PROSPECT ROCKVILLE HOSPITAL, INC.**

By:_____
Name: Samuel Lee
Title: Senior Vice President

**SOUTHERN        CALIFORNIA        HEALTHCARE SYSTEM, INC.**

By:_____
Name: Samuel Lee
Title: President

**ALTA LOS ANGELES HOSPITALS, INC.**

By:_____
Name: Samuel Lee
Title: President

**PROSPECT WATERBURY, INC.**

By:_____
Name: Samuel Lee
Title: Senior Vice President

**ALTA NEWPORT HOSPITAL, LLC**

By:_____
Name: Samuel Lee
Title: President

**FRMC HOSPITAL PROPERTY, LLC**

By:_____
Name: Samuel Lee
Title: Senior Vice President

*Signature Page 4 of 4*
*[Signature Page to Amended and Restated*
*Master Restructuring Agreement]*

**ANNEX A**

**GLOSSARY OF DEFINED TERMS**

The following terms (whether or not capitalized and whether used in the singular or plural) shall have the following meanings as used in this Agreement:

"Affiliate" with respect to any Person, (i) any Person that, directly or indirectly, controls or is controlled by or is under common control with such Person, or (ii) any other Person that owns, beneficially, directly or indirectly, 25% or more of the outstanding capital stock, shares or Equity Interests of such Person; *provided*, *however*, that (i) none of Green Equity Investors Side V, LP, Green Equity Investors V, LP or Ivy LGP Co-Invest LLP shall be considered to be "Affiliates" of any of the Prospect Parties for purposes of this definition, (ii) none of MPT Picasso TRS or the other MPT Parties shall be considered to be "Affiliates" of PHP Holdings (or any of the Prospect Parties) following consummation of the Phase I Transactions, and (iii) PHP Holdings and its Subsidiaries, and following the consummation of the Merger, Alta Newport, shall not be considered to be "Affiliates" of any of Prospect Medical and its other Subsidiaries.  For the purposes of this definition, "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities or otherwise.

"Agreed Connecticut Shortfall Amount" has the meaning set forth in Section 5.1(a).

"Agreed Pennsylvania Shortfall Amount" has the meaning set forth in Section 3.7(b)(ii).

"Agreement" has the meaning set forth in the preamble hereof.

"ALTA" has the meaning set forth in Section 4.2.

"Alta Newport" means Alta Newport Hospital, LLC, a California limited liability company.

"Amended and Restated Environmental Indemnity" means that certain Amended and Restated Environmental Indemnification Agreement, dated of even date herewith, by and among certain of the Prospect Parties  and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Guaranty" means that certain Amended and Restated Guaranty Agreement, dated of even date herewith, made by Prospect Medical and certain of the Prospect Parties in favor of certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Noncompetition Agreement" means that certain Amended and Restated Noncompetition Agreement, dated of even date herewith, by and among certain of the Prospect Parties  and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Pledge Agreement" means that certain Amended and Restated Pledge Agreement, dated of even date herewith, by and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

4872-7950-5502v14
1038442-980002

"Amended and Restated Security Agreement" means that certain Amended and Restated Security Agreement, dated of even date herewith, by and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Security Documents" means, collectively: (i) the Amended and Restated Security Agreement, (ii) the Amended and Restated Pledge Agreement, (iii) the Amended and Restated Guaranty, (iv) the Amended and Restated Environmental Indemnity, (v) the Amended and Restated Noncompetition Agreement, (vi) Omnibus Amendment of Collateral Lease Assignments, and (vii) any other documents securing any obligations of any of the Prospect Parties (or their respective Affiliates) to any of the MPT Parties (or their respective Affiliates) entered into in connection herewith.

"Amendment to Connecticut Master Agreement" has the meaning set forth in Section 3.8.

"Audited Balance Sheet" has the meaning set forth in Section 7.4(a).

"Audited Financials" has the meaning set forth in Section 7.4(a).

"Balance Sheet Date" has the meaning set forth in Section 7.4(a).

"Bankruptcy Remote Entity" means, with respect to PHP Holdings, an entity that: (a) generally operates in a manner intended to isolate all financial risks to the fullest extent reasonably practicable, and to minimize the risk of being involved in any voluntary or involuntary bankruptcy proceedings (including any initiated by the PhysicianCo Term Loan Lenders or any other creditors); (b) has implemented governance procedures, organizational structure or other arrangements designed to make PHP Holdings less likely to become the subject of a bankruptcy or insolvency event or to become consolidated into a bankruptcy proceeding of Prospect Medical or its other Affiliates (or any other Person); (c) has implemented arrangements that ensure that the assets of PHP Holdings and its Subsidiaries will not be available to the creditors of, or otherwise be consolidated with, any of Prospect Medical or its other Affiliates (or any other Person); (d) exist solely for the purpose of owning and operating the Subsidiaries that control the Managed Care Business (as reflected on the Prospect Organizational Chart) and activities incidental thereto; (e) engages (directly or indirectly) in no other business or activity other than the Managed Care Business and activities incidental thereto; (f) conducts business only in its own name (or a state-approved fictitious name); (g) does not hold, directly or indirectly, any ownership interest (legal or equitable) in any entity or any real or personal property other than the Equity Interest which it owns as reflected in the Prospect Organizational Chart and the other assets incident to the Managed Care Business (subject to the transfer of Alta Newport as contemplated in this Agreement) without the prior written consent of the MPT Parties; (h) does not have any debt, or guarantee or otherwise obligate itself, with respect to the debts of any other Person (other than its Subsidiaries in connection with the Managed Care Business), including, without limitation, Prospect Medical or its other Affiliates; (i) maintains its own separate books, records and financial statements (subject to consolidation with its Subsidiaries); (j) holds itself out as being a legal entity that is not part of any other legal entity (promptly corrects any known misunderstanding regarding its separate legal identity), and (k) maintains all entity formalities independent of any other entity (including Prospect Medical and its other Affiliates).

"Benefit Plans" has the meaning set forth in Section 7.9(a).

"Business Day" means any day other than Saturday, Sunday, or any day on which the principal commercial banks in the State of New York are authorized or obligated to close under applicable law.

