UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MEDICAL PROPERTIES TRUST, INC. SECURITIES LITIGATION | Case No. 1:23-cv-008597-VSB <br><br> <u>CLASS ACTION</u> |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    MPT and its business. ...................................................................................... 4

    B.    Prospect encounters financial difficulties, secures additional financing, and agrees to restructure its obligations to MPT. ..................................... 4

    C.    The Restructuring Agreement .......................................................................... 5

    D.    The DMHC reviews the Minority Interest Transaction. ................................ 7

    E.    MPT releases its second quarter earnings. ................................................... 7

    F.    The *Wall Street Journal* publishes a misleading article concerning the DMHC review. ............................................................................................ 8

    G.    Plaintiffs sue on the heels of the *Wall Street Journal* article. ................... 9

    H.    The DMHC completes its review of the Minority Interest Transaction. ................ 9

ARGUMENT ...................................................................................................................... 10

I.    PLAINTIFFS DO NOT PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION ............................................................................................................ 11

    A.    Plaintiffs fail to adequately allege any actionable misstatements or omissions in the May 2023 press release or Form 8-K announcing the Prospect transactions. .................................................................................. 11

    B.    Plaintiffs fail to adequately allege any actionable misstatements or omissions in MPT's August 2023 earnings releases and Form 10-Q. ................ 13

II.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ................ 18

    A.    Plaintiffs fail to allege facts showing that Defendants had motive to commit the alleged fraud. .......................................................................... 18

    B.    Plaintiffs fail to plead facts showing strong circumstantial evidence of conscious misbehavior or recklessness. ................................................... 21

III.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION ........................24

IV.    PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED ...........................25

CONCLUSION ..................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Acito* v. *IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir.1995)..........................................................................................14

*Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) .......................................................................10, 11, 21, 25

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................10, 18

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)..............................................................................................11, 12

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011) ......................................................................22

*Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortgage Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ................................................................................24

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014)......................................................................................14

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................................16, 18

*Fait* v. *Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)......................................................................................17

*Fila* v. *Pingtan Marine Enter. Ltd.*,
    195 F. Supp. 3d 489 (S.D.N.Y. 2016).......................................................................25

*Frederick* v. *Mechel OAO*,
    475 F. App'x 353 (2d Cir. 2012) ..............................................................................22

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................................19

*Gillis* v. *QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................22

*Goplen* v. *51job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006)....................................................................19

*In re Bank Of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
    2011 WL 3211472 (S.D.N.Y. July 29, 2011) .........................................................13

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
    658 F. Supp. 3d 220 (S.D.N.Y. 2023)............................................................... 19-20

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023)..............................................................14, 25

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
    2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018),
    *aff'd*, 764 F. App'x 127 (2d Cir. 2019)................................................................22

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................24

*In re Merrill Lynch & Co., Inc.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003),
    *aff'd sub nom. Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..........................................................................4 n.1

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)..............................................................24, 25

*In re Open Joint Stock Co. Vimpel-Commc'ns*,
    2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) .........................................................14

*In re Renewable Energy Grp. Sec. Litig.*,
    2022 WL 14206678 (2d Cir. Oct. 25, 2022).........................................................22

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...................................................................................22

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)...............................................................24 n.7

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)....................................................................................16

*Janbay* v. *Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .......................................................25

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................19, 20, 21, 22

*Kleinman* v. *Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013)................................................................................11

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*,
    2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013) ................................................. 23-24

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*,
    601 U.S. 257 (2024)...............................................................................12, 24 n.7

*Omnicare, Inc.* v. *Laborers Dist. Council of Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).......................................................................................17, 18

*Parnes* v. *Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) ..............................................................................16

*Podraza* v. *Whiting*,
    790 F.3d 828 (8th Cir. 2015) ..............................................................................24

*Resnik* v. *Swartz*,
    303 F.3d 147 (2d Cir. 2002)................................................................................10

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009).................................................................................19

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)...............................................................................19

*Sharette* v. *Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)...............................................................4 n.1

*Sjunde AP-Fonden* v. *Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019)...........................................................24 n.7

*Takata* v. *Riot Blockchain, Inc.*,
    2023 WL 7133219 (D.N.J. Aug. 25, 2023) .........................................................13

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ...............................................................................17

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).......................................................................................11, 18

## Statutes and Rules

Fed. R. Civ. P. 9(b) ...................................................................................................10

15 U.S.C. 78u–4 ............................................................................................11, 18

17 C.F.R. § 240.13a–11 ................................................................................13

Cal. Health & Safety Code § 1399.65 ........................................ 7, 14, 15, n.3 & n.4

**Other Authorities**

Cal. Anti. & Unfair Comp. L., § 8.02: The Medical Care Provider System, 2014
    WL 9967454 (Dec. 2022) ..................................................................15 n.4

## PRELIMINARY STATEMENT

Defendant Medical Properties Trust ("MPT") facilitates the delivery of critical healthcare services by leasing real estate to hospital operators and healthcare providers around the world. During the COVID-19 pandemic, some of MPT's healthcare tenants experienced significant financial strain. By the end of Q4 2022, one of those tenants, Prospect, was unable to make certain rent payments to MPT. On May 23, 2023, MPT and Prospect entered into agreements to restructure MPT's $1.6 billion in Prospect-related assets. In connection with this restructuring, and in partial satisfaction of Prospect's outstanding obligations (including unpaid rent), MPT received economic interests in Prospect's managed health business, PHP Holdings, allocated as follows: (1) a minority equity interest valued at $75 million in the form of "preferred units" issued to MPT, and (2) a $646 million promissory note convertible into additional preferred units at MPT's option. The restructuring transactions closed on May 23, 2023, and were publicly announced by MPT the same day. On August 8, 2023, MPT announced that it had recognized $68 million of the value of its interest in PHP Holdings as revenue associated with Prospect's previously unpaid rent.

On the morning of August 18, 2023, the *Wall Street Journal* published an article falsely suggesting that MPT's receipt of interests in PHP Holdings was not a "done deal" because the transaction was being reviewed by a California state regulator, the Department of Managed Health Care ("DMHC"). MPT immediately issued a public correction, noting that the DMHC was "highly unlikely" to disapprove the transaction and that, even if it did, MPT's economic interests were protected by the convertible note it had received.

