UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

IN RE MEDICAL PROPERTIES TRUST, INC.     :    Case No. 1:23-cv-008597-VSB
SECURITIES LITIGATION               :

THIS DOCUMENT RELATES TO:         :    <u>CLASS ACTION</u>
ALL ACTIONS                        :

-------------------------------------------------------------------x    **ORAL ARGUMENT**

                                           **REQUESTED**

<br>

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 2

    A.    MPT Announces a Deal to Restructure the Debt of Its Third Largest
Tenant ................................................................................................... 2

    B.    The DMHC Unexpectedly Issues the July 2023 DMHC Order Putting the
Minority Interest Transaction On Hold ................................................... 4

    C.    Defendants Conceal the July 2023 DMHC Order From Investors ................ 5

    D.    MPT Investors Suffer Losses After the *WSJ* Reveals the July 2023 DMHC
Order ..................................................................................................... 6

    E.    The DMHC Approves the Minority Interest Transaction Only After MPT
Consents to Onerous Restrictions ......................................................... 6

LEGAL STANDARDS ......................................................................................... 7

ARGUMENT ....................................................................................................... 8

I.    PLAINTIFFS ADEQUATELY ALLEGE MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS ....................................... 8

    A.    Defendants' Failure to Disclose the July 2023 DMHC Order Rendered the
August 2023 Statements Materially Misleading .................................... 9

    B.    The August 2023 Statements Were Materially False and Misleading
Because They Violated GAAP ............................................................. 15

II.    PLAINTIFFS ADEQUATELY ALLEGE SCIENTER ................................... 19

    A.    Plaintiffs Adequately Allege Motive and Opportunity to Commit Fraud ..... 20

    B.    Plaintiffs Adequately Allege Strong Circumstantial Evidence of Conscious
Misbehavior or Recklessness ............................................................. 23

III.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION ....................... 28

IV.    PLAINTIFFS ADEQUATELY ALLEGE A SECTION 20(A) CLAIM ............ 29

CONCLUSION .................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................................................ 10, 21

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
   19 F.4th 145 (2d Cir. 2021) ................................................................................................ 9

*Cheng v. Canada Goose Holdings Inc.*,
   2021 WL 3077469 (S.D.N.Y. July 19, 2021) (Broderick, J.) ................................................ 27

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ................................................................................................ 11

*Donoghue v. Gad*,
   2022 WL 3156181 (S.D.N.Y. Aug. 8, 2022) ........................................................................ 8

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................................ 21

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................................ 13, 20

*Fila v. Pingtan Marine Enter. Ltd.*,
   195 F. Supp. 3d 489 (S.D.N.Y. 2016) .................................................................................. 28

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ................................................................................................ *passim*

*Gauquie v. Albany Molecular Rsch., Inc.*,
   2016 WL 4007591 (E.D.N.Y. July 26, 2016) ...................................................................... 23

*Hartmann v. Popcornflix.com LLC*,
   690 F. Supp. 3d 309 (S.D.N.Y. 2023) (Broderick, J.) .......................................................... 12

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) .................................................................................................. 24

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...................................................................... 15, 19, 26

*In re Currency Conversion Fee Antitrust Litig.*,
   265 F. Supp. 2d 385 (S.D.N.Y. 2003) .................................................................................. 7

*In re DraftKings Inc. Sec. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023) .................................................................................. 11

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ................................................................................................ 19, 26

*In re Hansen Nat. Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................................ 27

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ............................................................ 9, 11, 24

*In re Lottery.com, Inc. Sec. Litig.*,
    2025 WL 605485 (S.D.N.Y. Feb. 25, 2025) .................................................................... 23, 26

*In re Mindbody, Inc.*, *S'holders Litig.*,
    2020 WL 5870084 (Del. Ch. Oct. 2, 2020) .......................................................................... 22

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ........................... 28

*In re Open Joint Stock Co. Vimpel-Commc'ns, Sec. Litig.*,
    2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ........................................................................ 10

*In re Ply Gem Holdings, Inc.*, *Sec. Litig.*,
    2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016) .................................................................. 14, 17

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ............................................................................................... 21

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ................................................................................................. 8

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, PLC,
    2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013), *aff'd*, 783 F.3d 383 (2d Cir. 2015) .................. 27

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ................................................................................ 9, 13, 14, 15

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024) ............................................................................................................. 8

*Micholle v. Ophthotech Corp.*,
    2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019) (Broderick, J.) .................................. 8, 9, 12, 19

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020) .................................................................................. 24

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
    122 F.4th 28 (2d Cir. 2023) ............................................................................................ 15, 16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................................ 11, 16

*Podraza v. Whiting*,
    790 F.3d 828 (8th Cir. 2015) .............................................................................................. 27

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ................................................................................................. 8

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024) ........................................................................... *passim*

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) ....................................................................................... 9

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021) (Broderick, J.) ..................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308, 326 (2007)......................................................................................... 19, 26

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438, 449 (1976).................................................................................................. 9

**Statutes**

Cal. Health & Safety Code §1399.65(a)(3) .......................................................................... 7, 11

Fed. R. Civ. P. 9(b) ................................................................................................................. 8

Staff Accounting Bulletin, No. 99, 1999 WL 625156 ................................................ 13, 14, 18, 22

Lead Plaintiff John Cuomo and Additional Plaintiff Christopher Armstrong ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion ("Motion") (Dkt. 29) to dismiss the First Amended Class Action Complaint ("FAC"). (Dkt. 28).[1]

## PRELIMINARY STATEMENT

This case concerns misstatements and omissions arising out of transactions under which MPT canceled $721 million of debt owed by its third largest tenant (Prospect) in exchange for a minority equity interest (and prospective majority equity interest) in Prospect's managed care business (PHP Holdings, or "PHP"). After MPT announced the transactions on May 23, 2023, investors concluded that they were a done deal. Unbeknownst to investors, however, it became apparent in June 2023 that the transactions were not a done deal when Prospect's regulator (the DMHC) unexpectedly required approval of the issuance of the minority equity interest to MPT. Then, on July 20, 2023, also unbeknownst to investors, the DMHC issued the July 2023 DMHC Order (i) finding that issuance of the minority equity interest to MPT did not comply with California law, (ii) suspending the effectiveness and prohibiting the implementation of that issuance pending further review, and (iii) launching an inquiry into certain "blocking rights" granted to MPT to protect its equity interest.

---

[1] Any capitalized term not defined herein has the meaning given in the FAC, with one key exception. The FAC defines Defendant Medical Properties Trust, Inc. as "MPW" (its ticker symbol). Defendants, however, use the acronym "MPT" in their brief. To avoid confusion, this brief also uses "MPT." Additionally, unless otherwise noted, in this brief (i) "MPT" refers to MPT and all of its relevant affiliates (including MPT Picasso), and (ii) "Prospect" refers to Prospect and all of its relevant affiliates (including PHP Holdings and Prospect Plan).

References to: (i) "¶" are to paragraphs in the FAC; (ii) "DB" are to Defendants' brief (Dkt. 30); (iii) "Facts §" are to sections in the "Factual Background" in this brief; (iv) "Argument §" are to sections of the "Argument" in this brief; and (v) "Ex." are to exhibits to the Declaration of Jonathan D. Park filed herewith. In all quotations, any emphasis is added (unless otherwise noted), and all internal quotation marks and citations are omitted.