Annex A<br>
Glossary<br>
-2-

4872-7950-5502v14<br>
1038442-980002

"Capital Transaction" means any transaction (or series of transactions) that involves aggregate consideration of One Million and No/100 Dollars ($1,000,000.00) or more (whether in cash, securities, or other property), involving (i) the sale or transfer of all or substantially all of the assets of Prospect Medical or any of its Affiliates, (ii) the sale or transfer of any direct or indirect Equity Interests in Prospect Medical or any of its Affiliates, (iii) the sale or transfer of any direct or indirect Equity Interests owned or held by Prospect Medical or any of its Affiliates (including any joint venture interests), or (iv) any other sale, transfer, merger, reorganization, or consolidation or other transaction that would result in any Person who is not currently an Affiliate of Prospect Medical operating or otherwise having voting control over Prospect Medical or any such Affiliates.

"Capital Transaction Covenants" has the meaning set forth in Section 6.4.

"Capital Transaction Covenant Conditions" means, collectively, the occurrence of all of the following events:

 (i) if any payment obligations under the Pennsylvania Mortgage Loan Note (and related Pennsylvania Mortgage Loan Agreement and Pennsylvania Mortgage) remain outstanding, then:

  (A) all such payment obligations then due have been paid through the then current date;

  (B) if, for two (2) consecutive trailing calendar quarters, "Consolidated EBITDAR" (as defined in the Pennsylvania Mortgage Loan Agreement) of Prospect Medical and its Subsidiaries shall greater than Three Hundred Percent (300%) of the Realty Payments (as defined in the Pennsylvania Mortgage Loan Agreement) (as determined utilizing the trailing twelve (12) month operating and financial results of Prospect Medical and its Subsidiaries and measured on a calendar quarterly basis); and

  (C) if, for two (2) consecutive trailing calendar quarters, "Consolidated EBITDAR" (as defined in the Pennsylvania Mortgage Loan Agreement) of the Borrowers (under and as defined in the Pennsylvania Mortgage Loan Agreement) shall greater than One Hundred Twenty-Five Percent (125%) of the Realty Payments (as defined in the Pennsylvania Mortgage Loan Agreement) (as determined utilizing the trailing twelve (12) month operating and financial results of such Borrowers and measured on a calendar quarterly basis);

 (ii) Prospect Medical and its applicable Subsidiaries are in full compliance with the financial covenants contained in Section 16.1(j) and (k) of Master Lease I and Master Lease II at the time of the Capital Transaction;

 (iii) Prospect Medical and its applicable Subsidiaries have paid all amounts then due and owing by any of them to any of the MPT Parties or their Affiliates; and

 (iv) if all of the foregoing conditions are satisfied in full, no uncured Event of Default then exists under any of the then existing Obligation Documents.

"CDPH" means the California Department of Public Health.

Annex A<br>Glossary<br>-3-

4872-7950-5502v14<br>1038442-980002

"Closing Date" means, as applicable: (a) with respect to the Phase I Transactions, the effective date of this Agreement, (b) with respect to the Phase II Transactions, the date of the closing of Phase II Transactions as contemplated in ARTICLE IV, and (c) with respect to the Phase III Transactions, the date of the closing of Phase III Transactions as contemplated in ARTICLE V.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral Assignment I" means that certain Collateral Assignment of Fifth Amended and Restated Assignable Option Agreement, dated March 30, 2023, made by Prospect Medical Systems, LLC, a Delaware Limited Liability Company, to and for the benefit of MPT of Upper Darby PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upland PMH, LLC, MPT of Waterbury PMH, LLC, MPT TRS Lender PMH, LLC, each a Delaware limited liability company, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT OF Culver City PMH, L.P., MPT of Bellflower PMH, L.P., MPT of Tustin PMH, L.P., and MPT of Norwalk PMH, L.P., each a Delaware limited partnership.

"Collateral Assignment II" means that certain Collateral Assignment of Ninth Amended and Restated Assignable Option Agreement ("Collateral Assignment B"), dated March 30, 2023, made by Prospect Medical Systems, LLC, a Delaware Limited Liability Company, to and for the benefit of MPT of Upper Darby PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upland PMH, LLC, MPT of Waterbury PMH, LLC, MPT TRS Lender PMH, LLC, each a Delaware limited liability company, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT OF Culver City PMH, L.P., MPT of Bellflower PMH, L.P., MPT of Tustin PMH, L.P., and MPT of Norwalk PMH, L.P., each a Delaware limited partnership.

"Collateral Assignments" means Collateral Assignment I and Collateral Assignment II.

"Collective Bargaining Agreement" has the meaning set forth in Section 7.10(a).

"Connecticut Closing Payment" has the meaning set forth in Section 5.1(a).

"Connecticut Master Agreement" means that certain Master Agreement (Connecticut Property Dispositions), dated as of October 5, 2022, entered into by certain of the Prospect Parties and certain of the MPT Parties named therein, as the same has been or may be modified, amended, or restated from time to time.

"Connecticut Properties" means the Manchester Property, the Rockville Property, and the Waterbury Property, each as defined in the Connecticut Master Agreement.

"Connecticut Transaction" means the applicable MPT Parties sale of the Connecticut Properties to the applicable Prospect Parties (or to such Person designated by the Prospect Parties) pursuant to the terms of the Connecticut Master Agreement and the other transactions contemplated therein and in the Underlying Acquisition Agreement (as defined in the Connecticut Master Agreement).

"Contracts" means all written contractual agreements relating to or affecting the assets or the operation of the Facilities to which any of the Prospect Parties or their respective Subsidiaries is a party, and all contracts or agreements with regard to the development and construction of any additional Health Care Facilities.

4872-7950-5502v14
1038442-980002

"Conversion Shortfall" has the meaning set forth in Section 4.1(e).

"Default Representation" has the meaning set forth in Section 2.4(d) hereof.

"Deferred Amounts" has the meaning set forth in Section 3.3.

"Deferred Base Rent" has the meaning set forth in Master Lease I and Master Lease II, respectively (and including past due amounts, together with overdue interests and late payment penalties on all past due amounts).

"Deferred Interest" has the meaning set forth in the Foothill Mortgage Loan Note and the TRS Note, respectively (and including past due amounts, together with overdue interests and late payment penalties on all past due amounts).

"Designated Subsidiaries" means:

(a)       with respect to Prospect Medical, each of (i) ManageCo, (ii) Prospect DCMH, LLC, (iii) Prospect CCMC, LLC, (iv) Prospect Manchester Hospital, Inc., (v) Prospect Rockville Hospital, Inc., (vi) Southern California Healthcare System, Inc., (vii) Alta Los Angeles Hospitals, Inc., (viii) Prospect Waterbury, Inc., and (ix) Alta Newport Hospital, Inc., and

(b)       with respect to PHP Holdings, all of its Subsidiaries (including Foothill Propco).