Plaintiffs nevertheless sued one month later, accusing MPT and certain of its executive officers of securities fraud for failing to disclose the DMHC review. In the months that followed, however, the DMHC review process played out as MPT had expected: Prospect provided the

DMHC with additional information, and the regulator blessed the transaction in April 2024. Plaintiffs nevertheless filed an amended complaint in October 2024, again accusing MPT of securities fraud for failing to disclose the DMHC review.

The amended complaint fails to state a claim under the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for multiple, independent reasons:

1.    *Plaintiffs fail to plead any actionable misstatement or omission*. Boiled down, Plaintiffs' theory of fraud is that MPT should have disclosed the DMHC review, and that failing to do so misled investors into believing that the restructuring transactions were a "done deal." MPT did not mislead anyone. The company's receipt of economic interests in Prospect's managed health business was a "done deal" on May 23, when the transactions closed. And because MPT acquired only a minority interest in PHP Holdings, that part of the transaction did not require consent from the DMHC under the relevant statute. Accordingly, and as MPT had predicted, the DMHC completed its review without incident, did not make any finding of wrongdoing of any kind, and there was never any meaningful risk that the transaction would be unwound.

In any event, the vast majority of MPT's economic interest was tied to the convertible promissory note and was contractually guaranteed regardless of the DMHC review. The DMHC review implicated at most $75 million—less than five percent—of the overall $1.6 billion in assets at issue in the restructuring transactions.  And revenue attributable to the portion of the transaction under review by the DMHC represented *less than one percent* of MPT's overall 2023 revenue. The review was therefore immaterial as a matter of law. Plaintiffs' contention that MPT committed accounting fraud by recording value associated with its interests in PHP Holdings as revenue fails

for the same reasons—there was no "contingency" to MPT's receipt of the Prospect preferred units, and any revenue even theoretically at risk from the DMHC review was immaterial.

2.    *Plaintiffs fail to plead a "strong inference" of fraudulent intent*. Plaintiffs' likewise fail to allege any particularized facts giving rise to a "strong inference" of scienter. The amended complaint is devoid of any of the allegations typically needed to survive dismissal under the PSLRA's heightened pleading standards—no allegations that any Defendant concealed the DMHC review to sell the Company's stock at inflated prices; no allegations from confidential witnesses; and no claim that MPT's independent auditor ever disputed its accounting, or that MPT ever restated its financials. Instead, the allegations uniformly demonstrate that Defendants acted reasonably in all respects—the DMHC review presented negligible regulatory risk, to a tiny portion of the restructuring transactions, and resulted in no adverse economic consequences. The complaint raises no inference, let alone a strong inference, that failing to disclose the DMHC review was motivated by an intent to defraud.

3.    *Plaintiffs fail to plead loss causation* Plaintiffs also fail to plead that any economic loss suffered by investors was caused by a revelation of any purported fraudulent conduct. As analysts noted at the time, investors took a "shoot first and ask questions later" approach in selling off stock in response to the *WSJ* article. The market's reaction to a misleading and incomplete news article is insufficient to establish loss causation when that article did not reveal any supposed fraudulent activity.

# BACKGROUND

## A.    MPT and its business.

MPT is a real estate investment trust.[1] FAC ¶ 2. MPT's primary business is acquiring and developing hospitals and other healthcare facilities and leasing them to healthcare operating companies, such as Prospect. *Id.* The company was founded in 2003 by Defendants Edward K. Aldag, Jr. (CEO and President) and R. Steven Hamner (CFO). FAC ¶¶ 64-65, 88. Defendant J. Kevin Hanna serves as MPT's Chief Accounting Officer and Controller. FAC ¶ 66. MPT's stock trades on the New York Stock Exchange. FAC ¶ 63.

PricewaterhouseCoopers LLP has been MPT's independent auditor since 2008. Ex. A at 64. After reviewing MPT's 2023 financial statements, PwC issued an unqualified opinion that the statements "present fairly, in all material respects, the financial position" of MPT and "the results of its operations and its cash flows" in conformity with generally accepted accounting principles ("GAAP"). Ex. A at 65.

## B.    Prospect encounters financial difficulties, secures additional financing, and agrees to restructure its obligations to MPT.

During the COVID-19 pandemic, some of MPT's healthcare tenants, including Prospect, experienced significant financial strain. FAC ¶ 3. By the end of Q4 2022, Prospect was unable to make certain rent payments. FAC ¶ 4. MPT subsequently announced that it was working to reallocate capital away from Prospect real estate, was seeking to restructure Prospect's obligations

---

[1] The facts set forth herein are drawn from the complaint and other documents properly before the Court on a motion to dismiss. The Court may consider (1) facts alleged in the complaint and documents incorporated by reference, (2) documents relied on in the complaint, (3) public disclosure documents filed with the SEC, and (4) facts of which judicial notice may properly be taken. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd sub nom. Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). This includes the press releases and earnings and conference call transcripts referred to in the complaint, as well as generally known facts or those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2); *Sharette* v. *Credit Suisse Int'l*, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015). Citations to "FAC ¶ __" refer to the amended complaint. Citations to "Ex. __" are exhibits to the Declaration of Nathaniel D. Cullerton, dated January 14, 2025, submitted herewith.

to MPT, and that Prospect was seeking additional financing from third-parties. FAC ¶ 6. MPT also disclosed that it expected to enter into transactions with Prospect that would give it an economic interest in the performance of Prospect's managed healthcare business, which MPT believed would help it recover portions of its original investment in Prospect. *Id.*

On May 23, 2023, MPT issued a press release announcing that "affiliates of [Prospect] have completed $375 million in new financings from third-party lenders" and that "Prospect's $250 million asset-backed credit facility has been repaid in full." Ex. B at 4. The same release described the restructuring of MPT's $1.6 billion in Prospect-related assets, and noted that MPT "expected" to "recover[]" a portion of those outstanding obligations though "equity interests in Prospect's managed care business." *Id.*

### C.     The Restructuring Agreement

The restructuring transactions between MPT and Prospect are set forth in an Amended and Restated Master Restructuring Agreement (the "Restructuring Agreement") between PHP Holdings, LLC, certain affiliated entities, and MPT Picasso Investors TRS, LLC, an MPT subsidiary. *See* Dkt. 28-1.[2] PHP Holdings is the parent of Prospect Health Plan, Inc. ("Prospect Plan"), the affiliate that operates Prospect's managed care business in California. FAC ¶ 7.