These regulatory setbacks put the issuance of equity in PHP to MPT at major risk. Defendants, however, failed to disclose the setbacks. That nondisclosure rendered misleading multiple statements in early August 2023 repeatedly confirming the issuance of equity in PHP to MPT, and reporting a $68 million gain from that equity interest as revenue in violation of GAAP. Relevant to scienter, the GAAP violations triggered thresholds that substantially boosted the compensation of Defendants Aldag and Hamner.

The truth emerged on August 18, 2023, when the *Wall Street Journal* ("*WSJ*") revealed the previously undisclosed regulatory setbacks, and questioned recognition of the gain from equity as revenue. On the news, MPT's market cap declined by approximately $341 million, or 7.6%.

The facts above, as further detailed below, adequately allege the elements of a federal securities fraud claim: materiality, falsity, scienter and loss causation. Defendants' arguments are unavailing. The Court should deny the Motion.

## FACTUAL BACKGROUND

### A.    MPT Announces a Deal to Restructure the Debt of Its Third Largest Tenant

Prospect was MPT's third largest tenant, representing 7.5% of MPT's assets, and more than 10% of MPT's revenue, as of 12/31/22. (¶94). Accordingly, per J.P. Morgan, MPT's stock price was "extremely sensitive" to "headlines and decisions" related to Prospect, "particularly on the downside." (*Id.*; Dkt. 31-9 at 1).

On February 23, 2023, MPT announced a $283 million impairment after Prospect stopped paying rent and experienced underperformance at its Pennsylvania facilities. (¶92). To address these challenges, MPT decided to restructure Prospect's debt. (¶95). Aldag and Hamner discussed the restructuring plan at length during calls in February and April 2023. (¶¶95-98, 100-01).

On May 23, 2023, MPT and Prospect executed the Restructuring Agreement (signed by Hamner for MPT). (¶¶106-07). The premise was simple: Prospect granted MPT an equity interest in PHP, and in exchange, MPT cancelled $721 million in debt owed by Prospect to MPT. (¶¶108-11). The PHP interest consisted of two components: a minority equity interest of 49% issued pursuant to the Minority Interest Transaction, and a note ("Prospect Note") convertible into a majority stake in PHP. (¶108).[2]

The Restructuring Agreement contemplated that converting the Prospect Note into equity would require DMHC approval (¶111), and expected such approval by November 30, 2023. (¶113). The Restructuring Agreement did *not* contemplate that the Minority Interest Transaction would require DMHC approval. (¶112).

After MPT announced the Restructuring Transactions, investors concluded that the issuance of equity in PHP to MPT was a done deal. (¶¶111-19). For example, on May 25, 2023, the Motley Fool website published an article entitled "***With a Major Tenant Issue Addressed***, *Is Medical Properties Trust's Ultra-High-Yielding Dividend Finally Safe?*," observing that the Restructuring Transactions were "a ***big shift*** in [MPT's] relationship with Prospect," exchanging "rental income from hospital real estate for upside potential in the managed-care business," the value of which will grow, and enable MPT to sell "***its equity interests*** at a profit." (¶17). Likewise, in another article entitled "*Medical Properties Trust Got A Base Hit*," an investor wrote that "***it does appear that MPT management can now put the Prospect issues in the 'resolved' column***." (*Id.*).

---

[2] Prospect filed for bankruptcy in January 2025. (Ex. F). In a filing, MPT indicated that conversion of the Prospect Note would have increased MPT's PHP stake to approximately 83%. (Ex. G).

**B.    The DMHC Unexpectedly Issues the July 2023 DMHC Order Putting the Minority Interest Transaction On Hold**

The Restructuring Agreement obligated Prospect to keep the "MPT Parties" (defined as the "undersigned," i.e., Hamner) apprised of the regulatory approval process. (¶111; Dkt. 28-1 at 1, 17 (§4.1(c)). Thus, Defendants would have learned that the issuance of a minority equity interest in PHP to MPT was *not* a done deal when, in June 2023, the DMHC unexpectedly required that the Minority Interest Transaction proceed as a "notice of material modification" ("NMM") requiring approval under California law. (¶126).

On June 23, 2023, Prospect filed the June 2023 NMM seeking approval of the Minority Interest Transaction. (*Id.*; Dkt. 31-3). The June 2023 NMM disclosed that the Minority Interest Transaction granted certain "*blocking rights* [to MPT] with respect to certain major decisions of [PHP]" (i.e., under the LLC Agreement; ¶109), and conceded that "MPT was not previously included in PHP's chain of ownership and the Minority Interest Transaction was not an internal restructuring." (¶127; Dkt. 31-3; *see also* Ex. A (LLC Agreement)).

On July 20, 2023, the DMHC issued the July 2023 DMHC Order (i) finding that the Minority Interest Transaction "does not demonstrate compliance" with California law, and (ii) postponing the effectiveness and prohibiting the implementation of the Minority Interest Transaction pending review. (¶129). Accompanying that order was a comment table seeking, *inter alia*, detailed information concerning MPT's blocking rights. (¶130; Dkt. 28-3 at 7-8 of 9 (#22, #24)). As Prospect explained in comments submitted in September 2023, the blocking rights were granted under the LLC Agreement and intended "to protect [MPT's] investment" by requiring MPT's written consent to any "Major Decision" of PHP. (¶162; Ex. B at 14 (#22); Ex. A §6.1(c), §14.1 (defining "Major Decision")).

The unexpected regulatory setbacks above were material because if the DMHC nixed the Minority Interest Transaction, it would bar conversion of the Prospect Note for the same reasons. MPT would then be left without *any* equity in PHP, thereby negating the premise of the Restructuring Transactions (i.e., swapping debt for equity). In particular, the absence of any equity interest in PHP would preclude MPT from exercising any blocking rights under the LLC Agreement (which assumed that equity in PHP had been issued to MPT). (¶¶108-09; Dkt. 28-1 §3.2(a)(i-ii); Ex. A at 1-2 (Recital.G)). As noted, those rights were designed to protect MPT's investment in PHP, and thus were material to MPT.

### C.     Defendants Conceal the July 2023 DMHC Order From Investors

Despite the materiality of the July 2023 DMHC Order, Defendants failed to disclose it to investors. That nondisclosure rendered multiple statements by Defendants materially misleading, i.e., statements in a press release issued on August 8, 2023, during a conference call on August 8, 2023, and in a Form 10-Q filed on August 9, 2023 (collectively, "August 2023 Statements"). (¶¶206-12; Ex. C). Specifically, the August 2023 Statements repeatedly confirmed MPT's receipt of equity in PHP—including the recognition of a $68 million gain from that equity—without disclosing that the July 2023 DMHC Order, and resulting inquiry into MPT's blocking rights, put the issuance of that equity at major risk.

Moreover, recognizing the $68 million gain from the receipt of equity as revenue violated GAAP because that gain was subject to a "contingency," i.e., the DMHC's review of the Minority Interest Transaction issuing that equity. (¶¶76-81, 213-20). Relevant to scienter, Aldag and Hamner benefited from this GAAP violation because recognizing the $68 million gain in Q2 2023 (and another $13 million gain in Q3 2023 while the DMHC review remained pending; ¶¶171-78) materially boosted their annual cash bonuses and equity awards. (¶¶183-93).