"Disclosure Schedules" means the Disclosure Schedules delivered by the Prospect Parties concurrently with the execution and delivery of this Agreement.

"Distribution" means any dividend or distribution (whether in cash, securities or other property) made by Prospect Medical to any Person with respect to any direct or indirect Equity Interest in Prospect Medical or any of its Affiliates.

"DMHC" means the California Department of Managed Health Care, together with any successor agency thereto.

"EIK" has the meaning set forth in Section 4.3.

"Electronic Transmission" means any form of communication (including, without limitation, by electronic mail) not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient of such record, and that may be directly reproduced in paper form by such a recipient through an automated process.

"Encumbrance" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, lien (statutory or otherwise) or preference, security interest, restrictions or easements or other encumbrance of any kind or nature whatsoever.

"Equity Interests" means with respect to any Person, the voting power, ownership, or other equitable interests of such Person, including any interest represented by any capital stock, convertible or participating debt instruments, membership interest, partnership interest, or any similar interest therein.

4872-7950-5502v14
1038442-980002

"Equity Rollover Transactions" means the applicable MPT Parties exchanging certain of the Outstanding Obligations for PHPH Series A-1 Preferred Units in PHP Holdings as described in this Agreement.

"Facility" has the meaning set forth in Master Lease I, Master Lease II, and the Foothill Mortgage Loan Agreement, as applicable.

"Financial Statements" has the meaning set forth in Section 7.4(a).

"Foothill Facility" has the meaning ascribed thereto in the Foothill Mortgage Loan Agreement.

"Foothill Lease" has the meaning set forth in Section 3.1(c).

"Foothill Mortgage" means that certain Deed of Trust, Security Agreement and Fixture Filing, dated August 23, 2019, and filed of record on August 29, 2019 under Document Number 2019000324068 in the official records of Orange County, California, and amended pursuant to that certain Amendment to Deed of Trust, Security Agreement and Fixture Filing, dated July 26, 2022, and filed of record on August 9, 2022 under Document Number 2022000272512 in the official records of Orange County, California, as the same have been or shall be further amended, modified, or restated from time to time.

"Foothill Mortgage Loan Agreement" means, collectively, that certain Real Estate Loan Agreement, dated August 23, 2019, as amended by that certain Amendment to Real Estate Loan Agreement (Tranche 2 Advances), dated July 26, 2022, as further modified, amended, or restated from time to time.

"Foothill Mortgage Loan Documents" means, collectively, the Foothill Mortgage Loan Agreement, the Foothill Mortgage Loan Note, the Foothill Mortgage, and all of the other documents entered into in connection therewith, as each of the same may be as modified, amended, or restated from time to time.

"Foothill Mortgage Loan Note" means that certain Amended and Restated Promissory Note (Mortgage Loan), dated as of July 26, 2022, made by Alta Newport in favor of MPT Foothill Lender in the amount of One Hundred and Fifty-One Million Two Hundred Sixty-Six Thousand Seven Hundred and No/100 Dollars ($151,266,700.00), as the same has been or may be modified, amended or restated from time to time.

"Foothill Propco" means FRMC Hospital Property, LLC, a California limited liability company and a wholly-owned subsidiary of PHP Holdings.

"Forbearance Agreement" means that certain Second Amended and Restated Forbearance Agreement, dated as of March 24, 2023, by and among Prospect Medical and certain of the other Prospect Parties named therein and certain of the MPT Parties named therein, as the same may have been amended, modified, supplemented, or extended from time to time.

"GAAP" shall mean generally accepted accounting principles in the United States as in effect from time to time and applied consistently throughout the periods involved.

"Governing Documents" has the meaning set forth in Section 7.1(a).

"Governmental Body" means any (a) national, federal, state, provincial, county, municipal or local government, foreign or domestic, (b) political subdivision of any of the foregoing or (c) entity, authority, agency, ministry or other similar body exercising any legislative, executive, judicial, regulatory or

4872-7950-5502v14
1038442-980002

administrative authority or functions of or pertaining to government, including any court, commission, tribunal or other quasi-governmental entity established to perform any such function (including, without limitation, the Securities and Exchange Commission, the Internal Revenue Service, the DMHC, and the California Board of Pharmacy).

"Government Programs" means all state and federal health benefit programs sponsored by a Governmental Body, including any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), Medicare and Medicare Advantage, state Medicaid programs, state CHIP programs, TRICARE and similar or successor programs with or for the benefit of any Governmental Body.

"Health Care Facility" has the meaning set forth in Section 856(e)(3)(D)(ii) of the Code.

"Healthcare Laws" shall mean all applicable Laws relating to health care providers and facilities, participation in Government Programs, participation in Payor Programs, Information Privacy and Security Laws, institutional and professional licensure, pharmacology and dispensing medicines or controlled substances, medical documentation and professional orders, medical record retention, laboratory services, unprofessional conduct, fee-splitting, corporate practice of medicine, referrals, billing and submission of false or fraudulent claims, claims processing, quality, safety, medical necessity, informed consent, the hiring of employees or acquisition of services or supplies from Persons excluded from participation in Government Programs, standards of care, quality assurance, risk management, utilization review, peer review, mandated reporting of incidents, occurrences, diseases and events, advertising or marketing of health care services, and the enforceability of restrictive covenants on health care professionals, including: (a) the Federal anti-kickback law (42 U.S.C. § 1320a-7b(b)), the Federal False Claims Law (42 U.S.C. § 1320a-7b(a)), the Federal physician self-referral law (42 U.S.C. § 1395nn), the Federal False Claims Act (31 U.S.C. § 3729, *et seq.*), the Federal Civil Monetary Penalties Law (42 U.S.C. § 1320a-7a), the Federal Program Fraud Civil Remedies Act (31 U.S.C. § 3801 *et seq.*) and the Federal Health Care Fraud Law (18 U.S.C. § 1347), the Beneficiary Inducement Statute (42 U.S.C. § 1320a-7a(a)(5)), the Confidentiality of Alcohol and Drug Abuse Patient Records Act (42 U.S.C. § 290ee-3, *et seq.*), the Clinical Laboratory Improvement Act (42 U.S.C. § 263a, *et seq.*), the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (P.L. 108-173, 117 Stat. 2066), the Food, Drug and Cosmetic Act of 1938 (21 U.S.C. § 301, *et seq.*), the Prescription Drug Marketing Act of 1987 (P.L. 100-293, 102 Stat. 95), the Deficit Reduction Act of 2005 (P.L. 109-171, 120 Stat. 4), the Controlled Substances Act (21 U.S.C. 801, *et seq.*); (b) Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute), including the amendments implemented by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and the Medicare Improvements for Patients and Providers Act of 2008; (c) Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396v (the Medicaid statute); (d) TRICARE, 10 U.S.C. §1071 *et seq.*; (e) the Patient Protection and Affordable Care Act (Pub. L. 111-148) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152); and (f) all applicable regulations promulgated under each of the foregoing Healthcare Laws.