As relevant here, the Restructuring Agreement provided for "Phase I Transactions" and "Phase II Transactions." *See* Dkt. 28-1 at 6-23. As part of the Phase I Transactions, MPT, through its subsidiary, received a minority interest in PHP Holdings valued by the parties at $75 million (the "Minority Interest Transaction"), granted to MPT in the form of "PHPH Series A-1 Preferred Units" (the "Preferred Units"). *Id.* § 3.2(a). MPT also received a convertible promissory note (the

---

[2] Unless indicated otherwise, citations to the exhibits attached to Plaintiffs' complaint refer to the ECF page numbers.

"Note") in the original principal amount of $646 million that could later be converted into additional Preferred Units at MPT's option, subject to regulatory approvals. *Id.* § 3.2(b).

The combined value of the Preferred Units issued in the Minority Interest Transaction ($75 million) and the Note ($646 million) were provided to MPT in full satisfaction of Prospect's "Phase I Outstanding Obligations" to MPT, which included, among other things, outstanding loan balances, uncollected rent, and portions of expected proceeds from anticipated asset sales. *Id.* § 3.2(c). Receipt of these benefits—amounting to an economic interest in PHP Holdings with an initial contractual face value of approximately $721 million—was not subject to regulatory approval. As the Restructuring Agreement made clear, the Phase I Transactions were "occurring as of the Closing Date of the Phase I Transactions," defined as the "effective date of this Agreement"—May 23, 2023. *Id.* at 2, 6, 31.

The Phase II Transactions included provisions governing any subsequent conversion of the Note by MPT. *Id.* at 17-23 (Article IV). In contrast to the Phase I Transactions, prior to any such conversion, Prospect was required to seek approval from the California Department of Managed Health Care ("DMHC"), a state agency that regulates managed health plans that operate in California. *Id.* § 4.1(b). MPT could not convert the Note into additional Preferred Units absent consent of the DMHC.

Recognizing that the DMHC might not approve a conversion, the parties contracted to ensure MPT would be left in the same financial position regardless. Section 4.1(e) of the Restructuring Agreement provided that if the DMHC did not approve the issuance of additional Preferred Units pursuant to a conversion of the Note, MPT would be entitled to the same share of proceeds from any sale of PHP Holdings as it would have received had the Note been converted (the "Fallback Provision"). FAC ¶ 13; Dkt. 28-1 § 4.1(e). As the Restructuring Agreement makes

clear: "It is hereby understood and agreed that the Parties intend that [MPT's] economic and financial rights shall not be diminished for any reason due to [Prospect's] failure to obtain" the consent of the DMHC to convert the Note. Dkt. 28-1 § 4.1(e).

### D.    The DMHC reviews the Minority Interest Transaction.

In California, healthcare service plans like Prospect Plan must obtain prior approval from the DMHC before engaging in certain transactions. Specifically, a "health care service plan that intends to merge or consolidate with, or enter into an agreement resulting in its purchase, acquisition, or control by, any entity . . . shall give notice to, and secure prior approval from, the director" of the DMHC. *See* California Health & Safety Code § 1399.65(a)(1). This notice is referred to as a "notice of material modification." FAC ¶ 19.

Because the Minority Interest Transaction was not a merger or consolidation, nor a change of control transaction, Prospect did not notify the DMHC of the Minority Interest Transaction prior to its consummation on May 23, 2023. Instead, on June 23, 2023, PHP filed an "amendment" to its plan notifying the DMHC that the Minority Interest Transaction had already been completed a month earlier, and explaining why prior approval was not required. Ex. C at 1-2. Prospect noted in its filing, however, that the DMHC had "expressed a preference that the submission be processed as a notice of material modification" and that, "in the spirit of collaboration," PHP would therefore "provide the information and documentation that would ordinarily be submitted in connection with a notice of material modification." *Id.*; FAC ¶ 20. On July 20, 2023, the DMHC issued an order purporting to postpone the already-completed Minority Interest Transaction pending the DMHC's receipt of further information from Prospect. Dkt. 28-3 at 2; FAC ¶ 25.

### E.    MPT releases its second quarter earnings.

In August 2023, MPT released its second quarter earnings, held an earnings call, and filed its Q2 Form 10-Q. FAC ¶ 29; Ex. D at 2. MPT informed the market that it now valued its interest

in PHP Holdings at approximately $655 million based on revised valuations that had been reviewed and approved by its auditors, and that applied a discount for lack of marketability of the interest. Ex. D at 2. The PHP Holdings value was allocated as follows: $68 million to the Preferred Units issued in the Minority Interest Transaction, and $586 million to the Note. Ex. E at 15. MPT further disclosed that because it had received its interests in PHP Holdings in part as satisfaction for $68 million in unpaid Prospect rent through the first half of 2023, it had recorded that $68 million in unpaid rent, now satisfied by its interest in PHP Holdings, as revenue. *Id.* at 15, 22; *see also* Ex. D at 2. As Mr. Hamner explained, this amount came "in lieu of cash" and was "a reflection of the excess in value of the managed care interest" held by MPT "over the book values of fee, real estate and other assets that [MPT] exchange[d] for that managed care business." Ex. F at 8.

MPT's earnings release further explained that the $68 million in revenue associated with its interest in PHP Holdings had been included in MPT's Normalized Funds From Operations ("NFFO")—a non-GAAP financial performance metric voluntarily disclosed by MPT in its quarterly and annual SEC filings. Ex. D at 2; Ex. E at 37.