### D.    MPT Investors Suffer Losses After the *WSJ* Reveals the July 2023 DMHC Order

On August 18, 2023, based on non-public documents secured from the DMHC, the *WSJ* disclosed the July 2023 DMHC Order, and questioned recognition of the $68 million "gain" from equity as revenue. (¶150). MPT's stock price initially dropped 15%, until trading was halted, and MPT sought to staunch the losses with a false and misleading response. (¶¶151-57). But investors were rightly skeptical of that response, and MPT's market cap ultimately declined by approximately $341 million, or 7.6%. (¶158). As a Wells Fargo analyst presciently observed—and investors plainly appreciated—"regulatory snags have a tendency to drag on." (¶160).

### E.    The DMHC Approves the Minority Interest Transaction Only After MPT Consents to Onerous Restrictions

Defendants contend that, in the months after the *WSJ* article, the DMHC "*blessed*" the Minority Interest Transaction "*without incident, just as MPT expected*" (DB at 15), and "there was *never any meaningful risk* that the [Minority Interest Transaction] would be unwound." (DB at 2). That characterization grossly misrepresents what transpired. As noted, MPT expected that the Minority Interest Transaction would *not* require DMHC approval. But that expectation was dashed in June 2023 when the DMHC required approval of the Minority Interest Transaction, and on July 20, 2023, when the DMHC issued the July 2023 DMHC Order.

Thereafter, starting in September 2023, the DMHC and Prospect engaged in months of back-and-forth correspondence concerning MPT's blocking rights with MPT making increasingly onerous concessions to secure approval of the Minority Interest Transaction. (¶¶162-70). Initially, MPT sought to reassure the DMHC about the blocking rights. (¶164). Subsequently, to avoid further "undue expense and burden on the parties" from the delay in approving the Minority Interest Transaction, MPT abandoned conversion of the Prospect Note into equity. (¶¶165-67). Finally, to further placate the DMHC, MPT agreed to numerous restrictions in the April 2024

Undertakings signed by Hamner, including with respect to blocking rights and equity issuances. (¶¶168-69; Dkt. 28-4 at 5-7 of 14).

Had MPT not agreed to those restrictions, the monthslong correspondence referenced above makes clear that the DMHC would have "disapproved" the Minority Interest Transaction, as it was empowered to do under Cal. Health & Safety Code §1399.65(a)(3), which provides in relevant part: "The health care service plan shall file all the information necessary for the director to make the determination to approve, conditionally approve, ***or disapprove*** the transaction or agreement." (Ex. D). Thus, the DMHC's review posed a major risk to the Minority Interest Transaction.

Defendants never mention the adverse facts above. They also ignore that in the first two quarters after executing the April 2024 Undertakings, MPT reduced the "fair value" of its PHP interest by *$360 million*—or over 50%—from $700 million (as of 12/31/23) to $340 million (as of 6/30/24). (¶¶196-201; Dkt. 31-1 at 14 (2), 66 (*Equity Method Investment—PHP Holdings*)).[3]

In sum, the DMHC plainly did *not* "complete[] its review *without incident*" as "MPT had predicted." (DB at 2).

## LEGAL STANDARDS

On a motion to dismiss, the Court "must accept as true all well-pleaded facts alleged in the complaint," and "draw all reasonable inferences in the plaintiff's favor." *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc*., 545 F. Supp. 3d 120, 134 (S.D.N.Y. 2021) (Broderick, J.). The Court may not draw inferences in defendants' favor. *In re Currency Conversion Fee Antitrust Litig*., 265 F. Supp. 2d 385, 419 (S.D.N.Y. 2003).

---

[3] After Plaintiffs filed the FAC, MPT's SEC filings disclosed a further sharp reduction in the value of its PHP interest to $200 million as of 9/30/24, based on a planned sale of PHP for $200 million. (Ex. H at 22, 35).

Further, at the pleading stage, a court must "look *only* to the allegations on the face of the complaint," with the exception of documents attached to the complaint, incorporated by reference, integral to the pleading, or subject to judicial notice. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). When a court takes judicial notice of public records such as SEC filings, it is "*not* to prove the truth of their contents but *only* to determine what the documents stated." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *accord Donoghue v. Gad*, 2022 WL 3156181, at *5 n.7 (S.D.N.Y. Aug. 8, 2022).

## ARGUMENT

## I.    PLAINTIFFS ADEQUATELY ALLEGE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

Claims under Section 10(b) of the Exchange Act and Rule 10b-5 must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Sjunde*, 545 F. Supp. 3d at 134. Under Rule 9(b) and the PSLRA, plaintiffs must specify, *inter alia*, the statements and omissions that were misleading, and the reasons why they were misleading. *Micholle v. Ophthotech Corp*., 2019 WL 4464802, at *5 (S.D.N.Y. Sept. 17, 2019) (Broderick, J.). Plaintiffs have done so here. (¶¶202-26).

Under Rule 10b-5(b), material omissions are actionable when they render affirmative statements misleading. *Macquarie Infrastructure Corp. v. Moab Partners*, *L. P.*, 601 U.S. 257, 263 (2024). That is, the securities laws forbid "half-truths" where a company makes true statements, but omits "critical qualifying information" concerning the subject matter of the statements. *Id*.

Misrepresentations and omissions are material if there is a "substantial likelihood" that reasonable investors would view disclosure of the truth "as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976). Materiality analyses require "delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts . . . [which] assessments are peculiarly ones for the trier of fact." *Id.* at 450.

Because materiality analyses are "inherently fact-specific," the burden to plead materiality is low (*Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011)), and materiality "will rarely be dispositive" at the pleading stage. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*., 19 F.4th 145, 151 (2d Cir. 2021). Indeed, the Second Circuit has held that alleged misstatements and omissions may *not* be dismissed as immaterial at the pleading stage "unless they are *so obviously unimportant* to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin*, 634 F.3d at 717; *accord Micholle*, 2019 WL 4464802, at *13.

Here, the misleading statements and omissions alleged would not have been "so obviously unimportant" to reasonable MPT investors.

### A.    Defendants' Failure to Disclose the July 2023 DMHC Order Rendered the August 2023 Statements Materially Misleading

When executives make positive public statements about a contract or product, but fail to disclose setbacks that put the contract or product at risk, the nondisclosure renders the statements materially misleading. *See, e.g.*, *In re Hi-Crush Partners L.P. Sec. Litig*., 2013 WL 6233561, at *13-16 (S.D.N.Y. Dec. 2, 2013) (where defendants continued to tout major contract without disclosing legal dispute with counterparty that put contract at risk, omission rendered positive public statements about contract materially misleading); *Sinnathurai v. Novavax, Inc*., 645 F. Supp. 3d 495, 517-20 (D. Md. 2022) (nondisclosure of regulatory setbacks rendered positive public

- 9 -

statements about vaccine materially misleading). That is precisely what occurred here—the August 2023 Statements repeatedly confirmed the issuance of equity in PHP to MPT—including the recognition of gain from that equity—without disclosing that the July 2023 DMHC Order, and resulting inquiry into MPT's blocking rights, put that issuance at major risk. (Facts §C).