"Healthcare Licenses" means, collectively, all applicable licenses, approvals, qualifications, variances, certificates of need, franchises, accreditations, certificates, certifications, consents, permits and other authorizations and contracts issued by any Governmental Body which may be (i) necessary for the operation of the Managed Care Business or of each of the Facilities as a general acute care hospital facility (and for such other legal ancillary uses as may be necessary in connection with or incidental to such uses), or (ii) required for certification and participation under Medicare and Medicaid legislation and regulations, the provider programs of any Governmental Body for the Managed Care Business and each particular Facility, the United States Department of Health and Human Services, and the Centers for Medicare and Medicaid

4872-7950-5502v14
1038442-980002

Services, and/or state or federal Title XVIII and/or Title XIX provider programs applicable for each such Facility.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HospitalCo Intercreditor Agreement" means that certain Intercreditor Agreement, dated of even date herewith, entered into between the certain of the MPT Parties and the PhysicianCo Term Loan Lenders under the HospitalCo Term Loan Agreement, as the same may be amended, modified, or restated from time to time.

"HospitalCo Term Loan Agreement" means that certain Financing Agreement, dated of even date herewith, entered into between certain Prospect Medical and MPT Picasso TRS, pursuant to which MPT Picasso TRS has made a term loan to Prospect Medical in the original principal amount of Seventy-Five Million and No/100 Dollars ($75,000,000.00), as the same may be amended, modified, or restated from time to time.

"HospitalCo Parties" means all of the Prospect Parties, other than PHP Holdings and its Subsidiaries, and Alta Newport.

"Indebtedness" means any obligation (whether incurred as a principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent.

"Information Privacy and Security Laws" shall mean HIPAA and any other laws concerning the privacy and/or security of personal information, including but not limited to the Gramm-Leach-Bliley Act, state data breach notification laws, state health information privacy laws, the Federal Trade Commission Act and state consumer protection laws.

"Insurance Policies" has the meaning set forth in Section 7.12(a).

"Intercompany Subordination Agreement" means that certain Intercompany Subordination Agreement, to be dated of even date herewith, entered into by (a) certain of the Prospect Parties and certain of their Affiliates, (b) MPT TRS Lender PMH, LLC (in its capacity as administrative agent and collateral agent for the "HospitalCo Creditors" as defined therein), (c) Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent for the "CB Creditors" as defined therein), and (d) certain of the MPT Parties named therein.

"Knowledge" or "Knowledge of the Prospect Parties" shall mean with respect to the Prospect Parties, the actual or deemed knowledge of a particular fact or matter if (i) with respect to any of the Prospect Parties, its chief executive officer, president, Samuel Lee, George Pillari, and Eric Samuels (collectively, "Knowledge Group"), has actual knowledge of such fact or matter or (ii) any of such Knowledge Group would reasonably be expected to discover or otherwise become aware of such fact or matter after conducting a reasonably diligent inquiry.

"Law" means any federal, state or local statute, rule, regulation, ordinance, order, code, policy or rule of common law, now or hereafter in effect, and in each case as amended, and any judicial or administrative interpretation thereof by a Governmental Body or otherwise, including, without limitation, any judicial or administrative order, consent, decree or judgment.

Annex A
Glossary
-8-

4872-7950-5502v14
1038442-980002

"Letter of Credit" means the "Letter of Credit" as defined in each of Master Lease I, Master Lease II, and the Pennsylvania Mortgage Loan Agreement.

"Liability" shall mean any and all debts, liabilities, expenses, commitments, obligations, actions and damages of any kind, character or description, whether direct or indirect, contingent or absolute, matured or unmatured, accrued or not accrued, asserted or not asserted, known or unknown, disputed or undisputed, joint or several, secured or unsecured, liquidated or unliquidated, determined, determinable or otherwise, whenever or however arising (including whether arising under any Law, Litigation or Order and those arising under any Contract), and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Licenses" shall mean all notifications, accreditations, licenses, Permits, franchises, certificates and certifications, approvals, exemptions, classifications, registrations and other similar documents and authorizations issued by any Governmental Body (including, without limitation, all Healthcare Licenses), and applications, amendments and modifications of any of the foregoing.

"Litigation" has the meaning set forth in Section 7.7(a).

"Lodging Facility" has the meaning set forth in Section 856(d)(9)(D)(ii) of the Code.

"Look-Back Date" shall mean July 19, 2019.

"ManageCo" has the meaning set forth in the preamble hereof.

"Managed Care Business" means value-based-managed care business operated by Prospect Medical, PHP Holdings, and certain of their respective Affiliates.

"Management Agreement" means that certain Management Services Agreement to hereafter be entered into in connection with the Phase II Transactions by and among ManageCo, PHP Holdings, and Alta Newport (and any other applicable Subsidiaries required be joined thereto), substantially in the form attached hereto as ***EXHIBIT D***.

"Master Lease I" means that certain Master Lease Agreement, dated August 23, 2019, by and among the Master Lease I Lessors and Master Lease I Lessees, as the same has been modified, amended, or restated from time to time.

"Master Lease I Amendment" means an amendment to Master Lease I to sever the applicable properties, Master Lease I Lessees, and Master Lease I Lessors (and to effect such other related actions) as described in this Agreement.

"Master Lease I Lessees" means, collectively, Prospect CCMC, LLC, Prospect DCMH, LLC, each a Pennsylvania limited liability company, Prospect Manchester Hospital, Inc., and Prospect Rockville Hospital, Inc., each a Connecticut corporation, and any other Person which becomes a "Lessee" under Master Lease I.

"Master Lease I Lessors" means, collectively, MPT of Upper Darby PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Springfield PMH, LLC, and MPT of Ridley Park PMH, LLC,

4872-7950-5502v14
1038442-980002

each a Delaware limited liability company and any other Person which becomes a "Lessor" under Master Lease I.