**F.    The *Wall Street Journal* publishes a misleading article concerning the DMHC review.**

On the morning of August 18, 2023, the *Wall Street Journal* ("WSJ") published an article claiming that the restructuring transactions were not a "done deal," and that it was unclear how Prospect would pay its outstanding obligations to MPT if the DMHC refused to approve the transactions. Dkt. 28-5 at 2; FAC ¶ 150. Although MPT had engaged with the article's author prior to publication, Ex. G at 1, missing from the article was any mention of the Note or the fact that MPT had negligible economic risk stemming from the DMHC review. In the hours following publication of the article, MPT's stock price declined approximately 15% in intraday trading. FAC ¶ 151.

The same day, MPT issued a public response correcting several mischaracterizations in the article. Ex. G at 1. MPT explained that the *WSJ* had "proceeded with publication before Prospect was able to provide necessary clarifications, even though Prospect indicated it intended to do so." *Id*. MPT further explained that although the DMHC had issued a purported hold pending receipt of additional information from Prospect, MPT had been advised that it was "highly unlikely" that the DMHC would disapprove of the transaction. *Id*. The DMHC's "request was deemed immaterial," MPT went on, because even in the unlikely event of adverse action by the DMHC, MPT's investment "would remain a convertible note with identical economics to equity ownership." *Id*. Following publication of MPT's clarification, the Company's stock price partially recovered from an intraday low of 15% to close down 7.6%. FAC ¶ 158.

### G.    Plaintiffs sue on the heels of the *Wall Street Journal* article.

One month later, and despite MPT's clarification, Plaintiffs filed this securities fraud action under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Dkt. 1. The complaint largely tracked the claims made by the *WSJ* and alleged that MPT failed to disclose purportedly material information about the recapitalization transactions and the DMHC's review. *Id*. at 3. On October 31, 2024, Plaintiffs filed an amended complaint making substantially similar allegations. Dkt. 28.

### H.    The DMHC completes its review of the Minority Interest Transaction.

In the months following the initial complaint, the DMHC process played out as MPT predicted it would. Prospect provided the DMHC with the requested information, including the Restructuring Agreement and organizational charts, the DMHC reviewed that information, and Prospect responded to the DMHC's questions without issue. FAC ¶¶ 162-64. Prospect also informed the DMHC that MPT would not convert the Note into equity. FAC ¶ 165. Soon thereafter, on April 18, 2024, the DMHC issued an order approving the Minority Interest

Transaction. FAC ¶ 170. The order contained no suggestion of wrongdoing of any kind by Prospect or MPT.

## ARGUMENT

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead, among other elements, a material misstatement or omission of fact, made with scienter, that caused an economic loss (*i.e.*, "loss causation"). *Arkansas Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 351-52 (2d Cir. 2022). Because litigation under § 10(b) and Rule 10b-5 has the potential to be particularly vexatious in nature, a complaint alleging securities fraud must satisfy Rule 9(b)'s "heightened pleading requirements." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). This pleading constraint "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *Id*. Accordingly, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*; *see also* Fed. R. Civ. P. 9(b) (requiring plaintiff to "state with particularity the circumstances constituting fraud").

Where omissions are alleged, this Circuit cautions that "[d]isclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik* v. *Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). Instead, omissions are only actionable when disclosure is "necessary to make the statements made, in the light of the circumstances under which they were made, not misleading." *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 353.

Securities fraud claims under § 10(b) must also satisfy the "[e]xacting pleading requirements" imposed by the PSLRA, which were enacted "[a]s a check against abusive litigation by private parties." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires a complaint to specify each statement or omission "alleged to have been misleading, the reason or reasons why the statement is misleading," and to "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(1), (b)(2)(A). Failure to meet these standards requires dismissal.

## I.   PLAINTIFFS DO NOT PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

Plaintiffs allege that MPT made misleading statements concerning the restructuring transactions in May and August 2023. FAC ¶¶ 202-12. According to Plaintiffs, MPT should have disclosed supposed "regulatory risks" purportedly stemming from the DMHC's review of the Minority Interest Transaction. Plaintiffs fail to plead any actionable misstatements.

### A.   Plaintiffs fail to adequately allege any actionable misstatements or omissions in the May 2023 press release or Form 8-K announcing the Prospect transactions.

Plaintiffs contend that MPT's May 2023 press release and Form 8-K announcing the restructuring transactions was misleading because they did not disclose that "issuance of equity in PHP Holdings" was purportedly "contingent on the DMHC approving the conversion of the PHP Convertible Note into equity." *See* FAC ¶¶ 202-05. But "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988); *see Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 152-53 (2d Cir. 2013). "Rule 10b-5(b) makes it unlawful to omit material facts in connection with buying or selling securities" only "when that omission renders 'statements made' misleading." *Macquarie Infra. Corp.* v. *Moab Partners, L. P.*, 601 U.S. 257, 259 (2024). For a misstatement or omission to be "material," "there must be a

*substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32 (emphasis added).

Plaintiffs fail to allege any material misstatement or omission under these standards. Most fundamentally, the issuance of equity to MPT *was not* "contingent on the DMHC approving the conversion of the PHP Convertible Note into equity." FAC ¶ 203. As Plaintiffs acknowledge and allege, Preferred Units representing 49% of the outstanding equity of PHP Holdings were issued to MPT as part of the Phase I Transactions. FAC ¶ 14. The Phase I Transactions closed on May 23, 2023, the day the Restructuring Agreement was executed, and the day MPT announced the restructuring transactions. Dkt. 28-1 at 2, 6, 31; Ex. B. No further action from the DMHC was required. To the contrary, one month later, PHP filed an "amendment" to its Plan "to inform" the DMHC that MPT had *already* "acquired a 49% equity interest . . . in PHP's parent company, PHP Holdings, LLC." Ex. C at 1-2.