Defendants contend that nondisclosure of July 2023 DMHC Order was not a materially misleading omission, but their arguments are unavailing. *First*, Defendants contend that the "mere existence of a governmental inspection, *unaccompanied by a clear indication of an adverse business consequence*, is not material information" (DB at 14). The July 2023 DMHC Order, however, was not a government action without adverse consequence. To the contrary, after finding that a critical transaction with MPT's third largest tenant did not comply with California law, the order postponed the effectiveness and prohibited the implementation of that transaction indefinitely pending further review (including an inquiry into MPT's blocking rights). (¶¶129-32). Indeed, MPT conceded adversity in its correspondence, complaining that "the continuing delays in approving the filings are resulting in *undue expense and burden on the parties*." (¶167).

Unlike here, the alleged nondisclosures in the cases cited by Defendants concerned government action *without* adverse consequences. For example, in *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995), although the defendant disclosed a facility inspection resulting in a suspension, plaintiffs argued that two earlier inspections should have also been disclosed. *Id.* at 51-52. The Second Circuit disagreed, observing that the facility represented only a tiny portion of defendant's business, and "*no materially adverse action was taken by the FDA* as a result of the first two inspections." *Id.* at 52. Likewise, in *In re Open Joint Stock Co. Vimpel-Commc'ns, Sec. Litig.*, 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006), the court held that the defendant was not obligated to disclose an inspection that preceded an adverse tax ruling because the earlier

inspection did not result in any adverse consequences. *Id.* at *5-6. Finally, both *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) and *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 168 (S.D.N.Y. 2023) held that companies need not disclose "uncharged" or "unadjudicated" wrongdoings.

*Second*, Defendants contend that the July 2023 DMHC Order posed no "substantial regulatory risk" because the DMHC erred, and the Minority Interest Transaction did not require approval under California law. (DB at 14-15). But where a company takes the position that "our conduct is lawful" with "knowledge that the Federal Government *was taking the opposite view*," investors have "cause to complain" because the company's position does not align "with the information in [its] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015). Thus, even if the Court were to agree that the DMHC erred, Defendants would still be liable for a materially misleading omission. *See Hi-Crush*, 2013 WL 6233561, at *16 (while court concluded that defendant had correctly believed that it had not breached the contract, "a new fact had come to light: *Baker Hughes disagreed*," and "acted on this belief") (emphasis in original).

*Third*, Defendants argue that the DMHC had no authority to nix the Minority Interest Transaction. (DB at 15). As noted, that is wrong—the relevant statute authorized DMHC to "disapprove" the Minority Interest Transaction. (Facts §E) (citing Cal. Health & Safety Code §1399.65(a)(3)). Defendants contend that the statute addresses "anticompetitive effects" (DB at 15 n.4), but disapproval under Section 1399.65(b) for anticompetitive effects is expressly "*[i]n addition to* any grounds for disapproval" under Section 1399.65(a)(3). *See* Ex. D.

*Fourth*, based on a single unrelated 2022 ruling in the DHMC's database involving a different company, Defendants contend that the DMHC would have never unwound the Minority

Interest Transaction. (DB at 15) (citing Dkt. 31-8). The Court, however, may not consider the database and the 2022 ruling to contradict the allegations in the FAC. *See Hartmann v. Popcornflix.com LLC*, 690 F. Supp. 3d 309, 317 (S.D.N.Y. 2023) (Broderick, J.) (court may not consider "inconsistencies between plaintiff's amended complaint in this action and his pleadings in other related actions"); *see also Micholle*, 2019 WL 4464802, at *11 n.13 (striking exhibits neither integral to complaint nor incorporated therein by reference).

Moreover, Plaintiffs adequately allege that the DMHC would have unwound the Minority Interest Transaction if MPT had not agreed to the restrictions on blocking rights in the April 2024 Undertakings. (Facts §E). In contrast, the 2022 ruling had nothing to do with blocking rights.[4]

*Fifth*, as noted, Defendants' contention that "the Minority Interest Transaction *was blessed without incident, just as MPT expected*" (DB at 15) misrepresents what transpired. (Facts §E).

*Sixth*, Defendants claim that the July 2023 DMHC Order was immaterial because even if the DMHC had nixed the Minority Interest Transaction, the Fallback Provision would have preserved the economic value of the Prospect Note. (DB at 15). Defendants ignore, however, that notwithstanding the Fallback Provision, disapproval of the Minority Interest Transaction would have still deprived MPT of *any* equity interest in PHP, and thereby precluded MPT from exercising blocking rights, which were material to MPT to protect its investment. (Facts §B). Indeed, the Fallback Provision did not purport to address disapproval of the Minority Interest Transaction. (¶113). Moreover, as a practical matter, the Fallback Provision did *not* preserve the economic value of the PHP interest. To the contrary, as noted, in the three quarters after executing the April 2024

---

[4] A January 2025 Senate report on past mismanagement of Prospect sheds light on why the DMHC insisted on the April 2024 Undertakings before approving the Minority Interest Transaction. *See* https://www.budget.senate.gov/ranking-member/newsroom/press/private-equity-in-health-care-shown-to-harm-patients-degrade-care-and-drive-hospital-closures.

Undertakings, MPT massively reduced the value of its PHP interest by $500 million from $700 million (as of 12/31/23) to $200 million (as of 9/30/24). (¶¶196-201; *supra* note 3).

*Seventh*, Defendants argue that disapproval of the Minority Interest Transaction would have had only an immaterial impact on a percentage basis. (DB at 15-16). Defendants' exclusive focus on percentages, however, misreads the Second Circuit's decision in *ECA*. (DB at 16). While *ECA* holds that quantitative comparisons are a "*good starting place*," it concludes that "*both quantitative and qualitative factors must be considered in determining materiality.*" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 204 (2d Cir. 2009); *see also Litwin*, 634 F.3d at 717 (same); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162-63 (2d Cir. 2000) ("*we have consistently rejected* a formulaic approach to assessing the materiality of an alleged misrepresentation," and instead adopted the SEC's position in Staff Accounting Bulletin ("SAB") No. 99 that "qualitative factors may cause misstatements of quantitatively small amounts to be material.").

The Second Circuit has endorsed a non-exhaustive list of qualitative factors in SAB No. 99 relevant to materiality. *Ganino*, 228 F.3d at 163. These factors include:

- Whether the misstatement concerns a business segment that plays a significant role in the company's operations.
- Whether the misstatement masks a change in earnings or other trends.
- Whether the misstatement hides a failure to meet analysts' expectations.
- Whether the misstatement has the effect of increasing management's compensation—*for example, by satisfying requirements for the award of bonuses or other incentive compensation*.

SAB No. 99, 1999 WL 625156.

Here, the misleading omissions were material both quantitatively *and* qualitatively. Quantitatively, Defendants seek to prove immateriality by comparing the $75 million minority equity interest to the $1.6 billion value of MPT's Prospect-related assets. (DB at 15). But "items

in issue should be compared to *like items* on the corporate financial statement." *Ganino*, 228 F.3d at 165; *accord In re Ply Gem Holdings, Inc*., *Sec. Litig*., 2016 WL 5339541, at *4 (S.D.N.Y. Sept. 23, 2016) (requiring like-for-like comparison).