"Master Lease II" means that certain Master Lease Agreement, dated August 23, 2019, by and among the Master Lease II Lessors and Master Lease II Lessees, as the same has been modified, amended, or restated from time to time.

"Master Lease II Amendment" means an amendment to Master Lease II to sever the applicable properties, Master Lease II Lessees, and Master Lease II Lessors (and to effect such other related actions) as described in this Agreement.

"Master Lease II Lessees" means, collectively, Southern California Healthcare System, Inc., a California corporation, Alta Los Angeles Hospitals, Inc., a California corporation, Prospect Waterbury, Inc., a Connecticut corporation, and Prospect CCMC, LLC, a Pennsylvania limited liability company, and any other Person which becomes a "Lessee" under Master Lease II.

"Master Lease II Lessors" means, collectively, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT of Culver City PMH, L.P., MPT of Bellflower PMH, L.P., and MPT of Norwalk PMH, L.P., each a Delaware limited partnership, and MPT of Upland PMH, LLC, and MPT of Waterbury PMH, LLC, each a Delaware limited liability company, and any other Person which becomes a "Lessor" under Master Lease II.

"Master Leases" means, collectively, Master Lease I and Master Lease II.

"Material Adverse Effect" means, with respect to any Prospect Party, any change, event(s), occurrence(s) or effect(s), whether direct or indirect, that, both before and after giving effect to the transactions contemplated by this Agreement, could, individually or in the aggregate, have a material adverse effect, the cost of which exceeds or could reasonably be expected to exceed Ten Million and No/100 Dollars ($10,000,000.00), on (a) the business, properties, results of operations, assets, revenue, income or condition (financial or otherwise) of, or the ability to timely satisfy the obligations or liabilities (whether absolute or contingent) of, such Prospect Party, (b) such Prospect Party's business or assets, or (c) the ability of such Prospect Party to perform its obligations under, and/or consummate the transactions contemplated by, this Agreement within the time periods specified herein.

"Material Contracts" shall mean the following Contracts to the extent in effect as of the date hereof:

(a)     any collective bargaining agreements;

(b)     any equity purchase, option or similar plans;

(c)     agreements or indentures relating to the borrowing of money or to mortgaging, pledging or otherwise placing an Encumbrance, except for Permitted Encumbrances, on any material portion of the assets of any of the Prospect Parties;

(d)     any guaranty of any obligation for borrowed money or other material guaranty;

(e)     any existing agreements relating to any material business acquisitions by any of the Prospect Parties or their respective Affiliates;

Annex A
Glossary
-10-

(f)        any Contract (other than confidentiality and non-solicitation agreements entered into in the ordinary course) which places any material limitation on any of the Prospect Parties from freely engaging in business anywhere in the world;

(g)        any Contracts or orders with any Governmental Body for payments to any of the Prospect Parties in excess of Five Percent (5%) of the gross revenue of any such Prospect Parties in any given year;

(h)        any Contract for capital expenditures or the acquisition or construction of fixed assets requiring payments by Prospect Medical or any of its Subsidiaries in excess of Five Million Dollars ($5,000,000);

(i)        any material management agreement whereby either (i) any of the Prospect Parties or their respective Subsidiaries is managed by a third party or (ii) a material line of the operating business is managed by a third party at one or more of the Facilities; and

(j)        any third-party participation, reimbursement, provider, managed care, or similar payor contract or agreement to which the Facilities are parties exceeding Five Percent (5%) of the gross revenue of the Facilities, as applicable, in any given year.

"Merger" has the meaning set forth in Section 4.2.

"Most Recent Annual Financials" has the meaning set forth in Section 7.4(a).

"Most Recent Balance Sheet" has the meaning set forth in Section 7.4(a).

"MPT Advance Convertible Note" means that certain Convertible Promissory Note, dated as of March 31, 2023, in the original principal amount of Fifty Million and No/100 Dollars ($50,000,000.00), made by PHP Holdings in favor of MPT Picasso TRS, as the same may be amended, modified, or restated from time to time.

"MPT Foothill Lender" means MPT of Tustin PMH, L.P., a Delaware limited partnership.

"MPT Indemnified Parties" has the meaning set forth in Section 10.1.

"MPT Op" means MPT Operating Partnership, L.P., a Delaware limited partnership.

"MPT Parties" has the meaning set forth in the preamble hereof.

"MPT Parties' Resolutions" has the meaning set forth in Section 3.9(b).

"MPT Picasso TRS" has the meaning set forth in the preamble hereof.

"MPT Representative" has the meaning set forth in Section 11.21(c).

"MPT TRS Lender" means MPT TRS Lender PMH, LLC, a Delaware limited liability company.

"Multiemployer Plan" has the meaning set forth in Section 7.9(a).

4872-7950-5502v14
1038442-980002

"Net Capital Proceeds" means an amount equal to the proceeds received by Prospect Medical or its Affiliates in connection with or as a result of any Capital Transaction, less (i) the payment of taxes, reasonable third party transaction fees, and payments to minority interest holders, in each case, with respect to such Capital Transaction, and (ii) an amount, not to exceed five percent (5%) of the purchase price of a Capital Transaction, to be reserved by Prospect Medical or its Affiliates for any post-closing net working capital adjustments provided for in the definitive agreement with respect to such Capital Transaction. Notwithstanding the foregoing, in connection with the CT Transaction, Net Capital Proceeds shall be equal to the Net Transaction Proceeds (as defined in the Connecticut Master Agreement).

"Obligation Documents" has the meaning set forth in the Master Lease I, Master Lease II, the Pennsylvania Restructuring Documents, together with the TRS Note, the MPT Advance Convertible Note, the Amended and Restated Security Documents, and any other guaranty agreements, security agreements, pledge agreements, subordination agreements, or other agreements, documents, or instruments entered into or delivered from time to time by any of the Prospect Parties or their Affiliates (or direct or indirect Equity Interest holders) in connection therewith.

"OFAC" has the meaning set forth in Section 7.17(e).

"Omnibus Amendment of Collateral Lease Assignments" means that certain Omnibus Amendment of Collateral Lease Assignments, dated of even date herewith, and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time (and including the requisite landlord counterparty consents thereto).

"Orders" has the meaning set forth in Section 7.7(b).