While the issuance of additional Preferred Units by converting the Note as part of the Phase II Transactions *was* contingent on DMHC approval, failing to disclose that fact was immaterial as a matter of law. As Plaintiffs also acknowledge and allege, because of the "Fallback Provision" in the Restructuring Agreement, it made no difference whether the DMHC approved a conversion or not—MPT and its stockholders would be in the exact same economic position in either case. *See* FAC ¶ 13 ("in the event that DMHC approval for conversion . . . was not timely received before consummation of a sale of PHP Holdings, [the Fallback Provision] provided for MPT Picasso to receive a share of the proceeds from any such sale equal to the share of the proceeds that it would have otherwise received from such sale had it converted the PHP Convertible Note into equity"). In light of the Fallback Provision, no reasonable stockholder could have viewed DMHC approval

or disapproval of a Note conversion as important, let alone as having "significantly altered" what stockholders already knew about the restructuring transactions.

Because Plaintiffs' have failed to identify any material misstatement or omission in the May 25, 2023 Form 8-K, their contention that the Form did not comply with Item 1.01 (FAC ¶¶ 119, 205) is irrelevant. Plaintiffs "cannot allege that the failure to comply with Item 1.01(a) is, standing alone, sufficient to state a claim under Section 10(b) and Rule 10b–5." *In re Bank Of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 2011 WL 3211472, at *10 (S.D.N.Y. July 29, 2011); *Takata* v. *Riot Blockchain, Inc.*, 2023 WL 7133219, at *8 (D.N.J. Aug. 25, 2023) ("[T]he Court cannot find that a violation of . . . Item 1.01 automatically gives rise to a material omission under Rule 10b-5, as [it] requires disclosure of information that does not meet Rule 10b-5's higher standard of materiality."); *see also* 17 C.F.R. § 240.13a–11(c) ("No failure to file a report on Form 8-K that is required solely pursuant to Item 1.01 . . . of Form 8-K shall be deemed to be a violation of 15 U.S.C. 78j(b) and § 240.10b–5."). In any event, the May 25 Form 8-K complied with Item 1.01 by "briefly describe[ing] the material terms of the Restructuring Agreement" (FAC ¶ 16)—it disclosed the restructuring of Prospect obligations to MPT, disclosed that MPT had received interests in PHP Holdings in satisfaction of a portion of those obligations, and described the amounts at issue. *See* Ex B.

### B. Plaintiffs fail to adequately allege any actionable misstatements or omissions in MPT's August 2023 earnings releases and Form 10-Q.

In August 2023, MPT released earnings, held an earnings call, and filed its Q2 Form 10-Q. FAC ¶ 29; Ex. D at 2. Plaintiffs allege that various statements concerning the restructuring transactions were misleading for failing to disclose the DMHC's review of the Minority Interest Transaction. FAC ¶ 206. Plaintiffs further allege that MPT violated GAAP by recording $68

million of the value attributable to its interest in PHP Holdings as revenue for the quarter. FAC ¶ 214. Plaintiffs fail to adequately allege any actionable misstatement or omission.

### 1. No actionable misstatements or omissions related to purported "regulatory risk."

Plaintiffs contend that MPT should have disclosed that the DMHC had put a purported "hold" on the Minority Interest Transaction in July 2023 pending receipt of further information from Prospect. FAC ¶ 32. According to Plaintiffs, this purported hold created "substantial regulatory risk to the issuance of equity in PHP Holdings to MPW" because the "DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether." *Id*. But the "mere existence of a governmental inspection, unaccompanied by a clear indication of an adverse business consequence, is not material information." *In re Open Joint Stock Co. Vimpel-Commc'ns*, 2006 WL 647981, at *6 (S.D.N.Y. Mar. 14, 2006); *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 51 (2d Cir. 1995) (FDA inspections that "did not result in any adverse action that affected earnings" not material); *cf. City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("companies do not have a duty to disclose uncharged, unadjudicated wrongdoing" (quotations and citation omitted)); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 168 (S.D.N.Y. 2023).

Here, the DMHC review created no "substantial regulatory risk," nor gave any indication that it would result in any material "adverse business consequence." As discussed above, no prior "approval" from the DMHC was required to close the Minority Interest Transaction. The relevant statutory provisions only required advance notice of mergers, acquisitions, or other change of control transactions. *See* California Health & Safety Code § 1399.65(a)(1). The Minority Interest Transaction was none of those things—as Prospect explained, "the equity interests acquired by MPT not only represented less than a majority of the economic interests in PHPH," they also did

"not give MPT the power, direct or indirect, to direct or cause the direction of the management and policies PHPH or the Plan." Ex. C at 1. MPT was merely a "passive investor." *Id.*

Plaintiffs identify no authority, and Defendants are aware of none, supporting the proposition that the DMHC could or would unwind an already completed transaction, like the Minority Interest Transaction, that did not involve a merger or change of control. Indeed, the *only* enforcement action in the DMHC's database relating to § 1399.65(a)(1), over a nearly 25 year period, resulted in the imposition of a $13,000 fine. *See* Ex. H at 1-2.[3] That case involved a covered plan that sold **100%** of its equity interests without providing *any* notice to the DMHC. *Id.* Even then, the DMHC took no action to unwind the transaction, and imposed only a negligible fine. *Id.* at 2. Here, the DMHC did not even do that—the Minority Interest Transaction was blessed without incident, just as MPT expected.[4]

Even if the DMHC review could have created some minimal risk that the Minority Interest Transaction would be unwound, the Preferred Units at issue implicated at most $75 million. Dkt. 28-1 § 3.2(a); Ex. B. The Note, meanwhile, which was guaranteed by the Fallback Provision, had a balance of $646 million, and the restructuring transactions as a whole involved $1.6 billion in assets. Dkt. 28-1 § 3.2(c); Ex. B. In other words, the DMHC review created a negligible risk to a transaction representing at most 10.4% of the economic value of MPT's interest in PHP Holdings,

---

[3] The DMHC maintains a searchable database of prior enforcement actions dating back to July 2000.   *See* https://www.dmhc.ca.gov/LawsRegulations/EnforcementActions.aspx.   Searches may be filtered by statutory violation. A search for § 1399.65(a)(1) returned one result, Exhibit H, which can be accessed here: https://wpso.dmhc.ca.gov/enfactions/actionSearch.aspx?Violation=1399.65(a)(1).