Here, the only valid apples-to-apples comparison is calculating the $75 million minority equity interest as a percentage of the total $655 million PHP interest, which is 11.4% (Defendants concede 10.4%; DB at 15). That is more than double the 5% threshold deemed material under SAB No. 99. *Litwin*, 634 F.3d at 717. In contrast, comparing $75 million to $1.6 billion is *not* a valid apples-to-apples comparison because the $1.6 billion includes *other* Prospect-related assets recorded separately from the $655 million PHP interest: (i) MPT's investment in Prospect's California facilities (which were unaffected by the Restructuring Transactions, and valued at $513 million as of 5/23/23), and (ii) $355 million in cash proceeds anticipated from the sale of Prospect's Connecticut facility over and above the $103 million PHP interest generated thereby. *See* ¶138 ($655 million interest is "*in addition to* our roughly $515 million of leased California hospitals and $355 million of cash" anticipated from Connecticut Hospital sale); Dkt. 31-5 at 21(1) (reporting $1.045 billion investment in Prospect as of 6/30/23, separately from $655 million PHP interest, which is reported under "Other assets").

But even if Defendants could show lack of materiality *quantitatively*, relevant *qualitative* factors establish materiality. As noted, disapproval of the Minority Interest Transaction would have precluded MPT from exercising any blocking rights, which were material to MPT. Further, the materiality of the misleading omissions here is supported by the list of qualitative factors from SAB No. 99 cited above. Specifically, the misleading omissions (and the GAAP violations; *see* Argument §I.B):

(i) concerned a segment of MPT's business (i.e., Prospect) identified by SEC filings, analysts, investors, and Defendants as significant to MPT's operations (¶¶94-98, 105, 120);

(ii) enabled MPT to recognize the $68 million gain as revenue, and thereby report an extra $0.11 in income per share (¶134) that allowed MPT to both mask a larger loss (*id.*), and beat analyst estimates for NFFO in Q2 2023 (¶140), and for 2023 (¶182); and

(iii) increased management's compensation by meeting thresholds for annual cash bonuses and equity compensation. (¶¶183-93).

*See Litwin*, 634 F.3d at 718-22 (alleged omissions were qualitatively material because they related to significant aspects of defendants' business, and masked changes in earnings or other trends); *Ganino*, 228 F.3d at 166 (qualitative factors demonstrated materiality because misstatements allowed defendants to manage income, and conceal failure to meet analyst expectations).

## B.    The August 2023 Statements Were Materially False and Misleading Because They Violated GAAP

Plaintiffs allege multiple GAAP-based misstatements. (¶¶213, 216, 218-19; Ex. C). Those filed with the SEC (¶¶213, 218-19) are *presumed* to be misleading. (¶72 (citing SEC regulation); *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018) (financial statements filed with SEC not prepared in accordance with GAAP "**will be presumed to be misleading or inaccurate**.").

Defendants contend that the GAAP-based misstatements are "quintessential opinion statements." (DB at 17). But under the Second Circuit's most recent analysis of opinion statements—*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28 (2d Cir. 2023)—the GAAP-based misstatements here are actionable. Indeed, like here, the accounting misstatements in *DeCarlo* concerned ASC 450. 122 F.4th at 45-46; *see* ¶¶76-78, 214, 217, 220.

In *DeCarlo*, plaintiffs alleged misstatements based on defendants' accounting for employee bonuses. *Id.* at 40. The lower court held that those statements were inactionable opinions. *Id.* The Second Circuit disagreed, holding that accounting choices constitute an

inactionable "exercise of subjective judgment" *only* where "reasonable alternative views exist" (*id.* at 41), and there was no alternative view supporting defendants' accounting treatment. Instead, under ASC 450, defendants' method of recognizing bonus expenses "**was objectively improper rather than an exercise of subjective judgment**." *Id.* at 46. The fact that defendants misinterpreted certain ASC provisions did not convert their accounting choices into inactionable opinions. *Id.*

Here, Defendants do not identify any relevant ASC provisions justifying recognition of the $68 million gain as revenue. (DB at 17); *see DeCarlo*, 122 F.4th at 46 ("We are not aware of any GAAP provision on which [defendant] relied that suggests otherwise."). To the contrary, Defendants had no basis under ASC 450-30-25-1 and ASC 855-10-25-1 to recognize the $68 million gain as revenue given the "contingency" created when the DMHC subjected the Minority Interest Transaction to approval in June 2023, and then issued the July 2023 DMHC Order, which qualified as a Type 1 subsequent event that provided additional evidence of regulatory risk. (¶¶77-81, 214, 217, 220). Thus, the GAAP-based misstatements are actionable under *DeCarlo*.

None of Defendants' other arguments are availing. *First*, Defendants contend that there was "no contingency" here (and hence ASC 450-30-25-1 did not apply) because the Minority Interest Transaction "*did not require prior DMHC approval*," and "*the subsequent review by the DMHC created no meaningful risk that the transaction would be unwound*." (DB at 17). As noted in Argument §I.A (*Second*), however, *Omnicare* forecloses the argument that the DMHC erred. Moreover, the DMHC review created a major risk that the Minority Interest Transaction would be unwound. As noted, the Restructuring Agreement did not contemplate that the Minority Interest Transaction required DMHC approval. Thus, in June 2023, when the DMHC unexpectedly required approval of the Minority Interest Transaction (¶126), a meaningful risk was created that the DMHC might not grant such approval. (¶132). That regulatory risk was substantially

heightened on July 20, 2023, when the DMHC issued the July 2023 DMHC Order postponing the effectiveness and barring the implementation of the Minority Interest Transaction. (¶129). As a Wells Fargo analyst observed after reading the *WSJ* article, "regulatory snags have a tendency to drag on" (¶160)—which is precisely what occurred here. (¶¶162-70). The market's negative price reaction to the *WSJ* article (¶¶151, 158) confirms investors' appreciation of that risk. *See Ganino*, 228 F.3d at 166-67 (market price reaction relevant to materiality analysis); *Ply Gem*, 2016 WL 5339541, at *4 (stock price decline after disclosure of omissions strengthens qualitative case for materiality).

In particular, the July 2023 DMHC Order was accompanied by a comment table seeking, *inter alia*, detailed information about MPT's blocking rights (¶130; Dkt. 28-3 at 7-8 of 9 (#22, #24)), thus increasing the risk that the DMHC would unwind the Minority Interest Transaction absent concessions from MPT addressing those rights. Indeed, based on the monthslong correspondence between the DMHC and Prospect concerning the blocking rights, the DMHC plainly would have nixed the Minority Interest Transaction if MPT had refused to agree to the restrictions on such rights in the April 2024 Undertakings. (¶¶162-70). As it is, the regulatory review caused MPT to abandon conversion of the Prospect Note. (¶¶165-68).