"Ordinary Course of Business" means, with respect to the business of Prospect Medical, PHP Holdings, and their respective Subsidiaries, the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Original Restructuring Agreement" means that certain Master Restructuring Agreement, dated as of July 26, 2022, by and among certain of the Prospect Parties and the MPT Parties named therein, as amended by that certain First Amendment to Master Restructuring Agreement, dated October 5, 2022, the same may be further modified, amended, or restated from time to time.

"Other Applicable Subsidiaries" shall mean, collectively, all Subsidiaries of Prospect Medical that are parties to the Amended and Restated Pledge Agreement (other than the Designated Subsidiaries).

"Outstanding Obligations" means (i) all amounts owed under the Foothill Mortgage Loan Note, including without limitation, all interest, principal, Deferred Interest, additional interest, and any other amounts owed thereunder, (ii) all amounts owed pursuant to the TRS Note, including without limitation, all principal, interest, Deferred Interest and any other amounts thereunder, (iii) all Deferred Base Rent due and payable under and as defined in Master Lease I, (iv) all Deferred Base Rent due and payable under and as defined in Master Lease II, (v) all amounts (if any) owed pursuant to the MPT Advance Convertible Note, including without limitation, all principal, interest, Deferred Interest and any other amounts thereunder, and (vi) any other outstanding payment obligations due and payable by any of Prospect Medical or its Affiliates to the applicable MPT Parties or their Affiliates when all of the foregoing obligations in subsections (i) through (v) above have been paid and satisfied in full to the MPT Parties (including any outstanding payment obligations now or hereafter arising under Master Lease I, Master Lease II, or the Pennsylvania

Annex A
Glossary
-12-

4872-7950-5502v14
1038442-980002

Restructuring Documents), in each case in the amounts as of the date hereof specified pursuant to Section 2.2 hereof.

"Outstanding Property Insurance" means the aggregate outstanding amount of the premiums and other costs for property insurance to be reimbursed by the applicable Prospect Parties to the applicable MPT Parties pursuant to Master Lease I, Master Lease II, and the Foothill Mortgage Loan Agreement, which amount is specified in the attached **_EXHIBIT A_**.

"Party" and "Parties" have the meanings set forth in the preamble hereof.

"Patriot Act" has the meaning set forth in Section 7.17(a).

"Payor Contract" has the meaning set forth in Section 7.14(e).

"Payor Programs" means all Government Programs, and all other third-party healthcare benefit plans and programs (including, but not limited to, those offered or administered by health maintenance organizations, preferred provider organizations, health benefit plans, waiver provider organizations and health insurance plans), to which claims for payment are submitted, presented or paid (in whole or part) by any of the Prospect Parties or any of their respective Subsidiaries.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Pennsylvania Facilities" means, collectively: (i) the Springfield Facility, the Taylor Facility, and the Delaware County Facility (as each such term is defined in Master Lease I) and (ii) the Crozer-Chester Facility (as such term is defined in Master Lease II).

"Pennsylvania Lessees" means, collectively, Prospect CCMC, LLC and Prospect DCMH, LLC, each a Pennsylvania limited liability company.

"Pennsylvania Lessors" means, collectively, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upper Darby PMH, LLC, and MPT of Upland PMC, LLC, each a Delaware limited liability.

"Pennsylvania Mortgage" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Mortgage Borrower" means the Pennsylvania Lessees.

"Pennsylvania Mortgage Lenders" means the Pennsylvania Lessors.

"Pennsylvania Mortgage Loan Agreement" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Mortgage Loan Note" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Purchase and Sale Agreement" means that certain Purchase and Sale Agreement, dated of even date herewith, by and among the Pennsylvania Lessees, as buyers, and the Pennsylvania Lessors, as sellers.

"Pennsylvania Purchase Price" has the meaning set forth in Section 3.7 hereof.

4872-7950-5502v14
1038442-980002

"Pennsylvania Restructuring Documents" means, collectively, the Pennsylvania Purchase Agreement, the Pennsylvania Mortgage Loan Agreement, the Pennsylvania Mortgage Loan Note, the Pennsylvania Subordination and Attornment Agreement, and each of the deeds, bills of sale, terminations, amendments, and other documents, instruments, certificates, or agreements contemplated therein or executed pursuant thereto, as each of the same may be amended or modified from time to time.

"Pennsylvania Subordination and Attornment Agreement" has the meaning set forth in Section 3.7 hereof.

"Permits" means any license, permit, consent, registration, authorization, approval, certificate or certificate of need (or similar Governmental Body approval) issued by or pending with any Governmental Body and accreditations.

"Permitted Encumbrance" shall mean each of (a) Encumbrances for or arising from current taxes not yet delinquent or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings; (b) defects or imperfections of title or other Encumbrances not interfering with the marketability or the Ordinary Course of Business of the Facilities or the Managed Care Business; and (c) any other matters, Encumbrances and defects that have been or are otherwise hereafter expressly approved in writing by any of the MPT Parties and/or provided as a "Permitted Encumbrance" (or similar words of import) in any document by and between any MPT Party, on the one hand, and any Prospect Party on the other (including those Encumbrances subject to the PhysicianCo Intercreditor Agreement and as expressly permitted in the Obligation Documents and in the Real Property Asset Purchase Agreement dated as of July 10, 2019).

"Permitted Transactions" means:

(a)    the Connecticut Transaction, subject to the terms set forth in the Connecticut Master Agreement;

(b)    the sale of all or substantially all of the assets of the Business and Joint Ventures (each as defined in the RI Purchase Agreement) on the terms set forth in such RI Purchase Agreement; or

(c)    the sale of all or substantially all of the assets of Coordinated Regional Care Group, LLC ("CRCG") and/or any of its Subsidiaries (or Equity Interests in CRCG and its Subsidiaries holding such assets).

"Person" means an individual, a corporation, a limited liability company, a general or limited partnership, an unincorporated association, a joint venture, a governmental body or another entity or group.

"Phase I Convertible Note" means that certain Convertible Promissory Note, dated of even date herewith, made by PHP Holdings as more particularly described in Section 3.3(b) hereof, and pursuant to which PHP Holdings grants to the holder thereof the right to convert on a dollar-for-dollar basis all principal, interests and other amounts payable thereunder into PHPH Series A-1 Preferred Units in the manner set forth therein.

"Phase I Outstanding Obligations" has the meaning set forth in Section 3.2(c) hereof.

"Phase I Transactions" means, collectively, the transactions contemplated in ARTICLE III of this Agreement.

Annex A
Glossary
-14-

"Phase II Transactions" means, collectively, the transactions contemplated in ARTICLE IV of this Agreement.