[4] That is no surprise because § 1399.65(a)(1) was enacted to address the "potential anticompetitive effects from hospital and health plan consolidation[.]" Cal. Anti. & Unfair Comp. L., § 8.02: The Medical Care Provider System, 2014 WL 9967454 (Dec. 2022). The statute thus gives the DMHC the power to "disapprove" of transactions that "would substantially lessen competition in health care service plan products or create a monopoly." Cal. Health & Safety Code § 1399.65(b). The Minority Interest Transaction did not implicate any antitrust concerns—MPT was a passive investor in PHP Holdings and, as a REIT, does not operate or compete with any other managed health business.

and *less than 5%* of the value of the restructuring transactions, further confirming that the review was immaterial. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ("[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.").

Any theoretical impact to MPT's financial statements was even more attenuated. As of Q2 2023, MPT adjusted its valuation of the Preferred Units obtained in the Minority Interest Transaction to $68 million, compared with a valuation of the Note at $586 million, for a total investment in PHP Holdings of $654 million. Ex. E at 15. This means that the Minority Interest Transaction was only about 10.4% of MPT's total investment in PHP Holdings.  In Q2 2023, MPT also recorded as revenue $68 million of previously unrecorded but contractually owed rent from Prospect due to the interest in PHP Holdings it had received as payment. Ex. D at 2. Therefore, of the $68 million in revenue attributable to MPT's interests in PHP Holdings recorded in Q2 2023, at most 10.4% was attributable to the Minority Interest Transaction, *i.e.*, $7 million. MPT's revenue in 2023, meanwhile, was $872 million. Ex. A at 8, 47. The revenue associated with the Minority Interest Transaction recorded in Q2 2023 was clearly immaterial, representing *less than 1%* of MPT's revenues for the year. *See ECA, Loc. 134 IBEW*, 553 F.3d at 204-05; *see also Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (finding alleged misrepresentations with regard to two percent of total assets were immaterial as a matter of law); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (stating that a misstatement was immaterial where only one percent of assets was allegedly misclassified).

2.    **Plaintiffs fail to plead any actionable misstatements on the basis of purported GAAP violations.**

Plaintiffs allege that MPT violated GAAP by recognizing $68 million in revenue tied to its estimated valuation of its PHP Holdings interests. FAC ¶¶ 214, 217, 220. According to Plaintiffs, it was improper to record this revenue because the Minority Interest Transaction was subject to the purported "contingency" that the DMHC might reject it. *Id*. As discussed above, however, there was no "contingency" to the Minority Interest Transaction—it closed on May 23, 2023, did not require prior DMHC approval, and the subsequent review by the DMHC created no meaningful risk that the transaction would be unwound. Moreover, any conceivable risk was immaterial, as it would touch on at most $7 million in revenue, less than 1% of MPT's annual revenue for 2023. And as MPT disclosed, its independent auditor, PwC, reviewed the relevant accounting treatment, and certified that MPT's financial statements "present fairly, in all material respects, the financial position" of MPT and "the results of its operations and its cash flows" in conformity with GAAP. Ex. A at 65. MPT's financials were never restated or corrected, because there was no accounting error.

Dismissal is especially warranted against this backdrop because accounting "[e]stimates are not "matters of objective fact," but rather "statements of opinion," subject to even higher standards for pleading falsity. *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 109-10 (2d Cir. 2011), *abrogated on other grounds by Omnicare, Inc.* v. *Laborers Dist. Council of Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *see also Tongue* v. *Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (meeting *Omnicare* standard for opinions "is no small task for an investor"). MPT's accounting estimates are quintessential opinion statements. As MPT disclosed in its Q2 2023 Form 10-Q, valuing its investment in PHP Holdings required "significant estimates" and "management judgment," including "appropriate consideration of the underlying risk profile of the forecasted

assumptions." Ex. E at 27; FAC ¶ 143, n.14. Yet Plaintiffs come nowhere near satisfying the heightened pleading standards governing opinion statements—they plead no facts suggesting that anyone at MPT subjectively believed that the accounting was wrong, nor any "particular (and material) facts . . . whose omission makes the opinion statement at issue misleading." *Omnicare*, 575 U.S. at 194.

## II.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

Under the PSLRA, "plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'" to deceive, manipulate, or defraud. *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. 78u–4(b)(2)). The plaintiff must allege particularized "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. The "inference of scienter must be more than merely plausible or reasonable." *Tellabs, Inc.*, 551 U.S. at 314. Accordingly, the Court must "take into account plausible opposing inferences" to determine whether the inference of fraudulent intent is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323-24. Plaintiffs fail to plead a strong inference of scienter under these standards.

### A.   Plaintiffs fail to allege facts showing that Defendants had motive to commit the alleged fraud.

"Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation" do not plead motive in support of a strong inference of scienter. *ECA, Loc. 134 IBEW*, 553 F.3d at 198. "Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.*

Plaintiffs do not allege any stock sales by any of the Individual Defendants here, and thus fail to plead any "motive" to commit fraud. *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("It defies reason that [a defendant] looking to profit on a fraudulently inflated stock price would hold [more than] ninety percent of its shares as share prices fell, while knowing that the information illuminating the fraud was seeping into the market."); *see also Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (no scienter where there was "no claim here that false statements were made in an effort to sell off shares held by management"); *Goplen* v. *51job, Inc.*, 453 F. Supp. 2d 759, 772 (S.D.N.Y. 2006) (same).

In the absence of suspicious stock sales, Plaintiffs resort to alleging that *some* of the Individual Defendants had motive to boost MPT's performance metrics in order to increase their executive compensation. FAC ¶ 232. Specifically, Plaintiffs claim that a portion of Aldag's and Hamner's compensation was "tied in part to NFFO and EBITDA" and that Defendants boosted NFFO and EBITDA by recognizing $82 million in revenue tied to MPT's equity interest in Prospect. *Id.*[5] This argument fails to show motive for Aldag or Hamner. And Plaintiffs do not even bother alleging that Defendant Hanna, MPT's Chief Accounting Officer, had any motive to commit fraud at all.