*Second*, Defendants argue that MPT did not restate its financials. (DB at 17). As noted, however, MPT reduced the value of its PHP interest by *over 50%* from $700 million (as of 12/31/23; Dkt. 31-1 at 14(2), 66) to $340 million (as of 6/30/24; ¶199) in the two quarters after MPT consented to the restrictions in the April 2024 Undertakings (¶¶196-201), and then down to $200 million in Q3 2024 (*supra* note 3). While not formally designated "restatements," these successive reductions in the value of the PHP interest over a span of just nine months represented massive corrections.

*Third*, Defendants argue that "any conceivable risk was immaterial" because (in their view) only $7 million of the Q2 2023 Prospect Gain is attributable to the minority equity interest. (DB at 16-17). But under a quantitative analysis, it is improper to allocate only $7 million of the $68 million gain to the minority equity interest. That is because while the $68 million gain resulted from an increase in the value of MPT's total PHP interest (i.e., from $573 million to $655 million), the entire $68 million gain was attributed to "*the receipt of equity in PHP*" (¶207), and as of August 2023, the minority equity interest in PHP was the *only* equity that had been issued to MPT (since the Prospect Note remained unconverted; ¶¶165-68). In turn, the $68 million gain constituted approximately 20% of the $337.4 million in revenue in Q2 2023 (Dkt. 31-5 at 4), or *four times* the 5% materiality threshold under SAB No. 99. Further, there is no basis to compare the $68 million *quarterly* gain to the $872 million *annual* revenue. (DB at 16-17). *See Ganino*, 228 F.3d at 165-66 (relevant timeframe required comparison of fees that were subject of misstatement to quarterly, not annual, results). In any event, $68 million is approximately 7.8% of $872 million, which exceeds the 5% threshold.

In sum, Defendants manipulate the quantitative analysis by depressing the numerator to $7 million, and inflating the denominator to $872 million. But even if the quantitative analysis supported Defendants, the *qualitative* factors identified in Argument §I.A (*Seventh*) indicate that improper recognition of the $68 million gain was material.

*Fourth*, Defendants cite the PwC report opining that MPT's financial statements conform with GAAP. (DB at 17). The PwC report, however, may not be considered for the truth of its contents. *See* Legal Standards, *supra*. Moreover, the fact that MPT's accounting "drew no objection from its auditors" does not change the analysis since the claims here do not concern

"what the non-party auditors may have known or believed that caused them to approve the financial statements as [complying] with GAAP." *Chicago Bridge*, 2018 WL 2382600, at *7.

## II.    <u>PLAINTIFFS ADEQUATELY ALLEGE SCIENTER</u>

To adequately allege scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." *Micholle*, 2019 WL 4464802, at *13. The inquiry "is whether all of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* That is, the "court's job" is "to assess *all* the allegations *holistically*," and ask: "[w]hen the allegations are accepted as true and taken *collectively*, would a reasonable person deem the inference of scienter *at least as strong* as any opposing inference?" *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 326 (2007). Notably, however, the inference that defendants acted with scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Micholle*, 2019 WL 4464802, at *15.

To establish a strong inference of scienter, plaintiffs "must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc*., 732 F. Supp. 3d 300, 317 (S.D.N.Y. 2024). When both factors are present, a court must "assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig*., 20 F.4th 131, 137–38 (2d Cir. 2021) (emphasis in original); *accord Dentsply*, 732 F. Supp. 3d at 317.

Here, when assessed holistically, the scienter allegations establish a strong inference of scienter with respect to Aldag and Hamner "at least as strong as any opposing inference." And because Plaintiffs adequately allege scienter as to Aldag and Hamner, MPT's scienter is also inferred. *Chicago Bridge*, 2018 WL 2382600, at *10.

### A. Plaintiffs Adequately Allege Motive and Opportunity to Commit Fraud

Since "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer," courts must weigh motive allegations. *Dentsply*, 732 F. Supp. 3d at 317. To adequately plead motive, plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. Plaintiffs may do so by showing a "*direct link* between [a] compensation package and the fraudulent statements because of the magnitude of the compensation and the defendants' motive to sweep problems under the rug." *Id.* at 201; *accord Dentsply*, 732 F. Supp. 3d at 318.

Here, Plaintiffs allege a direct link because "sweeping" the "contingency" (*i.e.*, DMHC review) "under the rug" enabled MPT to (i) record a $68 million gain in Q2 2023, and (ii) together with the $13 million gain recorded in Q3 2023 (even though the DMHC review remained pending), meet the thresholds for NFFO and EBITDA to maximize the annual cash bonuses and equity awards of Aldag and Hamner. (¶¶183-93). By meeting the "Maximum" NFFO threshold of $1.59 per share—instead of falling *$0.01 per share* below the "Target" NFFO threshold of $1.46 per share—Aldag and Hamner boosted their annual cash bonuses by $1 million, and $422,000, respectively. (¶¶187-90); *see Dentsply*, 732 F. Supp.3d at 318 ("[T]he alleged fraud was critical—*the company just barely hit the thresholds necessary for bonuses*").

Additionally, by meeting the "Maximum" threshold for the EBITDA/Interest Expense ratio, Aldag and Hamner further boosted their (i) annual cash bonuses by hundreds of thousands of dollars, and (ii) performance-based equity awards by millions of dollars (the precise boost being impossible to calculate because MPT does not disclose EBITDA). (¶¶191-93 & n.17).

Citing *ECA*, Defendants argue that Plaintiffs do not adequately allege motive because they do not allege suspicious stock sales. (DB at 18-19). But as shown, under *ECA* and *Dentsply*, a plaintiff can allege motive by pleading a direct link between fraudulent statements and increased

compensation, as Plaintiffs do here. The decisions cited by Defendant (DB at 19-20) are inapt because they concerned allegations that defendants committed fraud to increase their compensation *via higher stock prices. See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (rejecting as insufficient motive allegations "that the officers were motivated to *inflate the value of stock* to increase their executive compensation"). In particular, when making the statement quoted by Defendants that "an allegation that defendants were motivated by a desire to maintain or increase their compensation is insufficient" (DB at 19), *Kalnit* cited *Acito* (*see* 264 F.3d at 140), and *Acito* concerned an "allegation that defendants were motivated to defraud the public because *an inflated stock price* would increase their compensation." *Acito*, 47 F.3d at 54.

The distinction between this case, and cases like *Kalnit* and *Acito*, is simple. Committing fraud to increase compensation via higher stock prices relies on an *indirect* mechanism because stock prices are affected by a "tangle of factors." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). In contrast, the mechanism here was *direct*—the fraud enabled Aldag and Hamner to increase specific metrics (*i.e.*, NFFO and EBITDA) to meet defined thresholds that directly maximized their compensation. That easily manipulated mechanism has nothing to do with stock price.

Defendants deride the motive allegations as illogical, but again rely on an improper comparison; in this case, between cash and equity compensation. (DB at 20). Instead, the apples-to-apples comparison is cash-to-cash—boosting NFFO *alone* enabled (i) Aldag to increase his annual *cash* bonus by $1 million (equal to his entire annual base *cash* salary, and 35.7% of his total annual *cash* bonus in 2023 of $2.8 million), and (ii) Hamner to increase his annual *cash* bonus by $422,000 (equal to 62.5% of his entire base *cash* salary, and 28.7% of his total annual *cash*

bonus in 2023 of $1,417,500). (¶190). Those percentages far exceed the 5% threshold for materiality under SAB No. 99, *supra*.