"Phase III Transactions" means, collectively, the transactions contemplated in ARTICLE V of this Agreement.

"PHP Holdings" has the meaning set forth in the preamble hereof.

"PHP Holdings LLC Agreement" means that certain Third Amended and Restated Limited Liability Company Agreement for PHP Holdings, dated contemporaneously herewith, by and among PHP Holdings, Prospect Medical and MPT Picasso TRS, as the same may be modified, amended or restated from time to time.

"PHP Holdings Pledge Agreement" means that certain Pledge Agreement, to be dated as of the date hereof, executed by PHP Holdings in favor of MPT Picasso TRS, pursuant to which PHP Holdings is pledging its equity in Prospect Health Plan, Inc. and Prospect Intermediate Holdings, LLC to secure PHP Holdings' obligations under the Phase I Convertible Note, as the same may be modified, amended or restated from time to time.

"PHP Holdings Pro Forma Financials" has the meaning set forth in Section 7.4(a).

"PHP Holdings Representative" has the meaning set forth in Section 11.21(b).

"PHPH MidCo" means Prospect Intermediate Holdings, LLC, a Delaware limited liability company.

"PHPH Net Equity Value" has the meaning set forth in Section 2.3.

"PHPH Series A-1 Preferred Units" means the "Series A-1 Preferred Units," as defined in the PHP Holdings LLC Agreement.

"PHPH Series A-2 Preferred Units" means the "Series A-2 Preferred Units," as defined in the PHP Holdings LLC Agreement.

"PHS" has the meaning set forth in Section 3.1(d).

"Physician Holdings" means Prospect Physician Holdings, Inc., a California professional medical corporation.

"PhysicianCo Intercreditor Agreement" means that certain Intercreditor Agreement, dated of even date herewith, entered into between the certain of the MPT Parties and the PhysicianCo Term Loan Lenders under the PhysicianCo Term Loan Agreement, as the same may be amended, modified, or restated from time to time.

"PhysicianCo Term Loan" has the meaning set forth in Section 2.3(b).

"PhysicianCo Term Loan Agreement" means that certain Financing Agreement, dated of even date herewith, entered into between certain Subsidiaries of PHP Holdings set forth therein and the PhysicianCo Term Loan Lenders, pursuant to which the PhysicianCo Term Loan Lenders have collectively made a term

4872-7950-5502v14
1038442-980002

loan to PhysicianCo Term Loan Borrowers in the original principal amount of Three Hundred Seventy-Five Million and No/100 Dollars ($375,000,000.00), as the same may be amended, modified, or restated from time to time.

"PhysicianCo Term Loan Borrowers" has the meaning set forth in Section 2.3(b).

"PhysicianCo Term Loan Documents" means the PhysicianCo Term Loan Agreement and any guaranty agreements, security agreements, pledge agreements, subordination agreements, or other agreements, documents, or instruments entered into or delivered from time to time by any of the Prospect Parties to the PhysicianCo Term Loan Lenders in connection therewith.

"PhysicianCo Term Loan Lenders" means those Persons that are lenders under and pursuant to the PhysicianCo Loan Agreement.

"PPG" has the meaning set forth in Section 3.1(d).

"Present Fair Salable Value" means the amount that may be realized if the aggregate assets of (a) Prospect Medical, PHP Holdings, and each of their respective Subsidiaries, or (b) PHP Holdings and its Subsidiaries, as applicable, are sold as an entirety with reasonable promptness in an arm's length transaction under then-present conditions for the sale of comparable business enterprises.

"Priming Lien" means any first priority lien granted by any Prospect Party in the tangible personal property (and products and proceeds thereof) to a lender providing financing for such Prospect Party to purchase such items of tangible personal property, and any extension, refinancing, replacement or renewal thereof.

"Prospect CCMC" means Prospect CCMC, LLC, a Pennsylvania limited liability company.

"Prospect DCMH" means Prospect DCMH, LLC, a Pennsylvania limited liability company.

"Prospect Indemnified Parties" has the meaning set forth in Section 10.3.

"Prospect Medical" has the meaning set forth in the preamble hereof.

"Prospect Organizational Chart" has the meaning set forth in Section 2.3.

"Prospect Parties" has the meaning set forth in the preamble hereof.

"Prospect Parties' Resolutions" has the meaning set forth in Section 3.9(a).

"Prospect Representative" has the meaning set forth in Section 11.21(a).

"Redemption Agreements" means those certain Redemption Agreements, dated of even date herewith, by and among the Company, and each of PPG, and PHS, pursuant to which the Company has redeemed all of the Series A-2 Preferred Units previously held by PPG and PHS.

"Release and Waiver Agreement" means a Release and Waiver Agreement, duly executed by all of the Prospect Parties and delivered to the MPT Parties as described in Section 2.5 hereof.

Annex A
Glossary
-16-

4872-7950-5502v14
1038442-980002

"Released Defaults" means only those certain defaults under the Obligation Documents by the Prospect Parties that are described on the attached **_EXHIBIT E,_** including with respect thereto all manner of action or actions, causes of action, whether in law or equity, suits, debts, liens, remedies, contracts, agreements, promises, liabilities, judgments, claims, demands, damages, counterclaims, defenses, assertions, allegations, rights of setoff, suits, sums of money owed, reckonings, bonds, covenants, contracts, controversies, proceedings, agreements, promises, doings, omissions, variances, losses, costs, attorneys' fees, and expenses of whatever nature or kind whatsoever, whether fixed or contingent, asserted or unasserted, at law or in equity, in contract or tort, unsecured, secured, priority, administrative or otherwise, whether asserted, unasserted, suspected, unsuspected, accrued, unaccrued, patent, latent, liquidated, unliquidated, fixed, contingent, pending, threatened, now existing, or which may arise in the future, and all resulting damages, including, but not limited to, all actual damages, compensatory damages, consequential damages, statutory damages, punitive and exemplary damages, prejudgment and post-judgment interest, attorneys' fees and costs of court, and all other damages related to or arising out of claims by any MPT Parties related to such defaults.

"Required Consents" has the meaning set forth in Section 4.1(e).

"Restructuring Documents" means this Agreement and any other documents, instruments, certificates, or agreements to entered into by any of the Parties in connection with the transactions contemplated herein.

"Restructuring Term Sheet" has the meaning set forth in the recitals to this Agreement.