*First,* as the Second Circuit has repeatedly emphasized, "an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers." *Kalnit* v. *Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *see also S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re*

---

[5] In 2023, MPT recorded approximately $82 million as revenue for its investments in PHP Holdings in lieu of cash for previously unrecorded but contractually owed rent and interest revenue from Prospect. Ex. J at 3. This total consisted of $68 million recorded in the second quarter and an additional $13 million recorded in the third quarter. *Id.*; *see also* FAC ¶ 172.

*Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 231 (S.D.N.Y. 2023) (allegation that executives maintained high stock price to increase executive compensation insufficient).

*Second*, Plaintiffs' motive theory is illogical. Plaintiffs claim that Aldag and Hamner were motivated to increase their year-end bonuses by around $1.4 million. FAC ¶ 190. But that amount is dwarfed by the value of Aldag's and Hamner's stock holdings. As of March 23, 2023, shortly before the class period began, the two owned nearly five million shares of MPT stock. Ex. K at 48 (3,116,010 shares owned by Aldag, and 1,795,283 shares owned by Hamner). Based on MPT's $7.50 per-share closing price on August 17, 2023 (the day before the *WSJ* purportedly revealed the alleged "fraud"), those shares were worth more than *$35 million* combined. *See* FAC ¶ 44. Yet Plaintiffs do not allege that Aldag or Hamner sold *any* of those shares to take advantage of MPT's purportedly inflated stock price. There is no coherent basis to infer that senior executives with more than 20 years at the company would risk everything to secure an extra $1 million bonus, while simultaneously doing nothing to take advantage of stock worth more than 30 times as much. "Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." *Kalnit*, 264 F.3d at 140–41 (cleaned up)

*Finally*, and in all events, Plaintiffs' fail to plead that the alleged premature recognition of revenue tied to PHP Holdings actually increased Aldag's and Hamner's compensation. With respect to EBITDA, Plaintiffs admit that "it is impossible to determine" whether Defendants' compensation would have decreased if the $82 million in Prospect revenue had not been recognized. FAC ¶ 193, n.17. Plaintiffs allege merely that EBITDA was used to calculate executive compensation, that the revenue tied to PHP Holdings boosted EBITDA in some unspecified amount, and that therefore it was "easier" to hit certain performance benchmarks. FAC

¶ 192. That generalized and speculative allegation is plainly insufficient. *Kalnit*, 264 F.3d at 140 ("speculative and conclusory" allegations insufficient to plead motive).

With respect to NFFO, Plaintiffs argue that recognizing $82 million in Prospect revenue in Q2 and Q3 2023 boosted MPT's 2023 NFFO from $1.45 per share to $1.59 per share, which Plaintiffs claim is significant because part of Aldag's and Hamner's 2023 maximum bonus structure required NFFO to exceed $1.50 per share. FAC ¶ 190. And, Plaintiffs argue, it was improper for MPT to recognize $82 million in Prospect revenue because the Minority Interest Transaction was subject to the purported "contingency" of DMHC approval. FAC ¶ 188. As explained above, however, the Minority Interest Transaction represented at most 10.4% of MPT's interest in PHP Holdings. Even accepting Plaintiffs' flawed claim of a GAAP violation, that supposed violation would have accounted for only 10.4% of the $82 million, *i.e.*, $8.5 million, leaving MPT to record $73.5 million in revenue instead. Had MPT done so, it would still have comfortably achieved NFFO of above $1.50 per share.[6] In other words, even on Plaintiffs' theory, Aldag and Hamner did not need to commit any purported fraud to achieve their NFFO targets, and therefore had no motive to do so.

### B.   Plaintiffs fail to plead facts showing strong circumstantial evidence of conscious misbehavior or recklessness.

"If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonable' behavior or that which evinces 'an extreme departure from the standards of ordinary care.'" *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355 (quoting *Kalnit*, 264 F.3d at 142).

---

[6] The math is as follows. Per MPT's Form 10-K, MPT had approximately 598,991,000 shares outstanding as of December 31, 2023. Ex. A at 68. Total NFFO in 2023 was $951,066,000, which when divided by 598,991,000 shares, amounts to $1.59 per share. *Id.* at 55. If MPT had recognized only $73.5 million in revenue from Prospect as opposed to $82 million, then NFFO for 2023 would have been $942,566,000, which when divided by 598,991,000 shares, amounts to $1.57 per share.

And where "a motive to defraud is not adequately pled, a plaintiff 'must produce a stronger inference of recklessness.'" *Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) (quoting *Kalnit*, 264 F.3d at 143). "Recklessness is generally established by a showing that 'defendants knew facts or had access to non-public information contradicting their public statements,' and therefore 'knew or should have known they were misrepresenting material facts.'" *Id.* (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). Plaintiffs fail to allege anything close to "highly unreasonable" conduct, or that Defendants had reason to believe they were misrepresenting material facts.

### 1.    Plaintiffs' "core operations" argument fails.

Plaintiffs allege that there is a strong inference of scienter because Prospect was MPT's third largest tenant and represented more than 10% of MPT's revenue in 2022. FAC ¶ 230. But this is just another way to raise an argument under the "core operations" doctrine, the validity of which has been called into question in this Circuit. *See In Re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 n.4 (2d Cir. Oct. 25, 2022); *Frederick* v. *Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012).

Even if the theory remains viable, it does not apply here. "[C]ourts applying the core operations doctrine generally require[ ] that the operation in question constitute nearly all of a company's business before finding scienter." *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (citation omitted); *see also Bd. of Tr. of City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011), *aff'd sub nom.* 475 F. App'x 353 (2d Cir. 2012) (rejecting core operations theory where relevant product constituted 55% of defendant's revenues)). Plaintiffs' allegation that Prospect represented 10% of MPT's revenue is insufficient.

### 2.    Circumstantial evidence regarding Aldag's and Hamner's knowledge does not plead a strong inference of scienter.

Plaintiffs contend that Aldag and Hamner "would have been aware" of purported "regulatory snags with the DMHC." FAC ¶ 231. Even if that were true, it does not demonstrate fraudulent intent. The opposing inference—that Aldag and Hamner reasonably believed that the DMHC review was "highly unlikely" to lead to any adverse business consequence and that MPT's accounting was fully GAAP compliant, Ex. G—is far more compelling given the following:

- The Minority Interest Transaction had already closed before the DMHC began its review.