In contrast to cash, equity is illiquid—Aldag and Hamner could not have liquidated all of their stock for $35 million in the short period before the *WSJ* article was published, as Defendants imply. (DB at 20); *see In re Mindbody, Inc*., *S'holders Litig*., 2020 WL 5870084, at *3 (Del. Ch. Oct. 2, 2020) (CEO's wealth was tied up in company's stock, which he was unable to liquidate on the market, except under a 10b5-1 plan, which he analogized to "sucking through a very small straw."). Likewise, MPT's equity awards are subject to vesting periods and performance over time. (Dkt. 31-11 at 31-32). Thus, the comparison between cash and equity compensation is invalid.

Moreover, boosting EBITDA increased the *equity* compensation of Aldag and Hamner by millions of dollars. (¶193). Defendants attack this contention by misreading footnote 17 in the FAC (DB at 20), which does not retreat from the allegation that boosting EBITDA substantially increased Defendants' compensation, but simply observes that the precise amount of the increase is impossible to determine because—in a stunning lack of transparency—MPT fails to disclose EBITDA anywhere in its SEC filings. That detail can be obtained through discovery, and does not undermine the above allegations.

Finally, reverting to an earlier flawed calculation, Defendants argue that since the minority equity interest equaled only 10.4% of MPT's total PHP interest, only 10.4% of the $82 million gain was illegitimate. (DB at 21). Defendants ignore, however, that the gain on the equity interest in PHP in 2023 was attributable *entirely* to the minority equity interest because the Prospect Note remained unconverted. (Argument §I.B). Accordingly, *none* of the $82 million gain was properly recognized as revenue under GAAP so long as a regulatory contingency threatened the Minority Interest Transaction.

**B.    Plaintiffs Adequately Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Since Plaintiffs adequately allege motive with respect to Aldag and Hamner, the circumstantial evidence of their scienter need *not* be "correspondingly greater." *Dentsply*, 732 F. Supp.2d at 317. Nevertheless, the circumstantial evidence of scienter here is exceedingly strong because Plaintiffs adequately allege that Aldag and Hamner "knew facts or had access to information suggesting that their public statements were not accurate," and/or "failed to check information they had a duty to monitor." *Sjunde*, 545 F. Supp. 3d at 142.

Here, both Aldag and Hamner made detailed public statements concerning (i) MPT's plans to acquire and monetize an equity interest in PHP (¶¶95-96, 98, 100, 137); and (ii) MPT's accounting for its Prospect-related assets (¶¶95-96, 101), including the justification for recognizing the $68 million gain in Q2 2023. (¶¶138-39). The specificity of those statements "is strong circumstantial evidence" that both Aldag and Hamner had access to "specific information" about the foregoing topics. *Dentsply*, 732 F. Supp.3d at 319; *see also Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (communicating with public about topic "demonstrates defendants' sensitivity to it.").

Thus, it is not credible that Aldag and Hamner were unaware of the DMHC's scrutiny. That inference is particularly strong with respect to Hamner who signed both the LLC Agreement granting the blocking rights (Ex. A at third signature page), and the Restructuring Agreement. (¶107; Dkt. 28-1 at 24-25 of 47). As noted, the Restructuring Agreement obligated Prospect to keep Hamner informed of the regulatory approval process. (Facts §B). That Hamner remained so informed is evidenced by his signing the April 2024 Undertakings consenting to the restrictions necessary to secure approval of the Minority Interest Transaction. (¶169; Dkt. 28-4 at 13 of 14). *See In re Lottery.com, Inc. Sec. Litig.*, 2025 WL 605485, at *26 (S.D.N.Y. Feb. 25, 2025) (scienter

adequately alleged with respect to CFO who signed document underlying relevant transaction). And given the joint presentations by Aldag and Hamner on multiple conference calls concerning the Restructuring Transactions, there is no question that Hamner would have kept his fellow C-suite colleague, Aldag, informed about any regulatory developments affecting those transactions. *See Moshell v. Sasol Ltd*., 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) (vice president would have passed information to senior executives).

Thus, the most compelling inference is that Aldag and Hamner "consciously chose to withhold information" about the DMHC's review from investors "in the hopes that [it] would be quickly resolved and that investors would be none the wiser." *Hi-Crush*, 2013 WL 6233561, at *25. Alternatively, Aldag and Hamner were reckless if they did not know about the DMHC's review after professing on conference calls to have detailed personal knowledge about implementation of the Restructuring Transactions (and with respect to Hamner, after having signed the Restructuring Agreement obligating Prospect to keep him informed). *Dentsply*, 732 F. Supp.3d at 319.

Nor is it credible that Aldag and Hamner were unaware of the GAAP violations given the large number of "red flags" surrounding MPT's accounting. *See Sjunde*, 545 F. Supp.3d at 142-45 (red flags supported scienter); *In re Cabletron Sys., Inc*., 311 F.3d 11, 39 (1st Cir. 2002) (accounting shenanigans in the form of GAAP violations demonstrate scienter).

Once again, the inference of scienter is particularly strong with respect to Hamner, as CFO. *See Lottery.com*, 2025 WL 605485, at *26 ("one can reasonably infer" that CFO should have recognized accounting irregularity). In particular, on an April 2023 call, Hamner explained that MPT was "*recognizing* [P]rospect rental income *only as cash is received*." (¶101). This was consistent with MPT's 2022 Form 10-K, which stated that MPT would "record rent on our

Prospect leases on a *cash only basis* for the foreseeable future." (¶93). Yet, in August 2023, MPT inconsistently recognized as revenue "the receipt of equity in PHP *in lieu of cash*" for rent due in Q2 2023. (¶¶134-36). Contrary to his prior representation that only cash receipts from Prospect would be recognized as revenue, Hamner explained that MPT recognized $68 million in Prospect rent and interest in Q2 2023 that "*would have been collected* in 2023." (¶138). Analysts reacted derisively to this shenanigan with Hedgeye bluntly denigrating the $68 million gain as "Bullsh*t PHP Equity Booked as Rent," and Wells Fargo questioning "how the $68m of PHP equity made it into [MPT's] revenue line." (¶¶140-41).

Further, MPT's inclusion of the $68 million gain in NFFO for 2023 violated MPT's internal accounting policy, which excluded from NFFO gains (like the $68 million) deriving from "*non-core* events or activities" (like the Restructuring Transactions) to avoid making comparison to "prior period results and market expectations less meaningful to investors and analysts." (¶¶82, 221-22).

Additionally, the failure to publicly disclose the Restructuring Agreement as required by SEC regulations (¶¶86-87, 118-19, 144, 235), evidences a conscious intent by Defendants to conceal that agreement from investors in order to cover up accounting shenanigans. As Hedgeye determined after securing a copy of the Restructuring Agreement from the DMHC, the past due rent reported in Exhibit A of the Restructuring Agreement (Dkt. 28-1 at 47 of 47), and in MPT's SEC filings, were irreconcilable. (¶14 n.2; Ex. E at 5, 12-15). Hedgeye concluded that MPT's accounting shenanigans rendered it "un-investible." (Ex. E at 15).