"Restructuring Transactions" means those actions taken by the Parties, in addition to the Equity Rollover Transactions, to restructure the remaining Outstanding Obligations, as described in this Agreement.

"RI Purchase Agreement" means that certain Asset Purchase Agreement dated as of November 18, 2022, by and among Centurion Foundation, Inc., Prospect and each of Prospect CharterCare, LLC, Prospect CharterCARE RWMC, LLC, Prospect RI Home Health and Hospice, LLC, Prospect CharterCARE Home Health & Hospice, LLC, New University Medical Group, LLC, Prospect CharterCARE SJSHRI, LLC, Prospect CharterCARE Physicians, LLC, Prospect CharterCARE Ancillary Services, LLC and Prospect Blackstone Valley Surgicare, LLC.

"Schedule Supplement" has the meaning set forth in Section 11.10.

"Series A-1 Subscription Agreement" means that certain Series A Preferred Unit Subscription Agreement, dated of even date herewith, among PHP Holdings and MPT Picasso TRS, pursuant to which MPT Picasso TRS will subscribe for and acquire 69,494 units of Series A-1 Preferred Units as more particularly described in Section 3.2(a) hereof.

"Solvent" means, when used with respect to Prospect Medical or PHP Holdings, as applicable, means that, as of the applicable date of determination:

(a)    the Present Fair Salable Value of the assets of, as applicable: (i) Prospect Medical and each of its Subsidiaries, or (i) PHP Holdings and each of its Subsidiaries, will, as of such date, exceed all of its debts, as of such date,

(b)    as applicable, (i) Prospect Medical and each of its Subsidiaries, or (ii) PHP Holdings and each of its Subsidiaries, will not have, or have access to, as of such date, an unreasonably small amount of capital for the business in which they are engaged or will be engaged, and

(c)    as applicable, (i) Prospect Medical and each of its Subsidiaries, or (ii) PHP Holdings and each of its Subsidiaries, is able to pay their debts as they become absolute and mature, in the Ordinary Course of Business, taking into account the timing of and amounts of cash to be received by them and the timing of and amounts of cash to be payable on or in respect of its indebtedness, in each case after giving effect to the transactions contemplated herein.

The term "Solvency" shall have a correlative meaning.  For purposes of the definition of "Solvent": (1) "debt" means liability on a "claim"; and (2) "claim" means any right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured or the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Subsidiary" or "Subsidiaries" mean, with respect to any Person, any other Person, of which an amount of the voting securities, voting ownership or voting partnership interests of which is sufficient to control such Person or elect at least a majority of its board of directors or other governing body (or, if there are no such control / voting interests, 50% or more of the Equity Interests of which), is owned directly or indirectly by such first Person. For the purposes hereof, the term Subsidiary shall include all Subsidiaries of any such Subsidiary.

"Support Services Agreement" means that certain Support Services Agreement, dated effective as of March 31, 2023, by and between Prospect Medical and PHP Holdings.

"Tax Returns" shall mean any report, return, document or other filing (including any additional or supporting material and any amendments or supplements) required to be supplied to any Governmental Body with respect to Taxes.

"Taxes" shall mean any and all taxes, charges, fees, levies or other assessments, including, without limitation, any and all income, gross receipts, excise, real and personal property (including leaseholds and interests in leaseholds), sales, use, occupation, transfer, license, ad valorem, gains, profits, gift, minimum estimated, alternative minimum, social security, unemployment, disability, premium, recapture, credit, payroll, withholding, severance, stamp, capital stock, value added leasing, franchise and other taxes or similar charges of any kind including any interest and penalties on or additions thereto or attributable to any failure to comply with any requirement regarding any tax return.

"Tranche 1 Advance" means the advance by MPT Foothill Lender to Alta Newport in the amount of Fifty-One Million Two Hundred Sixty-Six Thousand Seven Hundred and No/100 Dollars ($51,266,700.00), as evidenced by and further defined in the Foothill Mortgage Loan Note.

"Tranche 2 Additional Interest" means the outstanding "Additional Interest" (as defined in the Foothill Mortgage Loan Agreement) specified in the attached ***EXHIBIT A***.

4872-7950-5502v14
1038442-980002

"Tranche 2 Advances" means the additional loan advances made by MPT Foothill Lender to Alta Newport in the amount of (i) Fifty Million and No/100 Dollars ($50,000,000.00) on May 2, 2022 and (ii) Fifty Million and No/100 Dollars ($50,000,000.00) on May 31, 2022, as evidenced by and further defined in the Foothill Mortgage Loan Note.

"TRS Note" means that certain Promissory Note, dated as of August 23, 2019, in the original principal amount of One Hundred Twelve Million Nine Hundred Thirty Seven Thousand Two Hundred Four and No/100 Dollars ($112,937,204.00), made by Prospect Medical in favor of MPT TRS Lender, as amended by the Amendment to Promissory Note, dated May 27, 2021, as the same have been or may be amended, modified, or restated from time to time.

"Uncured Defaults" means those certain matters under the Obligation Documents by the Prospect Parties that are described on the attached ***EXHIBIT F***.

"WARN" has the meaning set forth in Section 7.10(e).

"Yale Consent" has the meaning set forth in Section 3.8.

Annex A
Glossary
-19-

4872-7950-5502v14
1038442-980002

**EXHIBIT A**

**OUTSTANDING OBLIGATIONS**

| Phase I Obligations | Amount |
|---|---|
| Tranche 1 Advance (Foothill Mortgage Loan) | $   51,266,700.00 |
| Tranche 2 Advance (Foothill Mortgage Loan) | $ 100,000,000.00 |
| Tranche 2 Additional Interest (Foothill Mortgage Loan) | $9,137,500.00 |
| Accrued Base Interest -- Foothill Mortgage | $6,433,187.69 |
| TRS Note – Principal | $ 112,937,204.00 |
| Accrued Base Interest – TRS Note | $4,936,603.11 |
| MPT Advance Convertible Note - Principal | $50,000,000.00 |
| Accrued Base Interest – MPT Advance Convertible Note | $588,888.89 |
| Deferred Amounts | $182,605,385.16 |
| Agreed Pennsylvania Shortfall Amount | $100,000,000.00 |
| Agreed Connecticut Shortfall Amount | $102,942,998.00 |
| 2020/2021 & 2021/2022 Outstanding Property Insurance Premium | $783,708.00 |
|  |  |
|  |  |
| **TOTAL:** | **$721,632,174.85** |

*Exhibit A - 1*

4872-7950-5502v14
1038442-980002