- The Minority Interest Transaction was not a change of control transaction requiring advance notice to or approval of the DMHC.

- The DMHC was merely seeking additional information and gave no indication that it would seek to unwind the already completed Transaction.

- Recent DMHC precedent showed that even where a managed health plan had sold 100% of its outstanding equity without notice to the DMHC, the result was a $13,000.00 fine.

- The Minority Interest Transaction represented less than 5% of the overall assets at issue in the restructuring transactions, and at most 10.4% of the economic value of MPT's interest in PHP Holdings.

- MPT fully and repeatedly disclosed how it was accounting for its interests in PHP Holdings. Indeed, as plaintiffs allege, even after the *WSJ* reported (misleadingly) on the DMHC review, MPT continued to record revenue related to its interest in PHP Holdings, and to disclose that it was doing so. FAC ¶ 38.

- MPT's independent auditors at PwC reviewed MPT's accounting and issued clean opinions, certifying that MPT's financial statements conformed with GAAP in all material respects. Ex. A at 65.

Subsequent events have now confirmed that Defendants acted reasonably in all respects. The DMHC completed its review of the Minority Interest Transaction without incident, just as MPT predicted. The agency imposed no fines, and did not suggest any wrongdoing by MPT or Prospect. And despite public scrutiny from the *WSJ* and this lawsuit, MPT has not been forced to restate its financial statements or issue any correction to its prior accounting. *See, e.g.*, *Lighthouse*

*Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *8 (S.D.N.Y. Aug. 5, 2013)

("allegation of scienter . . . undercut by the fact that RBS never restated its holdings [and] RBS's

auditor gave RBS a clean opinion letter"); *see also Podraza* v. *Whiting*, 790 F.3d 828, 838 (8th

Cir. 2015) (inference of scienter "contradicted by the fact that [auditors] stated Patriot's financial

documents complied with GAAP"); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142,

1158 (C.D. Cal. 2007) (clean audit opinion is "highly probative" "of an absence of scienter").[7]

## III.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION

Plaintiffs' failure to identify a "corrective disclosure" is "fatal under Second Circuit

precedent." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd*,

597 F.3d 501 (2d Cir. 2010) (citation omitted); *see Cent. States, Se. & Sw. Areas Pension Fund* v.

*Fed. Home Loan Mortgage Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (summary order). To be

"corrective," the disclosure must "expos[e] [] the falsity of the fraudulent representation."

*Omnicom*, 541 F. Supp. 2d at 551. "[I]f markets react negatively to a characterization [of a

transaction], the 'loss is caused by the subsequent characterization[,] not by the transaction itself."

*Id.* at 552 (citation omitted).

Plaintiffs allege that the August 18, 2023 *WSJ* article was a partial corrective disclosure.

FAC ¶¶ 228-29. But that misleading article did not expose "the falsity of [any] fraudulent

representation." Rather, it mischaracterized the restructuring transactions, falsely asserted they

were not a "done deal," and suggested that Prospect might not be able to satisfy its obligations to

MPT as a result of the DMHC review. Dkt. 28-5 at 2, 4; *see generally id.*; FAC ¶ 150. As an analyst

---

[7] Against this backdrop, Plaintiffs' attempt to plead scienter based on alleged violations of Item 601 of the SEC's Regulation S-K fails. FAC ¶ 235; *see Sjunde AP-Fonden* v. *Gen. Elec. Co.*, 417 F. Supp. 3d 379, 398 (S.D.N.Y. 2019) (citation omitted) ("The Court need not dwell on . . . whether [defendant's] financial statements violated [ ] Regulation S-K . . . because Plaintiffs do not plead facts that [defendant's] omissions were made under circumstances that 'give rise to a strong inference of scienter.'"). Defendants' SOX certifications likewise provide no independent basis for finding scienter. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 230 (S.D.N.Y. 2022) ("[T]he law in this District is clear and uniform that [ ] SOX certifications do not provide a stand-alone basis for liability.").

report cited in the amended complaint noted, investors took a "shoot first and ask questions later" approach in selling stock in response to the *WSJ* article. Ex. I at 1. When MPT corrected the record later the same day, MPT's stock price rebounded, FAC ¶¶ 158-59, confirming that to the extent the market was reacting to the article, it was reacting "negatively to a characterization" of the DMHC review and its purported consequences, not to "the transaction itself." *Omnicom*, 541 F. Supp. 2d at 552.

Beyond its discussion of the DMHC review, the article included a lengthy and overwhelmingly negative portrayal of MPT and its relationship with its tenant more broadly, based on the author's opinions and speculation concerning previously disclosed facts. *See* Dkt. 28-6. For example, the article described the restructuring transactions as "unusual," notwithstanding MPT's disclosure of the transactions' material terms, and accused MPT of "play[ing] a crucial role in private-equity firms' push into healthcare facilities." *Id.* at 2. "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512. "[T]hat cannot be the basis for loss causation in this Circuit." *Fila* v. *Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016); *Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud[.]").

## IV.    PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED

Because Plaintiffs' 10b-5 claim must be dismissed, their § 20(a) claim must also be dismissed. *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 356-57; *DraftKings*, 650 F. Supp. 3d at 181.

## CONCLUSION

For the foregoing reasons, Plaintiffs' complaint should be dismissed with prejudice.

Dated: January 14, 2025

WACHTELL, LIPTON, ROSEN & KATZ

/s/ Nathaniel Cullerton
William Savitt
Sarah K. Eddy
Nathaniel Cullerton
Adabelle U. Ekechukwu
51 West 52nd Street
New York, NY 10019
Tel.: (212) 403-1000

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)

Pursuant to Local Civil Rule 7.1(c) of United States District Court for the Southern District of New York, I hereby certify that the foregoing Memorandum of Law, filed on January 14, 2025, contains 8,341 words and does not exceed Rule 7.1(c)'s 8,750 word-count limitation.

/s/ Nathaniel Cullerton
Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will give notice of such filing to all counsel of record.

/s/ Nathaniel Cullerton
Counsel