Finally, Senators Warren and Markey accused MPT of running a "Ponzi scheme" in connection with accounting for its largest tenant (Steward). (¶40 n.7).

Given all of the foregoing allegations, the opposing inference advanced by Defendants that "Aldag and Hamner reasonably believed that the DMHC review was highly unlikely to lead to any adverse business consequence and that MPT's accounting was fully GAAP compliant" (DB at 23) is not compelling. At a minimum, weighing the total circumstantial and motive allegations here together (¶¶230-35)—as the Second Circuit requires (*see Hain*, 20 F.4th at 137–38; *Dentsply*, 732 F. Supp. 3d at 317)—the inference advanced by Plaintiffs is "at least as strong" (*Tellabs*, 551 U.S. at 326), particularly with respect to Hamner. *See Lottery.com*, 2025 WL 605485, at *26 (defendant's role as CFO, his signing note underlying significant transaction important to company's operations, and accounting irregularities, collectively supported inference of scienter).

None of the bulleted points at page 23 of Defendants' brief support an opposing inference:

- The first bullet ignores that Section 1399.65(a)(3) of the California statute empowered the DMHC to "disapprove" the Minority Interest Transaction. (Facts §E; Ex. D).

- The second bullet regurgitates the flawed argument that the DMHC erred, which fails under *Omnicare*. (Argument §I.A, *Second*).

- The third bullet ignores correspondence indicating that the DMHC would have "disapproved" the Minority Interest Transaction if MPT had not agreed to the restrictions in the April 2024 Undertakings. (Facts §E).

- The fourth bullet references the irrelevant 2022 DMHC ruling. (Argument §I.A, *Fourth*).

- The fifth bullet ignores the qualitative factors supporting materiality, and makes a flawed quantitative calculation that is not apples-to-apples. (Argument §I.A, *Seventh*).

- The sixth bullet ignores all of MPT's accounting "red flags," as specified above, including that a "contingency" (i.e., DMHC review) rendered it improper under GAAP to record the Q2 and Q3 "gains" from equity as revenue. (¶¶76-81, 213-20).

- The seventh bullet cites the PwC opinion, which cannot be considered for its truth (Legal Standards, *supra*), and is irrelevant since there is no claim against PwC; *see Chicago Bridge*, *supra*.

The auditor-related cases cited by Defendants are distinguishable. (DB at 23-24). Most significantly, as noted, while MPT did not formally restate its financials, it massively corrected the value of its PHP interest from $700 million to $200 million during the first three quarters after signing the April 2024 Undertakings. (¶¶196-201; *supra* note 3).

Further, in *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, PLC, 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013), *aff'd*, 783 F.3d 383 (2d Cir. 2015), plaintiffs did not allege that defendants were "receiving numbers that *differed* from those they reported to the market," or "received any pertinent report" when they made their misstatements. *Id.* at *7. In contrast, Plaintiffs here plausibly allege that Defendants were aware (or reckless in not being aware) of the July 2023 DMHC Order, which was not reported to the market.

In *Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015), the plaintiffs failed to allege how defendants violated their "internal accounting policy." *Id.* at 838. Further, the company had publicly corresponded with the SEC concerning its accounting. *Id.* Here, Plaintiffs allege how MPT violated its internal accounting policy. (¶¶221-22). Additionally, the SEC never corresponded with MPT concerning the accounting misstatements alleged here.

Finally, in *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007), plaintiffs failed to alleged GAAP violations with particularity. *Id.* at 1157. Here, Plaintiffs allege GAAP violations with particularity. (¶¶74-81, 213-20).

Defendants are also mistaken about the viability of the "core operations" doctrine. (DB at 22). "Core operations" allegations may "constitute a supplementary . . . means to plead scienter." *Cheng v. Canada Goose Holdings Inc.*, 2021 WL 3077469, at *10 (S.D.N.Y. July 19, 2021) (Broderick, J.). Here, as shown, SEC filings, analysts, investors, and Defendants, identified Prospect as significant to MPT's operations. (¶¶94-98, 105, 120).

III.    <u>**PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION**</u>

Plaintiffs may plead loss causation by alleging "the market reacted negatively to a corrective disclosure of the fraud." *Sjunde*, 545 F. Supp. 3d at 146. "[T]he pleading rules for loss causation were not meant to impose a great burden upon a plaintiff," and thus plaintiffs need only plead a "short and plain statement pursuant to Fed. R. Civ. P. 8(a)(2)" that "provides defendants with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* In *Sjunde*, the Court held that a *WSJ* article revealing previously undisclosed "red flags," thereby causing a 3.9% price decline, constituted a corrective disclosure establishing loss causation. *Id.* at 147.

Here, based on non-public documents secured from the DMHC, the *WSJ* article revealed previously undisclosed facts concerning the DMHC's review, and the questionable recognition of the $68 million gain as revenue; in reaction, MPT's stock price declined 7.6%, and investors suffered losses. (¶¶150-51, 228-29). Under *Sjunde*, these facts adequately allege loss causation at the pleading stage.

Defendants' primary authority—*In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (DB at 24-25)—is distinguishable since it was decided at summary judgment where the burden is higher (*id.* at 550-51), and multiple analysts noted that the *WSJ* article there "disclosed nothing new." *Id.* at 553. In affirming, the Second Circuit also observed that the alleged disclosure concerned "already-public information." 597 F.3d at 513; *see also Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (article "based solely on public information").

Here, in contrast, the *WSJ* disclosed the July 2023 DMHC Order, which was previously non-public. (*See, e.g.*, Dkt. 31-9 at 1 (DMHC's "hold" was "*not* disclosed on [MPT's] 2Q earnings call in August.")). The "shoot first and, ask questions later mentality" referenced in J.P. Morgan's

report (DB at 25) referred to the fact that MPT had lost credibility with investors, not that investors

acted too rashly in selling after learning of the DMHC's scrutiny.

## IV.   <u>PLAINTIFFS ADEQUATELY ALLEGE A SECTION 20(A) CLAIM</u>

Since Plaintiffs adequately plead a 10b-5 claim, the Section 20(a) claim survives.

<u>CONCLUSION</u>

The Court should deny the Motion. Alternatively, if the Court grants the Motion,

Plaintiffs request leave to amend, which should be freely granted. Fed. R. Civ. P. 15(a)(2).

Dated:  March 17, 2025                 Respectfully submitted,

                                         **POMERANTZ LLP**
*/s/ Jonathan D. Park*
Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

*Lead Counsel for the Proposed Class*

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Additional Counsel for the Proposed Class*

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)

Pursuant to Local Civil Rule 7.1(c) of United States District Court for the Southern District of New York, relying on the word count of the word-processing program used to prepare the foregoing Memorandum of Law, dated March 17, 2025, I hereby certify that the Memorandum of Law contains 8,741 words (excluding the caption, table of contents, table of authorities, signature blocks, and certifications), and thus does not exceed Local Rule 7.1(c)'s 8,750 word-count limitation.

*/s/ Jonathan D. Park*
Jonathan D. Park

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will give notice of such filing to all counsel of record.

/s/ Jonathan D. Park
Jonathan D. Park